MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: SARAH S. NORMAND (SN-2834)
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: 212.637.2709
Fax: 212.637.2702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────────────────
                                        )
ASSOCIATED PRESS,                       )
                                        )
                                        )      06 Civ. 1939 (JSR)
         Plaintiff,                     )      **ECF Case**
                                        )
         v.                             )
                                        )      DECLARATION OF
DEPARTMENT OF DEFENSE,                  )      RICHARD B. JACKSON
     et.al.,                            )
                                        )
         Defendant.                     )
                                        )
────────────────────────────────────────

Richard B. Jackson, pursuant to 28 U.S.C. § 1746, declares as follows:

    1. I am an attorney with the Department of the Army. I am currently the Chief of the Law of War Branch for the Office of The Judge Advocate General, Headquarters, Department of the Army, in Rosslyn, Virginia. My position is also titled Special Assistant to The Judge Advocate General for Law of War Matters. I have held this position since September 19, 2005. Prior to commencing this position, I was a Colonel in the U.S. Army Judge Advocate General's Corps. My 30-year military experience includes serving as a Staff Judge Advocate and Legal Advisor in military operations all over the world, including as a supervisory or responsible attorney for detainee operations in Panama, Haiti, Bosnia, and Kosovo, as well as Chair of the Department and

Professor of International Law at the U.S. Army Judge Advocate General's School.

2. In my current capacity as Special Assistant for Law of War Matters, I advise senior officials of the Department of the Army on all matters related to the law of war. I am also a member of the Department of Defense Law of War Working Group. The statements contained in this declaration are based upon my personal knowledge and expertise, upon information provided to me in my official capacity, and upon determinations reached and made in accordance therewith.

3. Due to the nature of my official duties, I am familiar with the policy and practice of the U.S. Armed Forces as they pertain to photographs and other public depictions and displays of prisoners of war (POWs) and detainees.

4. The purpose of this declaration is to articulate the basis for withholding the production of certain photographs of individuals held at Guantanamo Bay, Cuba, who originally were detained by the U.S. Government in Afghanistan and elsewhere in the armed conflict against Al Qaeda and the Taliban.

## FINDINGS OF DECLARANT

5. I have personally reviewed a representative sample of the photographs responsive to the AP's FOIA request, and determined that they consist of identification photographs taken of individuals in the custody of U.S. forces, detained during a period of armed conflict in Afghanistan and elsewhere against the Taliban and Al Qaeda. I believe that the public release of the responsive photographs would violate long-standing DoD policy and practice, and the President's direction on the treatment of detainees. The public release of the responsive photographs would subject the photographed individuals to public insult, curiosity, embarrassment, unwanted exposure, harassment, and exploitation of their personal images. Such release would also encourage foreign governments or enemies detaining U.S. service members to subject those service members to similar treatment.

## SUPPORTING ANALYSIS

6. The United States has consistently sought to prevent the public disclosure of photographs and other public depictions and displays that identify individual detainees. For example, Army Regulation 190-8, paragraph 1-5d provides: "Photographing, filming, and video taping of individual [enemy POWs, civilian internees and retained personnel] for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of [enemy POWs, civilian internees and retained personnel] or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command." Paragraph 1-9 further provides: "In the interest of national security, and the protection of the prisoners from public curiosity, and in adherence to the [Geneva Convention Relative to the Treatment of Prisoners of War (GPW),[1] and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War (GC),[2]], [enemy POWs, civilian internees and retained personnel] and other detainees will not be photographed as per paragraph 1-5d." (Attached as Exhibit A.) AR 190-8 is a multi-service regulation, providing guidance for all U.S. Armed Forces detainee operations; it has been in use continually, incorporating the same basic principles of detainee treatment as a technical manual or a regulation, since World War II. The Department of Defense has disciplined service members who have violated the foregoing, including U.S. soldiers who are being disciplined for committing violations of this regulation in Iraq.

