UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ASSOCIATED PRESS,                          :
                                           :
                        Plaintiff,         :        **ECF CASE**
                                           :
            - v.-                          :
                                           :        06 Civ. 1939 (JSR)
                                           :
UNITED STATES DEPARTMENT                    :
OF DEFENSE,                                 :
                                           :
                        Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**


                    MICHAEL J. GARCIA
                    United States Attorney for the
                    Southern District of New York
                    Attorney for Defendant
                    86 Chambers Street
                    New York, New York 10007
                    Telephone:  (212) 637-2709
                    Facsimile:  (212) 637-2702


SARAH S. NORMAND
Assistant United States Attorney

    - Of Counsel -

**TABLE OF CONTENTS**

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

THE COURT SHOULD GRANT PARTIAL
SUMMARY JUDGMENT TO DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT I:        PHOTOGRAPHS IDENTIFYING INDIVIDUAL
                DETAINEES AT GUANTANAMO ARE EXEMPT
                FROM DISCLOSURE UNDER FOIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      Photographs Identifying Present Guantanamo Detainees
                Are Classified and Protected from Disclosure Under
                FOIA Exemption 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                1.      Exemption 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                2.      Photographs Identifying Present Guantanamo
                        Detainees Have Been Properly Classified . . . . . . . . . . . . . . . . . . . . . 7

        B.      Photographs Identifying Past and Present Detainees Are
                Exempt from Disclosure Under FOIA Exemption 6 . . . . . . . . . . . . . . . . . . . . 11

                1.      Exemption 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                2.      The Detainees Have Substantial and Well-Established
                        Privacy Interests in Avoiding Public Disclosure of
                        Identifying Photographs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                        a.      DOD's Historical Policy and Practice
                                Regarding Publication of Identifying
                                Photographs of Detainees . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                        b.      DOD's Policy Concerning Photographs of
                                Guantanamo Detainees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                3.      The Detainees' Significant Privacy Interests, and the
                        Government's Compelling Interest in Enforcing Its
                        Policy and Practice Prohibiting Disclosure of Detainee
                        Photographs, Outweigh Any Public Interest in Disclosure . . . . . . . . . . 22

POINT II:    WEIGHT INFORMATION CONTAINED IN DETAINEE
           MEDICAL RECORDS IS EXEMPT FROM DISCLOSURE
           UNDER FOIA EXEMPTION 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      A.    Weight Information Is Contained in Detainee Medical Records . . . . . . . . . . . . 25

      B.    The Detainees' Privacy Interests Outweigh Any Public
           Interest in Disclosure of Their Medical Records . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

**Cases**:                                                                                                **Page**

Bibles v. Oregon Natural Desert Association, 519 U.S. 355 (1997) . . . . . . . . . . . . . . . . . . . 22, 23

Bowers v. United States Department of Justice, 930 F.2d 350
      (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Central Intelligence Agency v. Sims, 471 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Carney v. Department of Justice, 19 F.3d 807 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 5

Carter v. United States Department of Commerce,
      830 F.2d 388 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Center for National Security Studies v. Department of Justice, 331 F.3d 918
      (D.C. Cir. 2003), cert. denied, 540 U.S. 1104 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Department of Defense v. Federal Labor Relations Authority,
      510 U.S. 487 (1994)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22

Department of the Air Force v. Rose, 425 U.S. 352 (1976)  . . . . . . . . . . . . . . . . . . . 12, 14, 15, 22

Doherty v. Department of Justice, 775 F.2d 49 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

Earth Pledge Foundation v. Central Intelligence Agency, 988 F. Supp. 623
      (S.D.N.Y. 1996), aff'd, 128 F.3d 788 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

Ferguson v. Federal Bureau of Investigation, No. 89 Civ. 5071, 1995 WL 329307
      (S.D.N.Y. June 1, 1995), aff'd, 83 F.3d 41 (2d Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . 5

Fitzgibbon v. Central Intelligence Agency, 911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . 7

Fund for Constitutional Government v. National Archives
      & Records Service, 656 F.2d 856 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Halperin v. Central Intelligence Agency, 629 F.2d 144 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . 7

Halpern v. Federal Bureau of Investigation, 181 F.3d 279 (2d Cir. 1999)   . . . . . . . . . . . . . . . 5

Katz v. National Archives & Records Administration, 862  F. Supp. 476
      (D.D.C. 1994), aff'd, 68 F.3d 1438 (D.C. Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Marzen v. Department of Health & Human Services,
        825 F.2d 1148 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

McDonnell v. United States, 4 F.3d 1227 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Military Audit Project v. Casey, 656 F.2d 724 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . 7

Miller v. Casey, 730 F.2d 773 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

National Labor Relations Board v. Robbins Tire & Rubber Co.,
        437 U.S. 214 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

National Archives & Records Administration v. Favish,
        541 U.S. 157(2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Perlman v. United States Department of Justice, 312 F.3d 100
        (2d Cir. 2002), vacated and remanded, 541 U.S. 970 (2004),
        and aff'd, 380 F.3d 110 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

Salisbury v. United States, 690 F.2d 966 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Strout v. United States Parole Commission, 40 F.3d 136 (6th Cir. 1994) . . . . . . . . . . . . . . . . . 24

Students Against Genocide v. Department of State, 257 F.3d 828
        (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Times Picayune Publishing Corp. v. United States Department of Justice,
        37 F. Supp. 2d 472 (E.D. La. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States Department of Justice v. Reporters Committee for Freedom of Press,
        489 U.S. 749 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States Department of State v. Ray, 502 U.S. 164 (1991) . . . . . . . . . . . . . . . . . . 14, 23, 26

United States Department of State v. Washington Post Co.,
        456 U.S. 595 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15

Wood v. Federal Bureau of Investigation, 432 F.3d 78 (2d Cir. 2005) . . . . . . . . . . . 12, 23, 26, 28

**Statutes**:

5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 552(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 552(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5 U.S.C. § 552(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 552(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

5 U.S.C. § 552(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

**Other Authorities**:

Executive Order 13292, 68 Fed. Reg. 15315 (March 25, 2003) . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9

Executive Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995) . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9

Restatement (Second) of Torts § 652D cmt. B. (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Preliminary Statement**

In this lawsuit, plaintiff the Associated Press ("AP") seeks access pursuant to the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq., to a host of personal identifying

information about persons detained by defendant the United States Department of Defense

("DOD") at the United States Naval Station, Guantanamo Bay, Cuba ("Guantanamo").  On April

19, 2006, DOD produced certain information with respect to detainees who went through

Combatant Status Review Tribunal ("CSRT") or Administrative Review Board ("ARB")

proceedings, and DOD will produce substantial additional information regarding detainees on

May 15, 2006.  However, DOD contends that two categories of information sought by AP –

photographs identifying individual detainees and detainee weight information (which is

contained only in medical records) – are exempt from disclosure under FOIA.

