UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ASSOCIATED PRESS, | : | **ECF Case** |
| | : | **No. 06 Civ. 1939 (JSR)** |
| Plaintiff, | : | |
| - against - | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| DEFENSE, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
David A. Schulz (DS-3180)
Adam J. Rappaport
230 Park Avenue, Suite 1160
New York, NY 10169
(212) 850-6100

David H. Tomlin
THE ASSOCIATED PRESS
450 West 33rd Street
New York, NY 10001

*Counsel for The Associated Press*

Dockets.Justia.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...................................................................................................2

      A.     Background of this Dispute ..................................................................2

      B.     Issues in this Litigation .......................................................................3

ARGUMENT ........................................................................................................................4

I.     DOD BEARS A HEAVY BURDEN TO WITHHOLD INFORMATION
      UNDER THE FREEDOM OF INFORMATION ACT........................................4

II.    EXEMPTION 6 DOES NOT AUTHORIZE DOD TO WITHHOLD
      EITHER DETAINEE WEIGHT INFORMATION OR PHOTOGRAPHS ........5

      A.     The Release of Detainee Weights Would Not Constitute a "Clearly
           Unwarranted" Invasion of Personal Privacy...........................................5

      B.     The Release of an Identifying Photograph Would Not Invade Any
           Protectable Privacy Interest of a Detainee ..............................................8

      C.     The Public Interest in Release of Detainee Identifying Photos
           Outweighs Any Potential Invasion of Privacy.......................................14

      D      At a Minimum, any Withholding Under Exemption 6 Should Be
           Undertaken on a Case-By-Case Basis....................................................17

III.   EXEMPTION 1 DOES NOT AUTHORIZE DOD TO WITHHOLD
      PHOTOGRAPHS OF CURRENT DETAINEES............................................18

CONCLUSION...................................................................................................................22

## TABLE OF AUTHORITIES

### CASES

*Adem v. Bush*, 2006 WL 1193853 (D.D.C. Apr. 28, 2006) ............................................................8

*Associated Press v. United States Department of Defense*, 410 F. Supp. 2d 147
    (S.D.N.Y. 2006) ................................................................................................................*Passim*

*Badhwar v. United States Department of the Air Force*, 829 F.2d 182 (D.C. Cir. 1987) ............18

*Caldarola v. County of Westchester*, 343 F.3d 570 (2d Cir. 2003) ...................................15, 16, 17

*Carney v. United States Department of Justice*, 19 F.3d 807 (2d Cir. 1994) ..................................5

*Department of the Air Force v. Rose*, 425 U.S. 352 (1976) ........................................................4, 5

*Detroit Free Press, Inc. v. Department of Justice*, 73 F.3d 93 (6th Cir. 1996) ................11, 15, 16

*Detroit Free Press, Inc. v. Oakland County Sheriff*, 418 N.W.2d 124
    (Mich. Ct. App. 1987)..................................................................................................................11

*Donovan v. FBI*, 806 F.2d 55 (2d Cir. 1986)................................................................19, 20, 21, 22

*Federal Open Market Committee of the Federal Reserve System v. Merrill*,
    443 U.S. 340 (1979)......................................................................................................................5

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ...............................................................4, 5, 19, 20

*Hamdan v. Rumsfeld*, 126 S. Ct. 622 (2005) ..............................................................................18

*Hicks v. Bush*, 397 F. Supp. 2d 36 (D.D.C. 2005) ......................................................................18

*Hudson v. Palmer*, 468 U.S. 517 (1984)......................................................................................10

*King v. United States Department of Justice*, 830 F.2d 210 (D.C. Cir. 1987)..............................19

*Lawyers Committee for Human Rights v. INS*, 721 F. Supp. 552 (S.D.N.Y. 1989) ......................19

*Lissner v. United States Customs Service*, 241 F.3d 1220 (9th Cir. 2001)................................6, 11

*McDonnell v. United States*, 4 F.3d 1227 (3d Cir. 1993) ...............................................................6

*National Archives & Records Administration v. Favish*, 541 U.S. 157 (2004)..............................4

*National Council of La Raza v. Department of Justice*, 411 F.3d 350 (2d Cir. 2005) ..............4, 15

*Paul v. Davis*, 424 U.S. 693 (1976) ............................................................................................11

*Planned Parenthood of Westchester, Inc. v. Town Board of the Town of Greenburgh*,
  587 N.Y.S.2d 461 (N.Y. Sup. Ct. 1992) ..............................................................................11

*Rosenfeld v. United States Department of Justice*, 57 F.3d 803 (9th Cir. 1995) .........19, 20, 21, 22

*United States Department of Justice v. Landano*, 508 U.S. 165 (1993) ........................................19

*United States Department of Justice v. Reporters Committee For Freedom of Press*,
  489 U.S. 749 (1989)....................................................................................5, 14, 16, 17

*United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989).....................................4

*United States Department of State v. Ray*, 502 U.S. 164 (1991) ..................................................18

*United States v. Willoughby*, 860 F.2d 15 (2d Cir. 1988)............................................................10

*Washington Post Co. v. HHS*, 690 F.2d 252 (D.C. Cir. 1982).........................................................5

*Weberman v. National Security Agency*, 490 F. Supp. 13 (S.D.N.Y. 1980)..................................21

## STATUTES

5 U.S.C. § 552(a)(4)(B) ..............................................................................................................19

5 U.S.C. § 552(b)(1) ...............................................................................................................4, 19

5 U.S.C. § 552(b)(6) ...............................................................................................................4, 5

28 U.S.C. § 2241(e) .....................................................................................................................8

## MISCELLANEOUS

British Broadcasting Corporation, *Afghans Tell of Guantanamo Ordeal*, Oct. 29, 2002..............10

*Britons Who Returned From Guantanamo Were Trained by al-Qaida: Report*,
  Agence France Presse, Jan. 27, 2005 ...................................................................................16

*Details of Some Hearings Involving Guantanamo Detainees*, Associated Press,
  Mar. 7, 2006.........................................................................................................................16