7. The foregoing U.S. Government policy is also reflected in the Department of Defense's guidance concerning media embedded with U.S. military units operating in Iraq. Specifically, DoD guidance provides that "no photographs or other visual media showing an enemy prisoner of war or detainee's recognizable face, name tag, or other identifying feature or item may be taken." It also prohibits "still or video imagery of custody operations or interviews with persons under

---

[1] *Geneva Convention Relative to the Treatment of Prisoners of War*, August 12, 1949, T.I.A.S. 3364 [hereinafter GPW].

[2] *Geneva Convention Relative to the Protection of Civilian Persons in Time of War*, August 12, 1949, T.I.A.S. 3365 [hereinafter GC].

custody."³ When an embedded photographer violated the policy by taking a photograph of an Iraqi detainee that was published in the New York Times on April 10, 2003, she was removed from the embedded reporter program and the cooperation of her wire services was sought to remove this and other similar photos from distribution.⁴

8. In early January 2002, photographs of the in-processing of detainees into Guantanamo were released by DoD public affairs personnel to the media, garnering strong international criticism. This release was mistakenly believed to be consistent with guidance issued on January 7, 2002, for detainee operations at Guantanamo. Upon discovery of the release of these photos, the Secretary of Defense issued supplemental guidance on January 11, 2002, to clarify and supersede the previous public affairs guidance. Under the January 11, 2002 supplemental guidance, which remains in force, photographic and video coverage that allows identification of individual detainees (i.e., close-up images of individual face(s) that would allow individuals to be identified) is specifically prohibited. Group photographs of detainees may be released provided they comply with the policy on individual detainees; that is, the photographs may not allow individual detainees to be identified. The January 11, 2002 guidance states:

> 6.G. The policy of limiting photography is in accord with treating detainees consistent with the protections provided under the [GPW]. This is not a change in policy. It is in conformity with long-standing U.S. procedures and practice.
>
> 6.H. The policy of limiting the release for publication of photography of detainees is consistent with Article 13 of the [GPW].... While [the] rule [in article 13] does not explicitly forbid the taking of pictures and publication of photographs of such individuals, the United States Government has interpreted it to mean that taking pictures of individual prisoners of war or detainees and publishing them in newspapers or journals would be holding them up to public curiosity and is therefore forbidden.
>
> 6.I. The United States has historically forbidden the release of photographs of individual prisoners of war, and has objected when hostile powers have published photographs of, or held press briefings showing detained U.S. military personnel. (Attached as Exhibit B.)

---

³ U.S. Marines, I Marine Expeditionary Force, "Media Embed Informational Package" (4 Feb 04), at http://www.iimefpublic.usmc.mil/public/iimefpublic.nsf/DPSByID/04BDD33ECB9A305685256F79005C91A9/$file/I-MEF_MediaEmbedInfoPkg.pdf, (particularly, Enclosure B, para. (k)(18)-(19)).

⁴ Susan B. Markisz, *Putting the Media in Soldiers Shoes*, May 2003. http://www.digitaljournalist.org/issue0305/smarkisz.html.

9. U.S. Government policies concerning the publication of photographs and other public depictions or displays of detainees date back well before the conflicts in Afghanistan and Iraq and have been consistent over time. The United States strongly protested public displays of American POWs in Hanoi in July 1966. At the Empire Range POW Camp in Panama, during Operation Just Cause (1989-1990), I personally advised journalists that they could not take identifiable photographs of detainees, due to relevant DoD policies. President George H.W. Bush objected to the "brutal parading" of allied pilots by Iraq in January 1991,[5] and the United States made a formal protest to the Government of Iraq because of the "unlawful coercion and misuse of prisoners of war for propaganda purpose, the failure to respect their honor and well-being, and the subjection of such individuals to public humiliation."