Detainee photographs are exempt from disclosure for two reasons.  As to persons

currently detained at Guantanamo, identifying photographs have been and currently are properly

classified, and thus are protected from disclosure under Exemption 1 of FOIA, 5 U.S.C.

§ 552(b)(1).  Photographs identifying current detainees are classified because they concern

human intelligence sources and methods, and DOD has determined that their disclosure could

reasonably be expected to cause serious damage to national security by decreasing the likelihood

that detainees will cooperate in intelligence-gathering efforts, thereby substantially impeding

DOD's ability to obtain useful information from detainees.

Photographs identifying detainees (past or present) are also exempt because their

disclosure would constitute a "clearly unwarranted invasion of personal privacy" under FOIA

Exemption 6, 5 U.S.C. § 552(b)(6).  Detainees have significant, well-established privacy interests

in avoiding disclosure of their photographs, as reflected by longstanding and consistent U.S. Government policy and practice relating to publication of photographs and other public depictions and displays of detainees.  The Government also has a compelling interest in enforcing its policy of nondisclosure of detainee images to protect U.S. servicemembers held by foreign powers or enemies.  These interests outweigh any public interest in disclosure of the photographs, which is diminished by the substantial other identifying information that DOD is producing with regard to detainees.

Exemption 6 also protects weight information, which is contained only in individual detainees' medical records.  Medical records are expressly protected under Exemption 6, and the detainees' privacy interests in those records are unmistakable.  There is little public interest in disclosure of this information, which is not necessary to identify the detainees.  AP has suggested that it seeks this information because of reported hunger strikes at Guantanamo, but this does not establish a cognizable public interest under FOIA, as information concerning individual detainees' weight would not shed light on DOD's response to the hunger strikes.  Disclosure of detainee weight information therefore would result in a clearly unwarranted invasion of the detainees' privacy.

Accordingly, the Court should grant summary judgment to DOD with regard to that portion of AP's request seeking photographs identifying individual detainees and weight information contained in detainees' medical records.

**BACKGROUND**

On or about January 18, 2006, AP submitted a FOIA request seeking, <u>inter alia</u>, "[d]ocuments sufficient to reveal the name, nationality, home town, age, and dates of confinement of each detainee who, since September 11, 2001, has been confined for any period of time at [Guantanamo]." Declaration of Sarah S. Normand dated May 11, 2006 ("Normand Decl."), Exh. 1 at Exh. A. AP also requested "[a]ny other relevant identifying information about the detainees in [DOD's] possession." <u>Id.</u> After DOD sought clarification of this request, AP advised DOD that it construed "other relevant identifying information" to include "such information as a photographic image of the detainee, date of birth, height, weight, or religious affiliation." Declaration of Karen L. Hecker dated May 11, 2006 ("Hecker Decl.") ¶ 3. Although AP's request was directed to Rear Admiral James McGarrah, head of DOD's Office for the Administrative Review of the Detention of Enemy Combatants ("OARDEC"), because OARDEC does not maintain the breadth of detainee information requested by AP, the request was forwarded to the United States Southern Command ("SOUTHCOM"), the parent command of Joint Task Force-Guantanamo ("JTF-Guantanamo"), for processing. Hecker Decl. ¶ 4.[1]

AP commenced this lawsuit on March 13, 2006. Normand Decl., Exh. 1. At the initial conference on April 3, 2006, the Court endorsed DOD's proposed schedule for responding to AP's FOIA request. Normand Decl., Exh. 2 at 10-11. On April 19, 2006, DOD produced to AP a list containing the names, Internment Serial Numbers ("ISNs"), and citizenship of all detainees

---

[1]    JTF-Guantanamo consists of several thousand U.S. service members and civilians representing the Army, Navy, Air Force, Marine Corps and Coast Guard. Hecker Decl. ¶ 5. The mission of JTF-Guantanamo is to conduct detention and intelligence-gathering operations in support of the Global War on Terrorism, to coordinate and implement detainee-screening operations, and to support law enforcement and war crime investigations. <u>Id.</u>

who went through CSRT or ARB proceedings.  Hecker Decl. ¶ 6.[2]  On May 15, 2006, in

accordance with the Court-approved schedule, DOD will produce the following additional

information regarding all detainees held by DOD at Guantanamo, subject to any individualized

withholdings:  name, ISN, citizenship, and date and place of birth.  Hecker Decl. ¶ 7.

DOD is withholding two categories of information sought by AP:  photographs

identifying individual detainees and detainee weight information.  Hecker Decl. ¶ 8.[3]  These

categories of information are exempt from disclosure under FOIA, for the reasons set forth

below.

## ARGUMENT

### THE COURT SHOULD GRANT PARTIAL
### SUMMARY JUDGMENT TO DEFENDANT

FOIA was enacted to "ensure an informed citizenry, . . . needed to check against

corruption and hold the governors accountable to the governed."  NLRB v. Robbins Tire &

Rubber Co., 437 U.S. 214, 242 (1978).  The statute requires each federal agency to make

available to the public an array of information, and sets forth procedures by which requesters may

obtain such information.  See 5 U.S.C. § 552(a).  At the same time, FOIA exempts nine

categories of information from disclosure.  See 5 U.S.C. § 552(b).  FOIA thus "represents a

balance struck by Congress between the public's right to know and the government's legitimate

interest in keeping certain information confidential."  Center for Nat'l Sec. Studies v. Dep't of

---

[2]      Although DOD was originally scheduled to produce this information on April 17, 2006, AP consented to a two-day extension of that deadline.  Normand Decl. ¶ 5.

[3]      By agreement of the parties, in order to expedite resolution of the issues in this case, DOD is moving for summary judgment with regard to these categories of information before undertaking any search for the information.

Justice, 331 F.3d 918, 925 (D.C. Cir. 2003), cert. denied, 540 U.S. 1104 (2004).