Paisley Dodds, *Former Guantanamo Prisoner Publishes Book*, Associated Press,
  Mar. 7, 2006.........................................................................................................................10

Jim Garamone, *"We Got Him" - Bremer Announces Saddam's Capture*, American Forces Press Service, Dec. 14, 2003 ..................................................................................13

Geneva Convention Relative to the Treatment of Prisoners of War art. 13, Aug. 12, 1949 .........12

Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 27, Aug. 12, 1949..........................................................................................................12

Gerry J. Gilmore, *Saddam Is a POW, But Status Could Change*, American Forces Press Service, Jan. 10, 2004 ...........................................................................................13

Halima Kazem, *Freed Afghans Decry Guantanamo Conditions*, L.A. Times, July 21, 2005.........................................................................................................3

Neil A. Lewis, *Widespread Hunger Strike at Guantanamo*, N.Y. Times, Sept. 18, 2005 .........3, 7

Maj. Scott R. Morris, *America's Most Recent Prisoner of War: The Warrant Officer Bobby Hall Incident*, Army Lawyer, Sept. 1996 ...................................................................17

Letta Tayler, *Behind Barbed Wire in Guantanamo*, Newsday, Oct. 3, 2005 ...................................3

Letta Tayler, *Inmate's Letters Shed Light on Conditions at Guantanamo*, Newsday, Oct. 6, 2005.........................................................................................................16

Jane Tyler, *We Can Never Go Home – Tipton Trio*, Birmingham Mail, Mar. 7, 2006 ................10

Josh White & Carol Leoning, *4 Men Cleared of Terrorism Links but Still Detained*, Wash. Post, May 20, 2006 ......................................................................................10

Josh White & Carol Leoning, *U.S. Cites Exception in Torture Ban; McCain Law May Not Apply to Cuba Prison*, Wash. Post, Mar. 3, 2006 ...........................................................7

## PRELIMINARY STATEMENT

Through this Freedom of Information Act ("FOIA") lawsuit and the related FOIA

litigation in *Associated Press v. U.S. Dep't of Defense*, No. 05 Civ. 3941 (JSR) and *Associated

Press v. U.S. Dep't of Defense*, No. 05 Civ. 5468 (JSR), the Associated Press ("AP") seeks to

inspect records maintained by the Department of Defense ("DOD") concerning hundreds of

individuals detained at the Naval Base in Guantanamo Bay, Cuba ("Guantanamo"). After more

than a year of litigation, on May 15, 2006 DOD released to AP information identifying all 759

detainees who have been held at Guantanamo since January 2002.[1]

The instant motion addresses two categories of additional detainee information sought by

AP: (1) information kept by DOD on the weights of detainees at Guantanamo, and (2) an

identifying photograph of each current and former detainee, all of whom have previously been

identified by name, citizenship, and date and place of birth.[2] In moving for summary judgment,

DOD contends that releasing this information would constitute a "clearly unwarranted" invasion

of detainee privacy. DOD also alleges a national security interest, but only in the photos of those

detainees who remain in DOD's custody. As demonstrated below, DOD fails to establish any

proper basis under FOIA to withhold this information about the Guantanamo detainees.

---

[1] AP's FOIA request sought identifying information on "each detainee who, since September 11, 2001, has been confined for any period of time" at Guantanamo. *See* Compl., Ex. A. DOD's response provides identifying information for "all individuals detained *by DOD* at Guantanamo Bay, Cuba since the detention facility opened in January 2002." Declaration of Karen L. Hecker ("Hecker Decl.") ¶ 7 (emphasis added). AP has requested a clarification of this limiting language to determine whether DOD has actually provided a full response to AP's request, and is still awaiting an explanation from DOD.

[2] To expedite the release of information, AP earlier advised DOD that it would accept weight information without height information. As now appears, these data are often recorded on the same document. *See* Declaration of Andrew Selsky ("Selsky Decl."), Ex. E. AP thus requests that height information be made public to the extent it is contained on any document showing weight.

## STATEMENT OF FACTS

### A.    Background of this Dispute

This lawsuit arises out of AP's determined effort to obtain information about individuals

held at Guantanamo, who were taken by the U.S. government from Afghanistan, Pakistan and

other locations around the world and detained for years, most without charge.  To understand

who was being held and the bases for their detention, in 2004 AP sought, *inter alia*, records of

then-ongoing Combatant Status Review Tribunals ("CSRTs") that had been convened to

determine whether detainees were properly characterized as "enemy combatants."  *See*

*Associated Press v. U.S. Dep't of Defense*, 410 F. Supp. 2d 147, 149 (S.D.N.Y. 2006).  When

Administrative Review Boards ("ARBs") were later created to review the need for continued

confinement of each detainee, AP sought records from these proceedings as well.  DOD initially

failed to respond to either request.  When forced by AP's FOIA litigation to release records from

these proceedings, it expunged any information that might reveal the identity of a detainee,

rendering the records all but useless.  *See id.*  In prior orders, this Court rejected DOD's claims

that the disclosure of identifying information would unreasonably invade the privacy of detainees

or their families.  *See id.* at 150-51, 154-57.

Even with identifying information restored, the CSRT transcripts and ARB records were

of limited use.  The records covered only a portion of the detainees who had passed through

Guantanamo, and in many cases the subject of the proceeding was referenced in the records only

by his Internment Serial Number ("ISN").  On January 18, 2006, AP thus submitted an additional

FOIA request for documents sufficient to match the ISN of each detainee with his name,

nationality, home town, age, and dates of confinement.  *See* Compl., Ex. A.  This and any "other

relevant identifying information" was sought for each detainee.  *Id.*  In response to a subsequent

request for clarification, on February 3, 2006 AP told DOD to construe its request for "other

relevant identifying information" as seeking a photo of each detainee along with information on height, weight, and religious affiliation. *See* Declaration of Karen L. Hecker ("Hecker Decl.") ¶ 3.