10. The United States has continued to object to the public release of photographs of detainees throughout Operation Iraqi Freedom. In March 2003, Iraqi forces captured U.S. soldiers of the 507 Maintenance Company and broadcast videotape of them being questioned. Secretary Rumsfeld vigorously protested those actions because: "[U]nder the Geneva Convention, it's illegal to do things with prisoners of war that are humiliating to those individuals. And the United States, of course, avoids showing photographs of prisoners of war. We have thousands of Iraqi prisoners that are in POW camps that we brought along and have erected in country. But we do not -- we avoid showing photographs of them."[6]

11. Although the President determined on February 7, 2002, that members of Al Qaeda and the Taliban do not qualify as POWs under the GPW, the President also determined that U.S. armed forces will "treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva."[7]

---

[5] U.S. Department of State Dispatch, Vol. 2, No. 4 (January 28, 1991), "Iraqi Mistreatment of POW's" (including release of photographs of U.S. Prisoners of War in Iraqi hands) at http://dosfan.lib.uic.edu/erc/briefing/dispatch/1991/html/Dispatchv2no04.html.

[6] Secretary Rumsfeld Interview with Tim Russert, NBC Meet The Press, March 23, 2003, at http://www.dod.mil/transcripts/2003/t03232003_t0323nbc.html.

[7] Presidential Memorandum, dated February 7, 2002, attached as Exhibit C.

12. As explained in the succeeding paragraphs, when the taking or disclosure of identifying images of detainees would expose them to public curiosity, embarrassment, humiliation, or exploitation, the U.S. Government historically has interpreted the principles of Geneva to mean that the publication of photographs of detainees is forbidden.

13. With regard to POWs, Article 13 of the GPW requires that a Detaining Power with custody over a POW protect that prisoner of war, "particularly against acts of violence or intimidation and against insults and public curiosity."

14. With regard to protected persons, GC Article 27 states:

> Protected persons are entitled, in all circumstances, to respect for their persons, their honor, their family rights, their religious convictions and practices, and their manners and customs. They shall at all times be treated humanely, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity.

15. Article 13 of the GPW and Article 27 of the GC do not expressly address the taking of pictures and publication of photographs of POWs or protected persons. However, the International Committee of the Red Cross (ICRC) has had a significant influence on the interpretation of the GPW and the GC, including these articles, and has generally taken the view that Article 13 of the GPW requires parties to a conflict to avoid the publication of images that allow the identification of individual POWs.[8] With regard to Article 27 of the GC, the official ICRC Commentary of the 1949 Geneva Conventions, edited by Jean S. Pictet, provides, "Individual persons' names or photographs, or aspects of their private lives must not be given publicity."[9] These interpretations are consistent with the ICRC's general focus on preserving the integrity and dignity of individuals in detention and civilians caught up in armed conflict.

16. As described above, the U.S. Government has historically interpreted GPW Article 13 and GC Article 27 – consistent with the interpretation given by the ICRC – to prohibit the

---

[8] Anthony Dworkin, *The Geneva Conventions and Prisoners of War* (Mar. 4, 2003), available at http://www.crimesofwar.org/special/Iraq/brief-pow.html (citing ICRC spokesman Florian Westphal for the proposition that any photograph "that makes a prisoner of war individually recognizable" violates the conventions).

[9] Jean S. Pictet, *Commentary to the IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War* (1958), at 201.

publication (in newspapers or journals for example) of photographs of identifiable detainees, because publication of such photographs would be holding the detainees up to public curiosity.

17. Moreover, the U.S. Government has a compelling interest in protecting U.S. service members who may become POWs, or otherwise be detained, from activities of foreign governments and detaining powers that would violate the GPW, including the publication of photographs that identify individual detainees and the public display of POWs and detainees. Publication of the photographs under consideration in this case would significantly undermine the ability of the United States to reasonably object to such activities by foreign detaining powers.

18. In conclusion, given my review of a representative sample of the photographs in question, I believe that the public release of these photographs that identify individual detainees would conflict with long-standing U.S. policy and practice, and the President's directive on the treatment of detainees. The photographs permit identification of individual detainees whom the President has determined are to be treated, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of the Geneva Conventions. In addition, release of the photographs would have a deleterious effect on the U.S. Government's ability to protect U.S. service members from similar treatment in the future.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of May 2006.

RICHARD B. JACKSON
Chief, Law of War Branch
Office of The Judge Advocate General
Headquarters, Department of the Army
Rosslyn, VA