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is the procedural vehicle by which most FOIA actions are resolved. See Carney v. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). "In order to prevail on a motion for summary judgment in a FOIA case, the defendant agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to FOIA." Id. "Affidavits or declarations supplying facts . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." Id. (footnote omitted); see also Halpern v. FBI, 181 F.3d 279, 291 (2d Cir. 1999) (same).[4] Although this Court reviews de novo the agency's determination that requested information falls within a FOIA exemption, see 5 U.S.C. § 552(a)(4)(B); Halpern, 181 F.3d at 287, the declarations submitted by the agency in support of its determination are "accorded a presumption of good faith," Carney, 19 F.3d at 812 (citation and internal quotation marks omitted).

## POINT I

## PHOTOGRAPHS IDENTIFYING INDIVIDUAL DETAINEES
## AT GUANTANAMO ARE EXEMPT FROM DISCLOSURE UNDER FOIA

Photographs identifying individual detainees are exempt from disclosure on two separate grounds. With respect to photographs of individuals presently detained by DOD at Guantanamo, such photographs are classified and therefore protected by Exemption 1 of FOIA, 5 U.S.C.

---

[4]     DOD is not submitting a Statement pursuant to Local Civil Rule 56.1, in accordance with the general practice in this Circuit. See Ferguson v. FBI, No. 89 Civ. 5071, 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995) (noting that "in FOIA actions, such a requirement would be meaningless. As a result, the general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment." (citing Carney, 19 F.3d at 812)), aff'd, 83 F.3d 41 (2d Cir. 1996). If the Court wishes DOD to submit a Rule 56.1 Statement, we will do so promptly.

-5-

§ 552(b)(1).  Identifying photographs of Guantanamo detainees, past and present, are also exempt

from disclosure under Exemption 6, 5 U.S.C. § 552(b)(6), because their release "would constitute

a clearly unwarranted invasion of personal privacy."

**A.     Photographs Identifying Present Guantanamo Detainees Are Classified and
         Protected from Disclosure Under FOIA Exemption 1**

**1.     Exemption 1**

Exemption 1 protects records that are:  (A) specifically authorized under criteria

established by an Executive Order to be kept secret in the interest of national defense or foreign

policy, and (B) are in fact properly classified pursuant to an Executive Order.  5 U.S.C.

§ 552(b)(1).  Executive Order 12958 governs the classification of national security information.

See Executive Order ("E.O.") 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended.[5]  Section

1.1 of the Order lists four requirements for the classification of national security information:  (1)

an "original classification authority" must classify the information; (2) the information must be

"owned by, produced by or for, or [be] under the control of the United States Government"; (3)

the information must fall within one of eight protected categories of information listed in Section

1.4 of the Order; and (4) the original classification authority must "determine[] that the

unauthorized disclosure of the information reasonably could be expected to result in damage to

the national security" and be "able to identify or describe the damage."  E.O. 12958, § 1.1.

An agency can demonstrate that it has properly withheld information under Exemption 1

if it establishes that it has met the substantive and procedural requirements of the Executive

Order.  Substantively, the agency must show that the records at issue logically fall within the

---

[5]     Executive Order 12958 was amended by Executive Order 13292.  See E.O.
13292, 68 Fed. Reg. 15315 (March 25, 2003).  All citations in this brief to Executive Order
12958 are to the Order as amended.

exemption, i.e., that Executive Order 12958 authorizes the classification of the information at issue. Procedurally, the agency must demonstrate that it followed the proper procedures in classifying the information. See Salisbury v. United States, 690 F.2d 966, 972 (D.C. Cir. 1982); Military Audit Project v. Casey, 656 F.2d 724, 737-38 (D.C. Cir. 1981).

Because the agencies responsible for national security have "unique insights" into the adverse effects that might result from public disclosure of classified information, courts accord "substantial weight" to agency affidavits justifying classification. Military Audit Project, 656 F.2d at 738 & nn.47-48 (citing legislative history); accord Doherty v. Dep't of Justice, 775 F.2d 49, 52 (2d Cir. 1985); Miller v. Casey, 730 F.2d 773, 777 (D.C. Cir. 1984); Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980); Earth Pledge Foundation v. CIA, 988 F. Supp. 623, 626 (S.D.N.Y. 1996), aff'd, 128 F.3d 788 (2d Cir. 1997). "Courts must be especially deferential to agency judgment when . . . the Government is concerned with protecting intelligence sources and intelligence gathering methods." Earth Pledge, 988 F. Supp. at 626; see also Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990) (disapproving of district court's performance of "its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure").

### 2. Photographs Identifying Present Guantanamo Detainees Have Been Properly Classified

As set forth in the Declaration of Paul B. Rester, Director of the Joint Intelligence Group, JTF-Guantanamo, and formerly the officer in charge of DOD interrogations at Guantanamo, identifying photographs of the approximately 485 individuals detained by DOD at Guantanamo (when linked with the detainees' names and ISNs, as any photographs responsive to AP's request for "identifying information about the detainees" would be) are classified at the SECRET level.

Declaration of Paul B. Rester dated May 10, 2006 ("Rester Decl.") ¶¶ 1, 3, 8-9.

The photographs satisfy all of the requirements in Section 1.1(a) of Executive Order 12958. First, the photographs were classified by the Commander, JTF-Guantanamo, the person with original classification authority, and were so classified prior to AP's January 18, 2006 FOIA request. Rester Decl. ¶¶ 2-3, 8-9; see E.O. 12958, § 1.1(a)(1). The photographs remain classified under the direction of Rear Admiral Harry B. Harris, Jr., the current Commander of JTF-Guantanamo. Rester Decl. ¶¶ 2, 8. Admiral Harris exercises original classification authority under the provisions of Section 1.3 of Executive Order 12958, which authority was delegated to him by the Undersecretary of Defense for Intelligence. Id. ¶ 2.

Second, the photographs are owned by, produced by and for, and under the control of the United States Government, in accordance with Section 1.1(a)(2) of Executive Order 12958. Rester Decl. ¶ 8.

Third, the photographs concern "intelligence sources or methods," and thus fall squarely within the categories of information that may be classified under the Order. See E.O. 12958, § 1.1(a)(3); id. § 1.4(c) ("Information shall not be considered for classification unless it concerns . . . intelligence activities (including special activities), intelligence sources or methods, or cryptology . . . ."). As explained by Director Rester,

> [h]uman intelligence is the most essential piece of the strategic intelligence being gathered in the Global War on Terror. Because of the nature of terrorist organizations, such as al Qaida, because of terrorist organizations' methods of operation, and because of the affiliations between terrorist organizations, human intelligence is the most effective source of actionable information for the anticipation and interdiction of terrorist activity. Because of the value of human intelligence, each detained enemy combatant, whether detained at JTF-Guantanamo, in Afghanistan or in Iraq, is a potential source of valuable information.