A photo of each detainee was sought in order to provide a visual record of the identity of detainees, to shed light on detainees who claimed to be victims of mistaken identity, and to provide information on the physical condition and appearance of the detainees. *See* Selsky Decl. ¶¶ 10-12. Height and weight information was sought to shed light on the scope and effect of hunger strikes known to have been undertaken by many detainees to protest conditions of their confinement. *See id.* ¶¶ 15-17. The existence of hunger strikes has been reported, but their size and impact are disputed by DOD. *See, e.g.*, Halima Kazem, *Freed Afghans Decry Guantanamo Conditions*, L.A. Times, July 21, 2005, at A3 (reporting 180 detainees on a hunger strike); Neil A. Lewis, *Widespread Hunger Strike at Guantanamo*, N.Y. Times, Sept. 18, 2005, at 24 (reporting more than 200 detainees engaged in a separate hunger strike); Letta Tayler, *Behind Barbed Wire in Guantanamo*, Newsday, Oct. 3, 2005, at A16.

**B.**     **Issues in this Litigation**

DOD did not timely respond to the AP's FOIA request and was unable to state when, or whether, it would provide the identifying information at all. *See* Compl. ¶ 3. AP therefore filed this lawsuit on March 13, 2006, seeking to compel release of the additional detainee information. After AP initiated litigation, DOD committed to produce in two waves some of the detainee information being sought. *See* Selsky Decl. ¶ 8. As of May 15, DOD has produced the names of 759 individuals along with their ISNs, citizenship, and dates and places of birth.[3]

---

[3] *See* Hecker Decl. ¶¶ 6, 7. At least 272 of these detainees are no longer held at Guantanamo; about 485 remain there to this day. *See* Declaration of Paul Rester ("Rester Decl.") ¶ 9.

Having released this identifying information, DOD nonetheless objects to providing weight information or a photograph of any detainee, and has yet to provide information about religious affiliations. In its present motion, DOD contends that (1) detainee photographs and weight information fall within the personal privacy provision of Exemption 6, 5 U.S.C. § 552(b)(6); and (2) photographs of current detainees have properly been classified "SECRET," and therefore are exempt from disclosure under Exemption 1, 5 U.S.C. § 552(b)(1).

## ARGUMENT

### I.

### DOD BEARS A HEAVY BURDEN TO WITHHOLD INFORMATION UNDER THE FREEDOM OF INFORMATION ACT

The purpose of FOIA is "to promote honest and open government and to assure the existence of an informed citizenry [in order] to hold the governors accountable to the governed." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355 (2d Cir. 2005) ("*La Raza*") (internal quotation and citation omitted). To achieve this goal, as this Court has recognized, "'FOIA strongly favors a policy of disclosure.'" *Associated Press*, 410 F. Supp. 2d at 150 (quoting *La Raza*, 411 F.3d at 350); *see also Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) ("disclosure, not secrecy, is the dominant objective of the Act"); *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999) (same). The Act mandates broad disclosure because access to information about the actions of government is "a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

DOD thus bears a heavy burden on this motion. FOIA requires DOD to disclose its records unless a document falls within one of the specific exemptions in the Act, which are "narrowly construed." *Associated Press*, 410 F. Supp. 2d at 150; *see also U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (FOIA "exemptions have been consistently given a narrow compass"); *La Raza*, 411 F.3d at 356 (same). DOD's claims of exemption are to be

4

reviewed *de novo*, *Halpern*, 181 F.3d at 287-88, and DOD bears the burden of establishing that

the exemptions properly apply, *see Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*,

443 U.S. 340, 352 (1979); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).

Summary judgment is appropriate only if DOD proves that there are no material facts in dispute

and it is entitled to judgment as a matter of law. *Associated Press*, 410 F. Supp. 2d at 150.

## II.
## EXEMPTION 6 DOES NOT AUTHORIZE DOD TO WITHHOLD EITHER DETAINEE WEIGHT INFORMATION OR PHOTOGRAPHS

Exemption 6 allows an agency to withhold "personnel and medical files and similar files

the disclosure of which would constitute a *clearly unwarranted* invasion of personal privacy." 5

U.S.C. § 552(b)(6) (emphasis added). As the Court explained in *Associated Press*, the

Government's burden to establish that Exemption 6 applies is heavier than under other

exemptions "because the Government must show that disclosure '*would* constitute' (as opposed

to 'could reasonably be expected to constitute') a '*clearly* unwarranted' (as opposed to simply

'unwarranted') invasion of personal privacy." 410 F. Supp. 2d at 150 (citations omitted); *see

also Rose*, 425 U.S. at 378 & n.16; *U.S. Dep't of Justice v. Reporters Comm. For Freedom of

Press*, 489 U.S. 749, 756 (1989) ("*Reporters Committee*"). While all FOIA exemptions are

narrowly construed, "under Exemption 6, the presumption in favor of disclosure is as strong as

can be found anywhere in the Act." *Washington Post Co. v. HHS*, 690 F.2d 252, 261 (D.C. Cir.

1982).

### A.    The Release of Detainee Weights Would Not Constitute a "Clearly Unwarranted" Invasion of Personal Privacy

In refusing to disclose the weights of the detainees, DOD again asserts a privacy interest

on their behalf without providing any evidence that they would want this information withheld,

and then claims that this interest outweighs any public interest in understanding significant aspects of the hunger strikes. DOD's contentions do not stand up to scrutiny.

DOD says it is "axiomatic" that individuals have a privacy interest in their medical information, but fails to provide any competent evidence that the detainees would want information about their weights kept private. *See* DOD Mem. at 26. Nor does DOD demonstrate that any of the detainees have a legitimate expectation that their weights would be kept private. When a person's name has already been disclosed, their "general physical description . . . including their height, weight, eye color, and ethnicity, implicates no personal privacy interest." *Lissner v. U.S. Customs Serv.*, 241 F.3d 1220, 1224 (9th Cir. 2001).