-8-

Rester Decl. ¶ 4.

Intelligence gathered from detainees at Guantanamo, moreover, "has provided actionable information for the DoD worldwide," including "information that has been, and continues to be, essential in conducting military operations on the battlefields of Iraq and Afghanistan." Id. ¶ 6. Identifying photographs accordingly concern intelligence sources (the detainees) and methods (collection of human intelligence, e.g., through strategic interrogations) and may be classified under Section 1.1(a)(3) of Executive Order 12958. Id. ¶¶ 4-8.

Fourth, and finally, the Commander of JTF-Guantanamo has determined that unauthorized disclosure of the photographs reasonably could be expected to result in serious damage to the national security, including DOD's defense against transnational terrorism, because such disclosure would substantially impede DOD's ability to gather actionable intelligence information from detainees. Rester Decl. ¶¶ 7-8; see E.O. 12958, § 1.1(a)(4) (information may be classified when "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage"). "The cooperation of human intelligence sources in the gathering of actionable information is an indispensable requirement in the fight against terrorist activity." Rester Decl. ¶ 5. Indeed, "[i]n strategic interrogations such as those conducted at JTF-Guantanamo, the cooperation of these intelligence sources is critical to the on-going human intelligence efforts." Id. ¶ 6.

DOD has determined that release of photographs identifying individual detainees would make it substantially less likely that detainees would cooperate in the intelligence-gathering process, for fear of reprisals. See id. ¶¶ 5, 7. Director Rester explains:

> Cooperating subjects simply will not provide information if they believe that, in so doing, they will jeopardize their safety or that of their families and loved ones. It is well documented in public sources, and consistent with my extensive experience,[6] that persons who cooperate with capturing authorities are subject to reprisals by those about whom they may have provided information. In fact, persons who are captured and detained may not have cooperated at all, but if entities about whom they possess information believe that such persons have cooperated or are considering cooperating, reprisals can and do occur. These concerns are particularly acute in the case of persons who are linked to terrorist activity.

Id. ¶ 5. Cooperating detainees at Guantanamo have specifically voiced concerns for their families' safety as well as their own. Id. ¶ 7.

Alleviating cooperating individuals' perceived or genuine concerns about reprisals is an essential part of developing human intelligence sources and gathering usable information. Id. ¶ 5. If identifying photographs along with names of detainees are publicly released, "[n]o human intelligence sources interested in cooperating with United States officials under any hope of anonymity will be willing to do so." Id. A release of photographs coupled with names (which may be common names) would specifically identify each detainee in a way that a release of names and other biographical information does not. Rester Decl. ¶ 7. Given the global communication capabilities provided by the internet, moreover, the photographs and names would be released worldwide almost instantaneously, and such release inevitably would become known to the detainees and to those that may seek reprisal against them. Id. As Director Rester states, in his experience with detainees generally, and with this population of detainees in particular, worldwide publication of an identifying photograph, coupled with a detainee's name,

---

[6]    Director Rester has been a professional in the field of human intelligence for more than 35 years. He served as a career intelligence officer for the United States Army and as a Supervisory Intelligence Officer in the Army Foreign Intelligence Activity and the Defense Intelligence Agency. He has been responsible for gathering human intelligence in locations such as Iraq, Afghanistan, and other areas such as JTF-Guantanamo. Rester Decl. ¶ 1.

is likely to exacerbate the detainee's fears of reprisal and make it substantially less likely that the detainee will cooperate and provide information in the future.  Id.  As a result, DOD has determined that public release of detainees' photographs in conjunction with their names "will undoubtedly have a chilling effect on human intelligence collection at JTF-Guantanamo and elsewhere."  Id.

The Rester Declaration thus makes clear that identifying photographs of current detainees at Guantanamo satisfy the substantive and procedural requirements of Executive Order 12958, and have been properly classified pursuant to that Order.  DOD has established that disclosure of such photographs, which concern intelligence sources and methods, reasonably could be expected to cause serious damage to national security by reducing the likelihood that detainees will cooperate and thus substantially impeding DOD's intelligence-gathering efforts.  DOD's declaration justifying its classification of the photographs is entitled to "substantial weight," Doherty, 775 F.2d at 52, and this Court should defer to the agency's determination as to the impact of disclosure on national security.  See, e.g., CIA v. Sims, 471 U.S. 159, 179 (1985); Students Against Genocide v. Dep't of State, 257 F.3d 828, 837 (D.C. Cir. 2001); Bowers v. United States Dep't of Justice, 930 F.2d 350, 357 (4th Cir. 1991); Earth Pledge, 988 F. Supp. at 626.  The requested photographs therefore should be found exempt from disclosure under Exemption 1 of FOIA.

**B.     Photographs Identifying Past and Present Detainees Are Exempt from Disclosure Under FOIA Exemption 6**

Photographs identifying past and present detainees at Guantanamo are also protected from disclosure under Exemption 6, 5 U.S.C. § 552(b)(6).

### 1.    Exemption 6

Exemption 6 protects information contained in "personnel and medical files and similar files" where disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The purpose of Exemption 6 is to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 599 (1982). The Supreme Court has interpreted Exemption 6 broadly, making clear that the "similar files" language encompasses any "information which applies to a particular individual." Id. at 602; accord Wood v. FBI, 432 F.3d 78, 87 n.6 (2d Cir. 2005); Perlman v. U.S. Dep't of Justice, 312 F.3d 100, 106 (2d Cir. 2002), vacated and remanded, 541 U.S. 970 (2004), and aff'd, 380 F.3d 110 (2d Cir. 2004) (per curiam).

Here, AP's FOIA request expressly sought photographs identifying the detainees who have been held at Guantanamo. See Normand Decl., Exh. 1 at Exh. A (written request seeking "any other relevant identifying information about the detainees"); Hecker Decl. ¶ 3 (when asked for clarification, AP indicated that this request included photographs). Accordingly, there can be no question that the responsive photographs "can be identified as applying to" the individual detainees, Washington Post, 456 U.S. at 602; Declaration of Richard B. Jackson dated May 11, 2006 ("Jackson Decl.") ¶ 5 (responsive photographs consist of "identification photographs"), and thus satisfy the "similar files" requirement of Exemption 6.

Upon determining that the responsive photographs constitute "similar files" under Exemption 6, the Court must balance the privacy interests at stake against the public's interest to determine whether disclosure would result in a "clearly unwarranted" invasion of the detainees' personal privacy. Dep't of the Air Force v. Rose, 425 U.S. 352, 372 (1976).