Even if the only source of weight information is the detainees' medical files, detainees are not likely to consider their weight as the kind of information that would expose them to danger, harassment, or embarrassment. *See id.* While medical files are identified as the kind of record Exemption 6 can protect, even DOD's own authority acknowledges that there may be no privacy interest in them at all in certain situations, and that any privacy interest can be overcome by the public interest in disclosure. *See McDonnell v. United States*, 4 F.3d 1227, 1254 (3d Cir. 1993) (no privacy interest where medical records involve deceased individual). Here, the very reason for the hunger strikes was to protest the conditions at Guantanamo and the detainees' long imprisonment without being charged with any crime. *See* Selsky Decl. ¶¶ 15-17. It would make little sense if detainees participating in a hunger strike would *not* want their weights disclosed.

In any case, any privacy interest in the detainees' weights is outweighed by the public interest in understanding the extent of the hunger strikes and DOD's response to them. First, disclosing weight information will help to establish the extent of the strikes, both in terms of the number of participants and the severity of weight loss they suffered. The government claims that

6

131 detainees participated in the hunger strikes that began on August 8, 2005. *See id.* ¶ 17. Representatives of the detainees, however, contend that at least 200 of them were involved, more than one-third of Guantanamo's population at the time. *See Lewis, supra;* Selsky Decl. ¶ 17.

Further, disclosure of weight information will allow the public to properly assess the propriety and effectiveness of steps taken by DOD to respond to the hunger strikes. It is clear that *DOD itself* uses the weight of detainees as a key measure of the impact hunger strikes have on detainees and whether its interventions are working. For example, it is known from documents filed in other litigation that DOD closely tracked Mohammad Bawazir's weight during a hunger strike he began in August 2005. *See* Selsky Decl. ¶ 19 & Ex. E. For four months, he did not consent to being fed through a tube, but did not physically resist either. *See id.* Ex. D. Nevertheless, in January DOD changed its techniques, strapping him to a restraint chair twice a day for two-hour feedings that he claimed were tantamount to "systemic torture." Josh White & Carol Leoning, *U.S. Cites Exception in Torture Ban; McCain Law May Not Apply to Cuba Prison*, Wash. Post, Mar. 3, 2006, at A4; *see* Selsky Decl. Ex. D. After several weeks of this treatment, Bawazir abandoned his hunger strike. *See id.*

Throughout these events, DOD measured the consequences of Bawazir's hunger strike on his body, and the effectiveness of its response, by his weight. *See id.* ¶¶ 19-20 & Ex. E. The public similarly has an interest is knowing this information for other detainees to shed light on DOD's performance. In the case of Mr. Bawazir, the data suggest that the involuntary feeding methods DOD used in late 2005 were not effective, but the techniques it started using on January 11, 2006 were. The public has a clear interest in similar information about other detainees whose lives are in the hands of DOD.

7

Contrary to DOD's contention, *see* DOD Mem. at 27, the press releases it has published regarding the hunger strikes and DOD's responses do not reveal what detainee weight information would reveal. Providing weight information would eliminate the debate about who is participating in a "hunger strike" and how to measure to scope of detainees' actions, by providing factual data through which to evaluate events at Guantanamo.

Such information by which the public may monitor DOD's actions is only more important since a recent legislative change to the jurisdiction of federal courts. In December 2005, the Detainee Treatment Act of 2005 amended the federal habeas corpus statute to remove court jurisdiction over applications for writs of habeas corpus on behalf of non-citizens detained at Guantanamo. *See* 28 U.S.C. § 2241(e). DOD has since argued in several cases that this statute requires courts to dismiss even pending habeas claims asserting that the detainees have been mistreated. *See, e.g., Adem v. Bush*, 2006 WL 1193853, at *7 (D.D.C. Apr. 28, 2006). If DOD is successful, no court will have any oversight over DOD's treatment of detainees in Guantanamo. Only the public, through FOIA requests such as this one, will be able to understand and monitor DOD in this respect.

**B.    The Release of an Identifying Photograph Would Not Invade Any Protectable Privacy Interest of a Detainee**

In withholding all detainee photos, DOD similarly asserts a privacy interest on behalf of individuals it has imprisoned without charge for several years. DOD argues that the privacy of detainees categorically outweighs the public interest in the release of a photograph of each detainee, but again fails to provide competent evidence establishing either a desire for such privacy among the detainees, or a privacy interest protected by FOIA that would be invaded. To the contrary, a detainee who has been photographed by the government without consent, and

whose identity is already publicly disclosed, has no reason to expect that his image would be kept private under FOIA.

In seeking to invoke Exemption 6, categorically, DOD once again relies upon speculation about adverse consequences that might befall some detainees if their image is released. *See* DOD Mem. at 16. In *Associated Press*, DOD previously asserted that the detainees had a privacy interest in keeping identifying information secret due primarily to concerns of possible retaliation against them or their families. In rejecting this claim, the Court noted that "thin and conclusory speculation" fails to satisfy DOD's obligation under Exemption 6 to show that "disclosure would in fact constitute a clearly unwarranted invasion of personal privacy." *Associated Press*, 410 F. Supp. 2d at 151.

DOD nonetheless offers more conclusory concerns for detainee privacy, urging now that release of photographs would "subject the photographed individuals to public insult, curiosity, embarrassment, unwanted exposure, harassment, and exploitation of their personal images." Declaration of Richard B. Jackson ("Jackson Decl.") ¶ 5; *see* DOD Mem. at 12-16. DOD boils its argument down to the cliché: "a picture is worth a thousand words," DOD Mem. at 16, but provides no evidence or specific examples to demonstrate that photographs would subject the detainees to any more "abuse and exploitation" than written identifying information. As with its earlier privacy contentions, DOD's argument is offered without "the slightest evidence that . . . embarrassment or retaliation is likely," and is confined instead "to wholly conclusory and grossly speculative assertions." *Associated Press*, 410 F. Supp. 2d at 157.