**2.    The Detainees Have Substantial and Well-Established Privacy Interests in Avoiding Public Disclosure of Identifying Photographs**

The Supreme Court's cases have established that the personal privacy protected by FOIA exceeds constitutional and common-law conceptions and includes personal interests both in avoiding unwanted public attention and emotional disquiet, and in controlling the dissemination of personal information that was provided or collected for a particularized and limited governmental use.  Because FOIA was not intended to afford the general public a right of access to the vast amounts of "information about private citizens that happens to be in the warehouse of the Government," U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 774 (1989) (emphasis omitted), the Court has repeatedly refused to adopt a "cramped notion of [the] personal privacy" that FOIA protects, id. at 763, cited in National Archives & Records Admin. v. Favish, 541 U.S. 157, 165 (2004) ("the concept of personal privacy under Exemption 7(C) is not some limited or 'cramped notion' of that idea").

The Court instead has broadly defined the types of privacy interests protected by Exemptions 6 and 7(C).  In Reporters Committee, the Court held that criminal history records -- "rap sheets" -- were exempted from disclosure under Exemption 7(C). Id. at 762-80.  In so holding, the Court explained that the privacy interests protected by FOIA are more expansive than tort-law or constitutional conceptions of privacy.  Id. at 762 n.13; see also Marzen v. Dept of Health & Human Servs., 825 F.2d 1148, 1152 (7th Cir. 1987) ("[T]he privacy interest protected under FOIA extend[s] beyond the common law.").  FOIA also protects information about an individual that is already in the public record, but that is "intended for or restricted to the use of a particular person or group or class of persons" and is "not freely available to the public." Reporters Comm., 489 U.S. at 763-64 (quoting Webster's Third New Int'l Dictionary 1804

-13-

(1976)).  The "practical obscurity" of such information and its "hard-to-obtain" character creates a FOIA-protected privacy interest against its broad disclosure to the public.  Reporters Comm., 489 U.S. at 762, 764.  See also Dep't of Defense v. FLRA, 510 U.S. 487, 497 (1994) (holding names and addresses exempt from disclosure); Washington Post, 456 U.S. at 600 (FOIA's protection of privacy interests is not limited to "highly personal" matters; it includes "information about a particular individual that is not intimate").

Further, "invasion[s]" of privacy that are "unwarranted" under FOIA extend beyond intrusions into the home, physical invasions of the body, disruption of mental solitude, and incursions on other archetypically private realms.  Under the Supreme Court's cases, privacy includes the right to avoid public embarrassment, harassment, and the unwanted attention of others.  In Reporters Committee, the Court spoke of a "privacy interest in keeping personal facts away from the public eye," especially matters that otherwise might be "wholly forgotten" due to the passage of time.  489 U.S. at 769.  In Ray, the Court recognized that disclosure of the identities of Haitian nationals who had unsuccessfully attempted to flee to the United States and were returned to Haiti "could subject them or their families to embarrassment in their social and community relationships," United States Dep't of State v. Ray, 502 U.S. 164, 176 (1991), and that there existed a "privacy interest in protecting these individuals from any retaliatory action" or even attempted "interview[s]" by third parties that disclosure might bring about, id. at 177.

Likewise, in Rose, the Court upheld, under Exemption 6, the redaction of identifying information about third parties and witnesses from case summaries of honors and ethics hearings held by the United States Air Force Academy.  Such redactions, the Court reasoned, promoted "privacy values" by protecting the subjects of the hearings from "embarrassment, perhaps disgrace," 425 U.S. at 376-77, due to the revival of "wholly forgotten" past events, id. at 381.

-14-

See also Washington Post, 456 U.S. at 599 ("Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.").

Moreover, in determining the scope of the privacy interests protected by FOIA, the Supreme Court has evaluated a wide range of legal and cultural sources. For example, the Court has looked to common law and dictionary definitions of privacy and federal statutory and regulatory provisions and state policies regarding disclosure of certain types of information. See id. at 763-71 (examining such sources to determine that individuals have "substantial" privacy interests in their criminal rap sheets, even though the information contained therein is a matter of public record). The Court has also looked to relevant cultural traditions and long-standing norms as sources of relevant privacy interests. See Favish, 541 U.S. at 167-71 (relying on such sources to determine that surviving family members had "weighty" privacy interests in avoiding disclosure of death-scene photographs).

As these cases make clear, FOIA's definition of "personal privacy" extends to (i) personal information about an individual that happens to be warehoused in government files, (ii) that was intended for or restricted to the use of particular persons, and (iii) the disclosure of which could reasonably be expected to cause embarrassment, emotional upset or anguish, injury, or unwanted public attention for the individual or family members. Like the rap sheets in Reporters Committee, the photographs in Favish, and the personal identifying information in Ray and Rose, all of these criteria apply to the photographs requested by AP here, which were taken for limited governmental purposes and depict identifiable individuals being detained against their will as enemy combatants during a time of war. See Restatement (Second) of Torts § 652D cmt. B. (1977) (individual's "privacy is invaded" when his "photograph is taken without [his] consent in

-15-

a private place").

Indeed, photographs are even more subject to abuse and exploitation than the written word, and the effect of their disclosure more invasive and enduring, because the mind remembers images better than words.  See Times Picayune Publ'g Corp. v. U.S. Dep't of Justice, 37 F. Supp. 2d 472, 477 (E.D. La. 1999) ("As in the cliche, a picture is worth a thousand words.  For that reason, a mug shot's stigmatizing effect can last well beyond the actual criminal proceedings."). See also Favish, 541 U.S. at 166 (in opposing disclosure of death images, family members sought "refuge from a sensation-seeking culture for their own peace of mind and tranquility"); Katz v. Nat'l Archives & Records Admin., 862 F. Supp. 476, 485 (D.D.C. 1994) (autopsy x-rays and photographs of President Kennedy would cause "additional anguish" to surviving family), aff'd on other grounds, 68 F.3d 1438 (D.C. Cir. 1995).