Even if a nugget of truth lies beneath its cliché, DOD provides no evidence that the detainees wish to keep the photographs confidential or that they will be embarrassed by their disclosure. In fact, the evidence is the opposite. Many released detainees have shown no

9

reluctance to being photographed and videotaped, and several have taken prominent public roles since their release. *See, e.g.*, Paisley Dodds, *Former Guantanamo Prisoner Publishes Book*, Associated Press, Mar. 7, 2006 (describing book by former detainee Moazzam Begg accompanied by photograph of him); Jane Tyler, *We Can Never Go Home – Tipton Trio*, Birmingham Mail, Mar. 7, 2006 (describing film about experiences of former detainees Shafiq Rasul, Rusel Ahmed, and Asif Iqbal accompanied by photograph of them); Josh White & Julie Tate, *4 Men Cleared of Terrorism Links but Still Detained*, Wash. Post, May 20, 2006, at A18 (report on recently released detainees accompanied by photograph of Adel Abdu al-Hakim); British Broadcasting Corporation, *Afghans Tell of Guantanamo Ordeal*, Oct. 29, 2002 (report on former detainees Haji Faiz Mohammed and Jan Mohammed, accompanied by AP photograph of them) (*available at* http://news.bbc.co.uk/2/hi/south_asia/2371349.stm).

Nor does DOD establish any expectation of privacy by the detainees that would be thwarted by release of the photos. The Court previously recognized that detainees have no reasonable expectation that their identifying information would be kept private, *Associated Press*, 410 F. Supp. 2d at 150-51, and this remains true of other identifying details beyond their names, *see Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984) ("we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell"); *United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir. 1988) (no reasonable expectation of privacy in telephone calls made in prison). Particularly given that the identities of the detainees are known, and that the vast majority of them appeared in quasi-judicial proceedings open to the press, any possible expectation of privacy in an identifying photograph is *de minimis*.

In an analogous context involving booking photos of individuals arrested and charged with a crime, courts recognize that individuals imprisoned by the government have diminished expectations of privacy and routinely require their photographs to be released. For example, in *Detroit Free Press, Inc. v. Dep't of Justice*, 73 F.3d 93 (6th Cir. 1996), a newspaper filed a FOIA request for the mug shots of eight criminal defendants in government custody. *See id.* at 95. In assessing the privacy interests of the defendants under Exemptions 6 and 7(C), the Sixth Circuit held that, because they "had already been identified by name by the federal government and their visages had already been revealed during prior judicial appearances," disclosing photographs would not reveal any new information about them, and thus would not invade their privacy. *Id.* at 97; *see also Detroit Free Press, Inc. v. Oakland County Sheriff*, 418 N.W.2d 124, 127-30 (Mich. Ct. App. 1987) (releasing "booking photographs" under state FOIA does not violate privacy); *Planned Parenthood of Westchester, Inc. v. Town Board of the Town of Greenburgh*, 587 N.Y.S.2d 461, 463 (N.Y. Sup. Ct. 1992) (same); *cf. Lissner*, 241 F.3d at 1224.[4]

Even if some detainees might be embarrassed by disclosure of their photographs, these cases establish that "the personal privacy of an individual is not necessarily invaded simply because that person suffers ridicule or embarrassment from the disclosure of information in the possession of government agencies." *Detroit Free Press, Inc. v. Dep't of Justice*, 73 F.3d at 97; *see also Paul v. Davis*, 424 U.S. 693, 712-13 (1976) (disclosure of arrest does not invade privacy). The photographs of detainees requested by AP are directly analogous to mug shots

---

[4] Similarly, the Supreme Court has held that public distribution of photographs of individuals arrested by the government does not invade any constitutional privacy rights. *See Paul v. Davis*, 424 U.S. 693, 712-13 (1976) (police distribution of a flier identifying a man previously arrested for shoplifting as an "Active Shoplifter" did not violate his constitutional right of privacy, and rejecting claim "that the State may not publicize a record of an official act such as an arrest").

11

taken of those charged with a crime. Similarly, their release is not an invasion of any privacy protected by FOIA.

DOD attempts to identify a privacy interest by pointing to Army regulations, DOD policy, and the Geneva Conventions, *see* DOD Mem. at 17-21, but its argument is misdirected. First, Army regulations do not supplant FOIA obligations. Moreover, regulations governing the treatment of prisoners held on the battlefield, or restrictions on the exploitation and humiliation of enemy soldiers, are far removed from a request for release of an individual identifying photo of prisoners arrested in various locations around the world, taken to an isolated location, and held for years without charge. This is not a case where enemies are being "paraded around" for humiliation.

Second, the Geneva Conventions – according to the U.S. government – have no application to the Guantanamo detainees. *See* Jackson Decl. ¶ 11 & Ex. C. Even if they did, releasing identifying photos would not violate the conventions. The applicable articles do not ban photographs of detainees, but rather provide that prisoners of war are to be protected "against insults and public curiosity." Geneva Convention Relative to the Treatment of Prisoners of War art. 13, Aug. 12, 1949; Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 27, Aug. 12, 1949. DOD's newly-found devotion to the Geneva Conventions, once again, makes it "hard to escape the inference that the Government's entire Exemption 6 argument . . . is a cover for other concerns." *Associated Press*, 410 F. Supp. 2d at 156 n.2.

Indeed, if DOD actually thought the Geneva Conventions had bearing, it would be asserting Exemption 3, concerning information specifically exempted from disclosure by another law. DOD makes no such claim. Nor does DOD assert that the Army regulations it discusses

raise national security concerns that might justify withholding photos of detainees who are no longer in its custody. In reality, policies embedded in these treaties and regulations in no way control the Court's determination whether a privacy interest of the detainees would be clearly invaded by the release of an identifying photograph.