With respect to photographs of military detainees in particular, relevant and longstanding DOD policies regarding such photographs are a principal source for determining the nature of the privacy interests at issue.  As set forth in the Declaration of Richard B. Jackson, Chief of the Law of War Branch of the Army's Office of Judge Advocate General and Special Assistant to the Judge Advocate General for Law of War Matters, the public release of photographs identifying individual detainees "would subject the photographed individuals to public insult, curiosity, embarrassment, unwanted exposure, harassment, and exploitation of their personal images," and "would violate long-standing DoD policy and practice, and the President's direction on the treatment of detainees."  Jackson Decl. ¶¶ 1, 5, 18.

a.    **DOD's Historical Policy and Practice Regarding Publication of Identifying Photographs of Detainees**

The United States has consistently sought to prevent the public disclosure of photographs and other public depictions and displays that identify individual detainees.  Jackson Decl. ¶ 6. Army Regulation 190-8 – a multi-service regulation that applies to all U.S. Armed Forces detainee operations – provides that "[p]hotographing, filming, and video taping of individual [enemy prisoners of war, civilian internees, and retained personnel] for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited."  Id. ¶ 6 & Exh. A ¶ 1-5d.  The regulation further provides that "detainees will not be photographed," among other things, for "the protection of the prisoners from public curiosity." Id. ¶ 6 & Exh. A ¶ 1-9.  This regulation has been in use continually, incorporating the same basic principles of detainee treatment as a technical manual or a regulation, since World War II.  Id. ¶ 6.  DOD has disciplined U.S. service members, including soldiers in Iraq, who have violated the regulatory prohibition on photographing detainees.  Id.

This policy is also reflected in DOD's guidance concerning media embedded with U.S. military units operating in Iraq.  Id. ¶ 7 & n.3.  That guidance provides that "no photographs or other visual media showing an enemy prisoner of war or detainee's recognizable face, name tag, or other identifying feature or item may be taken," and also prohibits "still or video imagery of custody operations or interviews with persons under custody."  Id.[7]  When an embedded photographer violated this policy by taking a photograph of an Iraqi detainee that was published

---

[7]    DOD implemented similar policies in earlier conflicts.  During Operation Just Cause (1989-90), for example, Mr. Jackson personally advised journalists at the Empire Range POW Camp in Panama "that they could not take identifiable photographs of detainees, due to relevant DoD policies."  Jackson Decl. ¶ 9.

in the New York Times in April 2003, she was removed from the embedded reporter program and the cooperation of her wire service was sought to remove this and other similar photographs from distribution. Id. ¶ 7 & n.4.

U.S. Government policies concerning publication of photographs and other public depictions or displays of detainees date back well before the conflicts in Afghanistan and Iraq, and have been consistent over time. Id. ¶ 9. The U.S. Government historically has protested the publication of images of American service personnel detained by foreign powers. For example, the United States strongly protested public displays of American prisoners of war in Hanoi in July 1966. Id. Similarly, during the Gulf War in January 1991, President George H.W. Bush objected to the "brutal parading" of allied pilots by Iraq, and the United States made a formal protest to the Government of Iraq because of the "unlawful coercion and misuse of prisoners for propaganda purpose[s], the failure to respect their honor and well-being, and the subjection of such individuals to public humiliation." Id. ¶ 9 & n.5.

More recently, in March 2003, during Operation Iraqi Freedom, Iraqi forces captured U.S. soldiers of the 507th Maintenance Company and broadcast videotape of them being questioned. Id. ¶ 10. Secretary of Defense Donald Rumsfeld vigorously protested those actions, noting that "under the Geneva Convention, it's illegal to do things with prisoners of war that are humiliating to those individuals." Id. ¶ 10 & n.6. The United States "avoids showing photographs of prisoners of war," Secretary Rumsfeld stated, including thousands of Iraqi prisoners held by the United States in POW camps in that country. Id.

Although the President determined on February 7, 2002, that members of al Qaeda and the Taliban do not qualify as prisoners of war under the Geneva Convention Relative to the Treatment of Prisoners of War ("GPW"), the President also determined that U.S. armed forces

-18-

will treat detainees "in a manner consistent with the principles of Geneva" to the extent

appropriate and consistent with military necessity.  Id. ¶ 11 & Exh. C.  When the taking or

disclosure of identifying images of detainees would expose them to public curiosity,

embarrassment, humiliation, or exploitation, the U.S. Government historically has interpreted the

principles of Geneva to mean that publication of photographs of detainees is forbidden.  Id. ¶ 12.

With regard to prisoners of war, Article 13 of the GPW requires that a detaining power

protect POWs in its custody, "particularly against acts of violence or intimidation and against

insults and public curiosity."  Id. ¶ 13.  With respect to "protected persons," Article 27 of the GC

states:

> Protected persons are entitled, in all circumstances, to respect for their persons,
> their honor, their family rights, their religious convictions and practices, and their
> manners and customs.  They shall at all times be treated humanely, and shall be
> protected especially against all acts of violence or threats thereof and against
> insults and public curiosity.

Id. ¶ 14.

Although neither Article 13 of the GPW nor Article 27 of the GC expressly addresses the

publication of photographs, the International Committee of the Red Cross ("ICRC") – which has

had a significant influence on the interpretation of the GPW and GC, including these provisions –

generally has taken the view that they require parties to a conflict to avoid publication of images

identifying individual POWs or protected persons.  See id. ¶ 15 & nn.8-9.  This interpretation is

consistent with the ICRC's general focus on preserving the integrity and dignity of individuals in

detention and civilians caught up in armed conflict.  Id. ¶ 15.

Consistent with the ICRC's interpretation, the U.S. Government historically has

interpreted GPW Article 13 and GC Article 27 as prohibiting the publication (in newspapers or

journals, for example) of photographs of identifiable detainees because such publication would

subject the photographed individuals to "public curiosity." Id. ¶ 16; see, e.g., id. ¶ 6 & Exh. A ¶ 1-9 (Army regulation 190-8 prohibiting photographs of detainees "[i]n the interest of national security, and the protection of the prisoners from public curiosity, and in adherence to the [GPW and GC]").

### b.    DOD's Policy Concerning Photographs of Guantanamo Detainees

As in Iraq and elsewhere, public release of photographs of Guantanamo detainees is specifically prohibited under DOD policy. See id. ¶ 8. In early January 2002, DOD public affairs personnel mistakenly released photographs of the in-processing of Guantanamo detainees to the media, prompting strong international criticism. Id. Upon discovery of the release of the photographs, the Secretary of Defense issued supplemental guidance on January 11, 2002, which remains in force, strictly prohibiting photographic and video coverage that allows identification of individual detainees. Id. ¶ 8 & Exh. B.