Moreover, DOD's invocation of these policies to avoid the release of identifying photos must be weighed against the government's own selective release of photos in other contexts. For example, when DOD captured Saddam Hussein, rather than protecting this prisoner of war from "public curiosity," the government publicly released a close-up video of him receiving a medical exam by American military personnel, and published photographs of him with a beard and after it had been shaved off.[5] *See* Selsky Decl. ¶ 13 & Ex. C; Jim Garamone, *"We Got Him" – Bremer Announces Saddam's Capture*, American Forces Press Service, Dec. 14, 2003 (describing video shown by Lt. General Ricardo Sanchez of Hussein undergoing medical tests). Similarly, the government released photographs of a bedraggled Khalid Shaikh Mohammad immediately following his capture, and released photographs of John Walker Lindh, the so-called "American Taliban," after his capture in Afghanistan. *See* Selsky Decl. ¶ 13 & Ex. C. All of this belies any firm expectation of privacy in an identifying photograph of a detainee, and certainly fails to support a continuing privacy interest for those held for years against their will.

In short, DOD has failed to provide any competent evidence that the already identified detainees have an interest in keeping an identifying a photograph private.

---

[5] Unlike the Guantanamo detainees, the U.S. government classified Hussein as an enemy prisoner of war to whom the Geneva Conventions apply. *See* Gerry J. Gilmore, *Saddam Is a POW, But Status Could Change*, American Forces Press Service, Jan. 10, 2004.

**C.**    **The Public Interest in Release of Detainee Identifying**
     **Photos Outweighs Any Potential Invasion of Privacy**

Even if DOD could show that detainees have some interest in keeping photographs

private, the public interest in disclosure would outweigh any such interest. Whether a disclosure

amounts to a "clearly unwarranted" invasion of personal privacy turns on "the nature of the

requested document" and its relationship to FOIA's core purpose of opening agency action "to

the light of public scrutiny." *Reporters Committee*, 489 U.S. at 772 (internal quotations and

citation omitted). In *Reporters Committee*, the Supreme Court addressed a FOIA provision in

Exemption 7(C) that more broadly exempts from disclosure information from law enforcement

files, in particular, information that could constitute an "unwarranted invasion of personal

privacy." The Court explained that this exemption allows information to be withheld only when

it "reveals little or nothing about an agency's own conduct." *Reporters Committee*, 489 U.S. at

773. On the other hand, even personal information about an individual must be disclosed when

that disclosure advances FOIA's purpose of informing citizens about "'what their government is

up to'":

> Official information that sheds light on an agency's performance
> of its statutory duties falls squarely within [FOIA's] statutory
> purpose. That purpose, however, is not fostered by disclosure of
> information about private citizens that is accumulated in various
> government files but reveals little or nothing about an agency's
> own conduct.

*Id.* (citation omitted).

The same analysis was applied in *Associated Press* and applies here. Information and

documents may be withheld only when the government shows that disclosure would invade an

individual's personal privacy *and* would not assist the public in understanding the actions of

government. *See Associated Press*, 410 F. Supp. 2d at 150-51. As in the related cases, DOD is

incorrect in asserting that release of the photographs would reveal nothing about the
government's conduct.

To the contrary, disclosure of an identifying photograph of each detainee will allow the
public visually to assess the physical condition of the detainees while under DOD's control, and
will allow the public to assess claims of many detainees that they are victims of mistaken
identity. It will also allow detection of detainees who may have provided an alias to DOD. *See*
Selsky Decl. ¶ 10. In short, disclosure of the photographs is important if the public is to "'hold
the governors accountable to the governed.'" *La Raza*, 411 F.3d at 355 (citation omitted). As
AP's Chief of Caribbean News explains, the news value of the photos is "enormous" and they
should be "part of the government's accountability of events in Guantanamo Bay." Selsky Decl.
¶ 12.

Again, precedent involving images of people arrested or detained by the government is
illustrative. In *Detroit Free Press, Inc. v. Dep't of Justice*, the court also evaluated the public
interest in mug shots of the eight criminal defendants, and concluded that disclosure can in many
circumstances "serve to subject the government to public oversight":

> For example, release of a photograph of a defendant can more
> clearly reveal the government's glaring error in detaining the
> wrong person for an offense than can any reprint of only the name
> of an arrestee. Furthermore, mug shots can startlingly reveal the
> circumstances surrounding an arrest and initial incarceration of an
> individual in a way that written information cannot.

73 F.3d at 98. Similarly, the Court of Appeals held in *Caldarola v. County of Westchester*, 343
F.3d 570 (2d Cir. 2003), that any constitutional right of privacy an arrestee might have in a
videotape of him being led to a police car is overcome by the public interest in disclosure. *See*
*id.* at 576-77. Not only can such videotapes "be used to serve the legitimate government purpose
of protecting individuals from police abuse and protecting police from false accusations of

abuse," but "allowing the public to view images of an arrestee informs and enables members of

the public who may come forward with additional information relevant to the law enforcement

investigation." *Id.* at 576 & n.3.

These interests are directly relevant here. The photographs will depict the physical

condition of the detainees, most likely at the time of their arrival at Guantanamo. Moreover, a

number of detainees claimed in CSRTs, ARB hearings, and other forums that they are victims of

mistaken identity.[6] Whether DOD adequately investigated these assertions is undoubtedly of

public interest, and could "reveal the government's glaring error in detaining the wrong person."

*Detroit Free Press, Inc. v. Dep't of Justice*, 73 F.3d at 98. Photographs of the detainees will

indeed "shed light on an agency's performance" of its duties and thus "falls squarely within" the

statutory purpose of FOIA. *Reporters Committee*, 489 U.S. at 773.

DOD counters that there is also a public interest in *not* releasing the photographs.