As the January 11, 2002 guidance notes, "[t]he policy of limiting photography is in accord with treating detainees consistent with the protections provided under the [GPW]. This is not a change in policy. It is in conformity with long-standing U.S. procedures and practice." Id. ¶ 8 & Exh. B ¶ 6.G. The guidance further notes:

> The policy of limiting the release for publication of photography of detainees is consistent with Article 13 of the [GPW]. . . . While [the] rule in [Article 13] does not explicitly forbid the taking of pictures and publication of photographs of such individuals, the United States Government has interpreted it to mean that taking pictures of individual prisoners of war or detainees and publishing them in newspapers or journals would be holding them up to public curiosity and is therefore forbidden.

Id. ¶ 8 & Exh. B ¶ 6.H. The guidance also states that the United States "has historically forbidden the release of photographs of individual prisoners of war, and has objected when hostile powers have published photographs of, or held press briefings showing, detained military

personnel." Id. ¶ 8 & Exh. B ¶ 6.I.

As the Jackson Declaration thus demonstrates, public release of photographs identifying Guantanamo detainees would violate longstanding DOD policy and practice with regard to the publication of photographs and other public depictions and displays that identify individual detainees. Jackson Decl. ¶¶ 5, 18. In addition to DOD's January 11, 2002 guidance specifically prohibiting release of identifying detainee photographs, this policy is reflected in numerous sources, including Army Regulation 190-8, DOD's guidance relating to embedded reporters in Iraq, and the U.S. Government's consistent practice of protesting the publication of images of American prisoners of war. Id. ¶¶ 6-10. Disclosure of the photographs also would conflict with the President's directive that detainees be treated, to the extent appropriate and consistent with military necessity, consistent with the principles of Geneva. Jackson Decl. ¶¶ 5, 11, 18. Those principles, as historically interpreted by the United States and the ICRC, include a prohibition on publication of identifying detainee photographs because such publication would improperly subject the photographed individuals to "public curiosity." Id. ¶¶ 12-16; see also id. ¶ 5 (public release of photographs would subject detainees to public insult, curiosity, embarrassment, unwanted exposure, harassment, and exploitation of their personal images).

These policies show that DOD has long sought to protect the privacy interests of detainees by preventing them from being subjected to public curiosity, and that the United States has also consistently objected when U.S. service members detained abroad were subject to public curiosity and invasion of their privacy. DOD has taken significant measures to enforce these policies with respect to persons detained by the United States. The privacy interests of the detainees are therefore well established and should be protected under Exemption 6 of FOIA.

**3.    The Detainees' Significant Privacy Interests, and the Government's Compelling Interest in Enforcing Its Policy and Practice Prohibiting Disclosure of Detainee Photographs, Outweigh Any Public Interest in Disclosure**

The balance of public and private interests here tips decidedly against disclosure.  As a threshold matter, while there may be some public interest in the photographs, such interest falls outside the ambit of the public interest that FOIA was enacted to serve.  Reporters Comm., 489 U.S. at 775.  Establishing that disclosure of personal information would serve a public interest cognizable under FOIA is the plaintiff's burden.  See Favish, 541 U.S. at 172; Carter v. U.S. Dep't of Commerce, 830 F.2d 388, 391 n.13 (D.C. Cir. 1987).  The "only relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government."  FLRA, 510 U.S. at 495 (quoting Reporters Comm., 489 U.S. at 775) (quotation marks omitted); accord Bibles v. Oregon Natural Desert Ass'n, 519 U.S. 355, 355-56 (1997) (per curiam).  This statutory purpose is not furthered by disclosure of information that "reveals little or nothing about an agency's own conduct."  Reporters Comm., 489 U.S. at 773. Likewise, whether an invasion of privacy is "warranted" under Exemption 6 "must turn on the nature of the requested document and its relationship to the basic purpose of [FOIA] to open agency action to the light of public scrutiny."  Id. at 772 (quoting Rose, 425 U.S. at 372) (quotation marks omitted).

The fact that the photographs here are being requested by the press and may be used in news-gathering fails to establish a public interest in favor of disclosure.  See id. at 771 (rights of press "no different from those that might be asserted by any other third party"); id. at 774-75 (concluding that although criminal history rap sheet "would provide details to include in a news

-22-

story," and there was "unquestionably[] some public interest in providing interested citizens with answers to their questions about [the subject of the rap sheet]," it was "not the type of interest protected by the FOIA").  Neither the "identity of the requesting party," nor the "particular purpose for which the document is being requested," has any bearing on the public interest analysis under FOIA.  Id. at 771-72; see also Bibles, 519 U.S. at 355-56 (finding no public interest in disclosure of agency mailing list, notwithstanding requester's ostensibly laudable intention to provide "additional information" to individuals on list).[8]

Further, the public interest in identifying detainees at Guantanamo is amply satisfied by DOD's substantial prior and imminent disclosures of detainee names and other biographical information.  See supra at 3-4; Ray, 502 U.S. at 178 (reasoning that the "public interest has been adequately served by disclosure of redacted interview summaries," and the "addition of the redacted identifying information [of Haitian returnees] would not shed any additional light on the Government's conduct"); Wood, 432 F.3d at 89 ("Given that the FBI has already revealed the substance of the investigation and subsequent adjudication, knowledge of the names of the investigators would add little, if anything, to the public's analysis of whether the FBI dealt with the accused agents in an appropriate manner.").  Thus, while release of the photographs would allow additional identification of detainees, it would not "contribut[e] significantly to public understanding of the operations or activities of the government."  Reporters Committee, 489 U.S. at 775 (first emphasis added; quotation marks omitted); see also Favish, 541 U.S. at 172

---

[8]        By contrast, the Supreme Court has indicated that the purpose for which a document is sought is relevant on the privacy side of the Exemption 6 analysis, at least to the extent (as is likely here) the requester intends to seek out the persons whose privacy is at stake. See Ray, 502 U.S. at 177 (fact that requesters intended to interview Haitian returnees "magnifie[d] the importance of maintaining the confidentiality of their identities").

(requester "must show that the public interest sought to be advanced is a significant one," and that "the information is likely to advance that interest").

Any public interest in disclosure of the photographs, moreover, is heavily outweighed by the compelling public interest against disclosure. In conducting the interest-balancing required by FOIA's privacy exemptions, courts have recognized that the "public interest properly factors into both sides of the balance." Fund for Constitutional Gov't v. Nat'l Archives & Records Serv., 656 F.2d 856, 865 n.22 (D.C. Cir. 1981); see also Favish, 541 U.S. at 170 (noting that Court's holding would allow government to deny "gruesome requests" by "child molesters, rapists, murderers, and other violent criminals" for autopsies, photographs, and records of their deceased victims); Perlman, 312 F.3d at 106 ("The strong public interest in encouraging witnesses to participate in future government investigations offsets the weak public interest in learning witness and third party identities."); Strout v. United States Parole Comm'n, 40 F.3d 136, 139 (6th Cir. 1994) ("[T]here would appear to be a public policy interest against such disclosure, as the fear of disclosure to a convicted criminal could have a chilling effect on persons, particularly victims, who would otherwise provide the Commission with information relevant to a parole decision.").