According to DOD, releasing the photographs could encourage foreign governments or enemies

to violate the Geneva Conventions in their treatment of American service members they have

detained, and would undermine the U.S. government's ability to object to such activities. *See*

DOD Mem. at 24-25. While it is obvious that some actions by the U.S. government could

encourage a foreign government to disregard the Geneva Conventions in its treatment of

---

[6] *See, e.g.*, Letta Tayler, *Inmate's Letters Shed Light on Conditions at Guantanamo*, Newsday, Oct. 6, 2005 (reporting detainee Omar Deghayes' claim, backed by a face identification expert, that the government incorrectly identified him as a man seen in a terrorist videotape); Transcript of CSRT hearing of Abdur Sayed (or Shed) Rahman, *available at* http://www.defenselink.mil/pubs/foi/detainees/csrt/Set_3_0205-0319_Revised.pdf, at 00272-00294 (asserting that he was a chicken farmer from Pakistan, and not the Taliban Deputy Foreign Minister with a similar name); *Details of Some Hearings Involving Guantanamo Detainees*, Associated Press, Mar. 7, 2006 (at CSRT hearings, Abdul Aziz Sa'ad Alfaldi said "his arrest may have been a case of mistaken identity" and Zain Ul Abedin "told the tribunal that U.S. forces had arrested the wrong man"); *Britons Who Returned From Guantanamo Were Trained By al-Qaida: Report*, Agence France Presse, Jan. 27, 2005 (reporting that former detainee Moazzam Begg's family claimed he was a victim of mistaken identity).

16

captured American soldiers, it is illogical to claim such a possibility in this case. The release for

identification purposes of a single photograph of individuals who have been held for several

years is not even an action not prohibited by the Geneva Conventions. *See supra* p.12.[7] Actions

directly outlawed by the Conventions would be a far greater motivation to a foreign power. Nor

is the release of an identifying photograph comparable to exploitive propaganda efforts such as

the "brutal parading" of Allied pilots by Iraq during the Gulf War, the videotape of members of

the 507th Maintenance Company broadcast by Iraq in March 2003, and the public displays of

American prisoners of war during the Vietnam War. *See* DOD Mem. at 18.

DOD has failed to provide any evidence that the detainees have an interest in keeping

private their identifying photographs taken by DOD, and the public interest in their disclosure

would outweigh any such interest. Releasing the photographs would in no way constitute a

clearly unwarranted invasion of the detainees' personal privacy.

**D.     At a Minimum, Any Withholding Under Exemption 6
        Should Be Undertaken on a Case-By-Case Basis**

While DOD has categorically withheld all weight information and photographs under

Exemption 6, categorical decisions are appropriate only in circumstances where "a case fits into

a genus in which the balance characteristically tips in one direction." *Reporters Committee*, 489

U.S. at 776. This is not true for either detainee weight information or identifying photographs.

At a minimum, therefore, any withholding should be done on a case-by-case basis, based upon a

specific factual demonstration DOD has yet to make.

---

[7] In fact, some commentators point to the "advantages" of foreign powers photographing
captured U.S. service members, such as verification of the identity of the prisoner and
confirming the detaining power's obligation to account for the prisoner and treat him as a POW.
*See* Maj. Scott R. Morris, *America's Most Recent Prisoner of War: The Warrant Officer Bobby
Hall Incident*, Army Law., Sept. 1996, at 3, 22 n.192.

For information the government contends must be withheld to protect a privacy interest, it is common for some individuals to have a stronger interest in privacy than others. *See, e.g., U.S. Dep't of State v. Ray*, 502 U.S. 164, 176 n.12 (1991) (disclosure of names and other identifying information not always a significant threat to privacy of named individuals); *Badhwar v. U.S. Dep't of the Air Force*, 829 F.2d 182, 185 (D.C. Cir. 1987) (Exemption 6 by its nature requires "a case-by-case evaluation"). As to weight information, it is likely that detainees who were involved in hunger strikes would prefer that their weight information be made public, and even those who did not are unlikely to have privacy concerns about disclosure of their weight in captivity.

As to the photographs, even if DOD provided any evidence of an interest in privacy, it is likely that some detainees would feel more embarrassed than others by disclosure. For example, many detainees have filed habeas corpus petitions, and a few are subject to charges that will be tried before a military commission. *See, e.g., Hamdan v. Rumsfeld*, 126 S. Ct. 622 (2005) (granting certiorari for case involving alleged personal bodyguard of Osama bin Laden); *Hicks v. Bush*, 397 F. Supp. 2d 36 (D.D.C. 2005) (staying military commission pending outcome of *Hamdan* case). DOD is wrong to assert categorically that the privacy interests of these detainees outweighs the public interest in disclosure of identifying information.

### III.
### EXEMPTION 1 DOES NOT AUTHORIZE DOD TO WITHHOLD PHOTOGRAPHS OF CURRENT DETAINEES

DOD claims that it may withhold photographs of anyone currently detained at Guantanamo under Exemption 1 because these images, when linked to detainee names and ISNs, are properly classified as "SECRET". *See* Declaration of Paul Rester ("Rester Decl.") ¶ 3; DOD Mem. at 7. DOD's rationale for classification is not supported by any tangible evidence, and the

18

logic of its position is entirely undercut by DOD's admission that photographs of former detainees are not classified.

Records may be withheld under Exemption 1 only when they are (1) authorized to be kept secret under an Executive Order in the interest of national defense and (2) properly classified pursuant to that Executive Order. 5 U.S.C. § 552(b)(1). Exemption 1 thus applies only if the agency has properly classified the records procedurally and the withheld information "logically falls within the classification categories" established in the relevant Executive Order. *See Halpern*, 181 F.3d at 290. In this case, DOD asserts that it may withhold photographs of detainees still in its custody under Executive Order 12958, as amended. *See* DOD Mem. at 6. This Executive Order permits a record to be classified if it concerns "intelligence sources or methods," E.O. 12958 § 1.4, and "the unauthorized disclosure of the information reasonably could be expected to result in damage to national security," *id.* § 1.1(3).