Here, as Mr. Jackson explains, the United States has a compelling interest in protecting U.S. service members who may become prisoners of war, or otherwise be detained, from activities of foreign governments or detaining powers that would violate the GPW, including the publication of photographs that identify individual detainees and the public display of POWs and detainees. Jackson Decl. ¶ 17. Public release of photographs of individual detainees at Guantanamo would encourage foreign governments or enemies detaining U.S. service members to subject those service members to similar treatment. Id. ¶ 5. Such publication "would

-24-

significantly undermine the ability of the United States to reasonably object to such activities," id. ¶ 17, and thus "would have a deleterious effect on the U.S. Government's ability to protect U.S. service members from similar treatment in the future," id. ¶ 18.

The public interest against disclosure of detainee photographs is thus extremely strong, and trumps any public interest in disclosure.  In light of the detainees' substantial and well-established privacy interests, as reflected in the U.S. Government's consistent and longstanding policy and practice prohibiting disclosure of detainee photographs, and the Government's compelling interest in enforcing that policy to protect U.S. service members, disclosure of the photographs "would constitute a clearly unwarranted invasion of [the detainees'] personal privacy." 5 U.S.C. § 552(b)(6).  The photographs accordingly should be found exempt from disclosure under FOIA.

**POINT II**

**WEIGHT INFORMATION CONTAINED IN DETAINEE MEDICAL RECORDS IS EXEMPT FROM DISCLOSURE UNDER FOIA EXEMPTION 6**

**A.    Weight Information Is Contained in Detainee Medical Records**

Exemption 6 also protects another category of "identifying information" requested by AP: information regarding individual detainees' weight.  Detainees at Guantanamo are provided with comprehensive health care, both on a routine basis and in response to particular medical problems or concerns.  Hecker Decl. ¶ 9 & Exh. A.  Information regarding a detainee's weight is contained only within the detainee's medical records.  Id. ¶ 10.  Thus, detainee weight information constitutes "medical . . . files" within the meaning of Exemption 6.  5 U.S.C. § 552(b)(6).

**B.    The Detainees' Privacy Interests Outweigh Any Public Interest in Disclosure of Their Medical Records**

It is axiomatic that individuals have significant privacy interests in their medical information.  Indeed, those interests are so well settled that Congress expressly included "medical . . . files" in the definition of records protected by Exemption 6.  5 U.S.C. § 552(b)(6).  Courts have routinely protected these privacy interests and denied requests for disclosure of medical records.  See, e.g., McDonnell v. United States, 4 F.3d 1227, 1254 (3d Cir. 1993).  In accordance with Exemption 6 and the case law applying it, DOD's policy is to withhold medical information regarding Guantanamo detainees from public release under FOIA.  Hecker Decl. ¶ 10.

On the other side of the scale, there is little public interest in learning the weight of individual detainees.  Information regarding weight is not necessary for identification of detainees, given that detainee names, ISNs, nationalities, dates and places of birth have been or will be disclosed (subject to any individualized withholdings).  See Ray, 502 U.S. at 178; Wood, 432 F.3d at 89.

Nor does information about individual detainees' weight contribute "significantly" to the public's understanding of DOD's "operations or activities."  Reporters Comm., 489 U.S. at 775.  AP has suggested that it seeks information concerning detainees' weight because of reported hunger strikes by detainees at Guantanamo.  Normand Decl., Exh. 2 at 4.  But AP's FOIA request sought information about weight, and then only as a subset of "any other relevant identifying information."  Normand Decl., Exh. 1 at Exh. A; Hecker Decl. ¶ 3.

Production of weight information for all detainees at Guantanamo would reveal substantial medical information wholly unrelated to the reported hunger strikes.  According to

information already made public by DOD, as of December 29, 2005, medical officials assigned to JTF-Guantanamo reported a total of 84 enemy combatants as participants in a voluntary fast. Hecker Decl., Exh. B.  As of January 6, 2006, according to medical officials, the number of detainees on hunger strikes had decreased to 40.  Id. Exh. C.  AP, however, requests weight information with regard to more than 750 detainees held at one time or another at Guantanamo. Further, production of information about weight alone would provide an incomplete and potentially inaccurate picture as to whether a particular detainee had engaged in a hunger strike, as a detainee's weight could fluctuate up or down on account of illness or other factors aside from voluntary fasting.

More importantly, production of detainee weight information, even as to detainees who had engaged in hunger strikes, would provide little if any information about how DOD responded to those hunger strikes – the only potential public interest that FOIA conceivably would protect in this context.  See Reporters Comm., 489 U.S. at 773 (FOIA not concerned with information that "reveals little or nothing about an agency's own conduct").  DOD has already made public substantial information regarding the actions it has taken to respond to hunger strikes by detainees at Guantanamo.  See Hecker Decl. ¶ 11 & Exhs. B-C (press releases providing information regarding the number of detainees engaged in hunger strikes and DOD's response); id. Exh. D (Declaration of Major General Jay W. Hood, former Commander, JTF-Guantanamo, regarding DOD's procedures for responding to detainee hungers strikes, filed in various habeas cases).  This information sheds far more light on DOD's response to the hunger strikes than detainee weight information, and it was never even requested by AP.

Given the detainees' significant privacy interests in their medical information, and the minimal public interest in disclosure of detainee weight information, disclosure "would

constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); see also

Wood, 432 F.3d at 9 (finding clearly unwarranted invasion of privacy where negligible public

interest in disclosure). Therefore, weight information contained in detainee medical records

should be found exempt from disclosure under Exemption 6.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to DOD with regard

to that portion of AP's FOIA request seeking photographs identifying individual detainees and

weight information contained in detainees' medical records.

Dated: New York, New York
       May 11, 2006

                                    Respectfully submitted,

                                    MICHAEL J. GARCIA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for Defendant

                        By:      s/ Sarah S. Normand
                                    SARAH S. NORMAND (SN-2834)
                                    Assistant United States Attorney
                                    86 Chambers Street
                                    New York, New York 10007
                                    Telephone: (212) 637-2709
                                    Facsimile: (212) 637-2702

-28-