As with all FOIA exemptions, under Exemption 1 "the burden is with the agency to justify nondisclosure." *Donovan v. FBI*, 806 F.2d 55, 60 (2d Cir. 1986), *limited on other grounds*, *U.S. Dep't of Justice v. Landano*, 508 U.S. 165 (1993). Affidavits must, with "reasonable specificity," identify the damage to national security that would be caused by disclosure. *Halpern*, 181 F.3d at 291-92; *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 807 (9th Cir. 1995) (government must demonstrate injury to national security with "particularity"); *King v. U.S. Dep't of Justice*, 830 F.2d 210, 221 (D.C. Cir. 1987); *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 564 (S.D.N.Y. 1989). Representations made in the affidavits are then subject to *de novo* review by the Court. 5 U.S.C. § 552(a)(4)(B); *see Halpern*, 181 F.3d at 291 (Congress specifically amended FOIA to guarantee *de novo* review under Exemption 1). While Exemption 1 affidavits are entitled to substantial weight, they are not to receive "blind

19

deference." *Halpern*, 181 F.3d at 293.  For example, in *Donovan*, the Court of Appeals acknowledged that assertions by the FBI were entitled to deference, but nevertheless upheld the district court's decision that the information sought to be withheld "provided no danger of revealing the identity of the confidential source, and, therefore, were not exempt."  806 F.2d at 60; *see also Rosenfeld*, 57 F.3d at 807 (not error to disclose information despite classification where "government failed to make an initial showing which would justify deference by the district court").

DOD here relies upon the declaration of Paul Rester, the Director of the Joint Intelligence Group of Guantanamo.  The Rester Declaration first asserts that photographs of current detainees, when linked to their names and ISNs would disclose "intelligence sources or methods."  Rester Decl. ¶ 8.  In essence, DOD contends that every person is a potential source of intelligence so long as they are under its control.  Even setting aside this expansive view of the meaning of "intelligence sources" that may be classified under Executive Order 12958 § 1.4, the Rester declaration fails to establish how the release of an identifying photograph of each detainee is reasonably likely to damage national security.

DOD argues that some cooperating detainees at Guantanamo have provided useful information, and that these detainees do not want their cooperation to be known.  *See* Rester Decl. ¶¶ 5, 7.  DOD reasons that the uniform release of photos of all detainees will somehow impair its ability to obtain information from detainees remaining in its custody, because the release of photos will destroy any hope of anonymity for a detainee.  *See* Rester Decl. ¶ 8; DOD Mem. at 9-11.  DOD's argument does not survive scrutiny, for a number of reasons.

First, DOD fails to explain how releasing photos of all detainees makes it any more possible to identify those who may be cooperating.  Plainly, it does not.  Nor does DOD establish

how releasing a photo will make it easier for someone seeking to retaliate against a cooperating detainee. The name, date of birth, and other information for all detainees are already public. The only detainees protected by withholding a photo would be those who have given an alias, and are therefore not already identifiable, to those who wish to find them. Moreover, photographs of many of the detainees are already publicly available on the Internet. *See* http://www.cageprisoners.com/prisoners.php?location=Guantanamo. Declaring photographs of individuals still detained to be classified fails to advance the asserted goal of protecting against reprisals. Where an agency's conclusion is not supported by facts, it fails to establish a *reasonable* likelihood of damage to national security, and Exemption 1 does not apply. *See Donovan*, 806 F.2d at 60; *Rosenfeld*, 57 F.3d at 807.

Further still, DOD's position is logically inconsistent. If a detainee will not cooperate with DOD simply because the release of his photograph presents identification, notwithstanding that his name and other identifying details are already public, this same concern would exist whether the photograph is released while the detainee is in custody or after his release. If detainees know that DOD will not keep their photographs classified once they are released, they would have the very same fear of reprisals based on public access to a photograph as they would if their photographs were made public while they remain in U.S. custody. Yet, DOD makes no claim of any national security interest in the release of photographs of detainees no longer held at Guantanamo. *Cf. Weberman v. Nat'l Sec. Agency*, 490 F. Supp. 9, 13 (S.D.N.Y. 1980) (refusing to accept assertion of harm to national security because agency affidavit was internally contradictory).

DOD's claim that withholding photographs of *current* detainees will "[a]lleviat[e] cooperating individuals' perceived or genuine concerns about reprisals" makes no sense. Rester

21

Decl. ¶ 5; DOD Mem. at 10.  Again, DOD fails to establish that Exemption 1 applies if the facts

presented do not logically establish likelihood of damage to national security.  *See Donovan*, 806

F.2d at 60; *Rosenfeld*, 57 F.3d at 807.

## CONCLUSION

For each and all of the foregoing reasons, the Court should deny defendant's motion for

summary judgment, and grant AP's motion for an order requiring defendant to provide records

and information that has improperly been withheld under Exemptions 1 and 6, and enter such

other and further relief as to the Court seems proper.

Dated:    May 22, 2006                Respectfully submitted,

                                      LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.


                                      By:    /s/ David A. Schulz
                                             David A. Schulz (DS-3180)
                                             Adam J. Rappaport

                                      230 Park Avenue, Suite 1160
                                      New York, NY 10169
                                      (212) 850-6100

                                      David H. Tomlin
                                      The Associated Press
                                      450 West 33rd Street
                                      New York, NY 10001

                                      *Counsel for The Associated Press*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————X

ASSOCIATED PRESS,

                                 Plaintiff,

      - against -

UNITED STATES DEPARTMENT OF
DEFENSE,

                               Defendant.

———————————————————————X

**ECF CASE**
**Index No. 06 CV 1939**
**Judge Rakoff**

**PROOF OF SERVICE**

STATE OF NEW YORK     )
                          ) SS.
COUNTY OF NEW YORK  )

      SCOTT BAILEY, being duly sworn, deposes and says as follows:

      1.      I am a legal assistant with the law firm of Levine Sullivan Koch & Schulz,

L.L.P. I am not a party to this action, am over 18 years of age, and reside in Brooklyn, New

York.

      2.      On May 22, 2006, I served true copies of the Memorandum in Opposition to

Defendant's Motion for Partial Summary Judgment and Declaration of Andrew Selsky by

ECF filing and e-mailing same to:

                        Sarah S. Normand
                        U.S. Attorney – Civil Division
                        86 Chambers Street
                        New York, NY 10007
                        sarah.normand@usdoj.gov.

_____
Scott Bailey

Subscribed and sworn to before me
this 22nd day of May, 2006

_____
Notary Public

HELEN KELLY
Notary Public, State of New York
No. 5005276
Qualified in Suffolk County
Commission Expires Dec. 7, 200_

2