UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
ASSOCIATED PRESS,                          :
                                           :
                        Plaintiff,         :        **ECF CASE**
                                           :
            - v.-                          :
                                           :        06 Civ. 1939 (JSR)
                                           :
UNITED STATES DEPARTMENT                    :
OF DEFENSE,                                 :
                                           :
                        Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant
86 Chambers Street
New York, New York 10007
Telephone:  (212) 637-2709
Facsimile:  (212) 637-2702

SARAH S. NORMAND
Assistant United States Attorney

    - Of Counsel -

# TABLE OF CONTENTS

POINT I:     IDENTIFYING PHOTOGRAPHS OF GUANTANAMO DETAINEES ARE
             PROTECTED FROM DISCLOSURE UNDER EXEMPTION 1 . . . . . . . . . . . . 1

      A.     DOD Is Properly Asserting Exemption 1 with Respect to Photographs of
             Former Detainees at This Stage of the Litigation  . . . . . . . . . . . . . . . . . . . . . . . 1

             1.    Under FOIA Case Law, the Government May Raise a New Argument
                   or Exemption Belatedly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

             2.    Photographs of Former Detainees Have Been Properly Classified  . . . . . . 4

             3.    The Court Should Consider DOD's Supplemental Exemption 1
                   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.     AP's Remaining Arguments Regarding DOD's Exemption 1 Withholding
             Lack Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT II:    EXEMPTION 6 PROTECTS IDENTIFYING DETAINEE
             PHOTOGRAPHS AND HEIGHT AND WEIGHT INFORMATION
             CONTAINED IN DETAINEE MEDICAL RECORDS  . . . . . . . . . . . . . . . . . . . 10

      A.     DOD Has Demonstrated That Identifying Detainee Photographs
             Are Protected by Exemption 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

             1.    The Detainees' Privacy Interests  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

             2.    The Public Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.     DOD Has Shown That Height and Weight Information Contained
             in Detainee Medical Records Is Protected by Exemption 6 . . . . . . . . . . . . . . . 18

      C.     Categorical Withholding of Detainee Photographs and
             Height and Weight Information Is Appropriate . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**Cases:** **Page**

American Civil Liberties Union v. Department of Defense,
    389 F. Supp. 2d 547 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Associated Press v. Department of Defense, 410 F. Supp. 2d 147 (S.D.N.Y. 2006) . . . . . . 15, 16

August v. Federal Bureau of Investigation, 328 F.3d 697 (D.C. Cir. 2003) . . . . . . . . . . . . . . 1, 3

Bowen v. United States Food and Drug Administration, 925 F.2d 1225 (9th Cir. 1991) . . . . . . 18

Caldarola v. County of Westchester, 343 F.3d 570 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 15

Computer Professionals for Social Responsibility v. United States Secret Service,
    72 F.3d 897 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Detroit Free Press v. Department of Justice, 73 F.3d 93 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . 15

El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155 (1999) . . . . . . . . . . . . . . . . . . . . . 17

Ehrlich v. American Airlines, Inc., 360 F.3d 366 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 18

Fitzgibbon v. Central Intelligence Agency, 911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . 9

Halpern v. Federal Bureau of Investigation, 181 F.3d 279 (2d Cir. 1999) . . . . . . . . . . . . . . . 9, 10

Hudson River Sloop Clearwater, Inc. v. Department of Navy, 659 F. Supp. 674
    (E.D.N.Y. 1987), aff'd, 891 F.2d 414 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hunt v. United States Marine Corps, 935 F. Supp. 46 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . 18

Jordan v. United States Department of Justice, 591 F.2d 753 (D.C. Cir. 1978),
    reversed on other grounds sub nom Crooker v. Bureau of Alcohol,
    Tobacco, and Firearms, 670 F.2d 1051 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 3

Lissner v. United States Customs Service, 241 F.3d 1220 (9th Cir. 2001) . . . . . . . . . . . . . . . . 18

Maydak v. United States Department of Justice, 362 F. Supp. 2d 316 (D.D.C. 2005) . . . . . . . . 7

National Archives and Records Administration v. Favish, 541 U.S. 157 (2004) . . . . . . 16, 17, 19

National Council of La Raza v. Department of Justice, 339 F. Supp. 2d 572
     (S.D.N.Y. 2004), aff'd, 411 F.3d 350 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 19

National Council of La Raza v. Department of Justice, 03 Civ. 2559 (LAK),
     2004 WL 2314455 (S.D.N.Y. Oct. 14, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Piper v. United States Department of Justice, 374 F. Supp. 2d 73 (D.D.C. 2005) . . . . . . . . . 2, 7

Rubin v. Central Intelligence Agency, No. 01 Civ. 2274 (DLC),
     2001 WL 1537706 (S.D.N.Y. Dec. 3, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Schanen v. Department of Justice, 798 F.2d 348 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . 2

Times Picayune Publishing Corp. v. United States Department of Justice,
     37 F. Supp. 2d 472 (E.D. La. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States Department of Justice v. Reporters Committee for Freedom of Press,
     489 U.S. 749 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States Department of State v. Ray, 502 U.S. 164 (1991) . . . . . . . . . . . . . . . . . . 11, 17, 20

Whitehouse v. United States Department of Labor, 997 F. Supp. 172 (D. Mass. 1998) . . . . . . . 18

Wood v. Federal Bureau of Investigation, 432 F.3d 78 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 11

**Statutes and Regulations:**

5 U.S.C. § 552(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 552(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5 U.S.C. § 552(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 552(b)(7)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

32 C.F.R. § 286.12(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**<u>Other References</u>:**

Executive Order 12958 § 1.4(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Executive Order 12958 § 1.7(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Scott Morris, <u>America's Most Recent Prisoner of War: The Warrant Officer</u>
       <u>Bobby Hall Incident</u>, Army Law, Sept. 1996, at 22 & n.191 . . . . . . . . . . . . . . . . . . . . . 17

Gordon Risius & Michael A. Meyer, <u>The Protection of Prisoners of War Against Insults</u>
       <u>and Public Curiosity</u>, 295 Int'l Rev. Red Cross 298 (July-Aug. 1993) . . . . . . . . . . . . . 17

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant the Department of Defense ("DOD") respectfully submits this reply

memorandum of law in further support of its motion for partial summary judgment.  For the

reasons set forth below, and in DOD's initial moving papers, identifying photographs of

Guantanamo detainees and height and weight information contained in detainee medical records

are categorically exempt from disclosure under FOIA.

**POINT I**

**IDENTIFYING PHOTOGRAPHS OF GUANTANAMO DETAINEES ARE
PROTECTED FROM DISCLOSURE UNDER EXEMPTION 1**

In its initial moving papers, DOD asserted Exemption 1 with regard to identifying

photographs of current detainees because such photographs had been classified prior to the filing

of plaintiff the Associated Press's ("AP's") FOIA request.  See DOD's Memorandum in Support

of Its Motion for Partial Summary Judgment ("Mem.") at 5-11.  The Deputy Secretary of

Defense has since classified photographs of former detainees, for the same reasons.  Accordingly,

DOD now asserts Exemption 1 with respect to all photographs responsive to AP's request.

A.      **DOD Is Properly Asserting Exemption 1 with Respect to Photographs of Former
        Detainees at This Stage of the Litigation**

        1.      **Under FOIA Case Law, the Government May Raise a New Argument or
                Exemption Belatedly**

As a general rule, the Government "must assert all exemptions at the same time, in the

original district court proceedings."  August v. FBI, 328 F.3d 697, 699 (D.C. Cir. 2003) (citation

and internal quotation marks omitted).  However, courts have found exceptions to the general

rule where the Government properly asserts new FOIA exemptions or arguments for the first

time at later stages of the litigation at both the district court and appellate levels.  See, e.g., id. at

701-02 (remanding case to district court under authority of 28 U.S.C. § 2106 because third party

safety and privacy interests at stake and "[t]he law does not require that third parties pay for the

Government's mistakes"); <u>Computer Prof'ls for Social Responsibility v. U.S. Secret Service</u>, 72

F.3d 897, 903 (D.C. Cir. 1996) (reversing district court's denial of Rule 60(b) motion to

reconsider based upon Secret Service's new <u>in camera</u> declaration, and ruling that Exemptions

7(C) and 7(D) were properly invoked in light of new declaration, where Secret Service showed

good faith and speed in bringing motion, and third-party interests were at stake); <u>Schanen v.

Dep't of Justice</u>, 798 F.2d 348, 349 (9th Cir. 1986) (allowing Government to assert FOIA

exemptions for first time on appeal on motion for rehearing where "[r]elease of the documents

would endanger the lives and well-being of agents and informants"); <u>Piper v. U.S. Dep't of

Justice</u>, 374 F. Supp. 2d 73, 78-79 & n.1 (D.D.C. 2005) (allowing the Government to raise new

FOIA exemptions in Rule 60(b) motion filed while plaintiff had pending appeal, where the

Government had "apparently acted in good faith, if also with sluggish neglect, and with the

interests of the third-party individuals at heart").

Courts in this district have similarly allowed the Government to raise new arguments or

exemptions after the Government's initial submission in district court.  In <u>ACLU v. Department

of Defense</u>, 389 F. Supp. 2d 547, 574-75 (S.D.N.Y. 2005), Judge Hellerstein permitted the

Government to raise a new argument under FOIA Exemption 7(F), 5 U.S.C. § 552(b)(7)(F), after

the Government's motion for summary judgment was fully briefed and more than two months after

the motion was initially argued.  Despite arguments by the plaintiffs and *amici curiae* that

the Government's supplemental argument could have been presented much earlier and that its

belated invocation would delay the ultimate resolution of the issues, Judge Hellerstein ruled that

"the government's opposition, although filed late, should be considered." Id. at 575 ("The issue of the physical safety of our troops in Iraq and Afghanistan, and of the citizens of those countries, has been of paramount concern throughout this case, and it is sensible to address the issue squarely under the framework advanced by the government.").

In National Council of La Raza v. Department of Justice, 03 Civ. 2559 (LAK), 2004 WL 2314455, at *1 (S.D.N.Y. Oct. 14, 2004), Judge Kaplan allowed the Government to make a new argument under FOIA Exemption 5, 5 U.S.C. § 552(b)(5), and to present a document for in camera inspection for the first time on reconsideration. Citing Local Civil Rule 6.3, Judge Kaplan noted that strict compliance with the rule would require denial of the motion for reconsideration, but reconsidered his ruling "[n]evertheless, . . . [because] FOIA Exemption 5 . . . serve[s] important public interests." 2004 WL 2314455, at *1.

As these cases demonstrate, courts have not hesitated to consider belatedly raised arguments or exemptions under FOIA to protect substantial public or third-party interests. The reasons for allowing belated assertion of FOIA exemptions apply with even greater force where, as here, the Government asserts Exemption 1 to protect national security information. See Jordan v. U.S. Dep't of Justice, 591 F.2d 753, 780 (D.C. Cir. 1978) (recognizing that appellate court would have discretion to remand for further proceedings "[i]f the value of the material which otherwise would be subject to disclosure were obviously high, e.g., confidential information compromising the nation's foreign relations or national security, and it appeared highly likely was intended to be protected by one of the nine enumerated exemptions"), reversed on other grounds sub nom Crooker v. Bureau of Alcohol, Tobacco, and Firearms, 670 F.2d 1051 (D.C. Cir. 1981), quoted in August, 328 F.3d at 700.

### 2.    Photographs of Former Detainees Have Been Properly Classified

The reasons underlying DOD's determination to classify photographs of former Guantanamo detainees, and to withhold such photographs under Exemption 1, are set forth in the Declaration of Deputy Secretary of Defense Gordon R. England ("England Decl."), and the Supplemental Declaration of Paul B. Rester, Director of the Joint Intelligence Group at Joint Task Force ("JTF") Guantanamo ("Supp. Rester Decl.").

At the time DOD's initial moving papers were filed on May 11, 2006, the applicable Classification Guide for JTF Guantanamo provided that an identifying photograph of a detainee, when linked with his name and ISN, was classified at the SECRET level until such time as the detainee was transferred or released.  England Decl. ¶ 3; Supp. Rester Decl. ¶ 2.  FOIA Exemption 1 applies only to documents or information that "are in fact properly classified pursuant to [an] Executive Order."  5 U.S.C. § 552(b)(1).  Thus, at the time of DOD's initial submission in this case, only photographs of current detainees were eligible for withholding under Exemption 1.

DOD has determined that the rationale for classification of photographs of current detainees applies equally to photographs of detainees who have been transferred or released. England Decl. ¶ 5; Supp. Rester Decl. ¶ 7.  As set forth in Director Rester's initial declaration, identifying detainee photographs are classified because their public release will have a chilling effect on human intelligence collection and substantially impede DOD's ability to gather actionable intelligence information from detainees.  Rester Decl. ¶ 7.  While former detainees are no longer subject to interrogation at Guantanamo, release of their photographs is likely to become known to detainees who remain there.  England Decl. ¶ 5; Supp. Rester Decl. ¶ 7.  If

4

detainees believe that their photographs may be published upon their release, they will be less likely to cooperate and provide usable information to DOD.  England Decl. ¶ 5; Supp. Rester Decl. ¶¶ 7-8.  Thus, as AP itself recognizes, "the same concern" regarding DOD's ability to gather human intelligence information "would exist whether the photograph is released while the detainee is in custody or after his release."  AP's Memorandum in Opposition ("Opp.") at 21.

For these reasons, Deputy Secretary England has exercised his authority under Section 1.7(d) of Executive Order 12958 to classify the photographs of all detainees, past or present, because such photographs concern "intelligence sources or methods" and their release could reasonably be expected to result in serious damage to the national security, including DOD's defense against transnational terrorism.  England Decl. ¶ 6.  Because these photographs were not classified at the time AP filed its FOIA request, they could be classified only "on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of [the Executive Order]."  E.O. § 1.7(d).  In this case, this determination has been made by the Deputy Secretary of Defense.  England Decl. ¶ 6.

### 3.    The Court Should Consider DOD's Supplemental Exemption 1 Argument

The Court should consider DOD's supplemental Exemption 1 argument even though it is being made for the first time in reply.  In connection with DOD's motion, Director Rester was asked to provide a declaration to support the then-current classification of the photographs of Guantanamo detainees, and to explain the rationale for such classification.  Supp. Rester Decl. ¶¶ 2-4.  As Director of the Joint Intelligence Group at JTF Guantanamo, Director Rester is responsible for day-to-day management of intelligence collection activities, including supervising

the development and implementation of interrogation plans, insuring that intelligence obtained is

analyzed and provided to persons requesting or needing the information, and other tasks purely

related to strategic intelligence-gathering operations.  Id. ¶ 1.  He is not an attorney, and his

duties typically do not involve dealing with FOIA litigation matters.  See id.

    In Director Rester's preparation of his initial declaration, the question of the

Classification Guide's distinction between photographs of past and present detainees was not

discussed.  Id. ¶ 4.[1]  Further, although Director Rester was aware of the error in the Classification

Guide, and that guidance was under review by staff responsible for its development and revision,

neither Director Rester nor Admiral Harris, the original classification authority for JTF

Guantanamo, had authority to classify information after a request for such information had been

made under FOIA.  Id. ¶¶ 3, 5-6; see E.O. § 1.7(d).

    After AP filed its opposition to DOD's motion, in which AP argued that DOD's rationale

for classification of photographs of current detainees would also apply to photographs of past

detainees, Opp. at 21, Director Rester was asked to explain the substantive reasons why

photographs of current detainees were classified, but photographs of former detainees were not.

Supp. Rester Decl. ¶ 6.  Director Rester advised that there was no substantive reason for the

distinction in the Classification Guide, and that the Guide was in error.  Id.  At that point, agency

counsel immediately brought the issue to the attention of senior officials within the Department

of Defense, and ultimately to Deputy Secretary England.  See Supp. Rester Decl. ¶ 6; England

---

[1]    This distinction was added when the Classification Guide was revised in
September 2005.  Supp. Rester Decl. ¶ 2.  Director Rester was not at JTF Guantanamo when the
Classification Guide was revised, and he has no knowledge of the reason for the revision.  Id.
¶¶ 2, 4.

Decl. ¶¶ 1-6.  Deputy Secretary England corrected the error and reclassified the photographs of past detainees at the SECRET level.  England Decl. ¶ 6.

DOD has thus acted promptly and in good faith in bringing this matter to the Court's attention and supplementing its submissions to the Court.  See Piper, 374 F. Supp. 2d at 78-79 & n.1 (considering additional argument made for first time in Rule 60(b) motion, where agency acted in good faith despite significant delay).  The timing of DOD's supplemental argument, moreover, will neither prejudice AP nor substantially delay the Court's resolution of the issues presented in this motion.  This lawsuit was commenced in March 2006, and the releasability of the photographs is still pending before this Court.  The Government has requested a brief ten-day extension of its reply deadline, and AP will have an opportunity to respond to DOD's additional argument under Exemption 1.  See Maydak v. U.S. Dep't of Justice, 362 F. Supp. 2d 316, 319 (D.D.C. 2005) (allowing Government to assert new FOIA exemptions in renewed motion for summary judgment where "plaintiff has had ample opportunity to respond to the BOP's alleged new claims, which, in any event, are being asserted in 'the original district court proceedings.'" (citation omitted)).  Courts have permitted the Government to assert new arguments or exemptions in cases involving far more substantial delay than is present here.  See supra at 1-3.

Most importantly, the Deputy Secretary of Defense has determined that these photographs must be classified, and withheld from public disclosure under Exemption 1, because their release could reasonably be expected to result in serious damage to the national security.  England Decl. ¶ 6.  Under DOD's FOIA regulation, upon the Deputy Secretary's determination that photographs of past detainees satisfy the criteria for classification and withholding under Exemption 1, the agency has no discretion to release the information.  See 32 C.F.R. § 286.12(a) ("If the

7

information qualifies as Exemption 1 information, there is no discretion regarding its release.").

Under all of the circumstances, and particularly the potential harm to national security if the photographs are released, the Court should consider DOD's supplemental argument and sustain DOD's determination to withhold the photographs under Exemption 1.

**B.     AP's Remaining Arguments Regarding DOD's Exemption 1 Withholding Lack Merit**

AP baldly asserts that "DOD's rationale for classification is not supported by any tangible evidence," Opp. at 18, but in fact, DOD's withholding is amply supported by the sworn declaration of Director Rester.  Rester Decl. ¶¶ 4-8; see also Supp. Rester Decl. ¶¶ 7-8; England Decl. ¶¶ 4-6.  AP appears to misunderstand DOD's basis for classification of detainee photographs.  In order to qualify for classification under Executive Order 12958, release of the photographs need not "disclose 'intelligence sources or methods,'" Opp. at 20; rather, the documents or information at issue need only "concern . . . intelligence sources or methods."  E.O. 12958 § 1.4(c).  The initial Rester Declaration makes clear -- and AP nowhere disputes, nor could it -- that all detainees at Guantanamo are potential sources of human intelligence information.  Rester Decl. ¶¶ 4, 6.

AP's arguments that release of the photographs will not "make[] it any more possible to identify those who may be cooperating," Opp. at 20, "make it easier for someone seeking to retaliate against a cooperating detainee," id. at 21, or "protect[] against reprisals," id., are therefore both incorrect and beside the point.  The photographs are not classified because their release necessarily will enable individuals to identify and retaliate against the detainees or their families, although that likely is true as a factual matter.  See Rester Decl. ¶ 5; Supp. Rester Decl.

¶ 8.  Rather, the photographs are classified because DOD has determined that if the detainees are aware that their visual images have been or may be publicly released and broadcast worldwide (and there is no question that the detainees would learn of the release), then the detainees will be less likely to cooperate because of their fears of reprisal, however well founded those fears may be.  Rester Decl. ¶¶ 4-9; Supp. Rester Decl. ¶¶ 7-8; see also Rester Decl. ¶ 5 ("Alleviating cooperating individuals' perceived or genuine concerns about reprisals is an essential part of developing human intelligence sources and gathering usable information." (emphasis added)).

        AP's argument that the photographs of some detainees are available on the internet, Opp. at 21, is also unavailing.  The public release of a photograph taken while a detainee is in DOD custody and posting of such photograph to DOD's official website (as any photographs produced to AP would be, see Supplemental Declaration of Karen L. Hecker ("Supp. Hecker Decl.") ¶¶ 2-3), is substantially different from an unauthenticated photograph posted by a detainee's family member or other third party on a private website with no government confirmation or imprimatur.  See Rubin v. CIA, No. 01 Civ. 2274 (DLC), 2001 WL 1537706, at *5 (S.D.N.Y. Dec. 3, 2001) ("There is an important distinction between official and unofficial disclosures.") (citing cases); see also Halpern v. FBI, 181 F.3d 279, 294 (2d Cir. 1999); Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 659 F. Supp. 674, 681-83 (E.D.N.Y. 1987), aff'd, 891 F.2d 414, 421-22 (2d Cir. 1989); Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990).  The actions of private persons do not limit DOD's ability to protect national security under FOIA Exemption 1.  In any event, the website cited by AP purports to contain the photographs of a small fraction of the 759 detainees held by DOD at Guantanamo since January 2002.

        DOD's considered judgment is that the public release of identifying photographs of

9

detainees at Guantanamo is reasonably likely to result in serious damage to the national security. Rester Decl. ¶¶ 4-9; Supp. Rester Decl. ¶¶ 7-8; England Decl. ¶¶ 4-6.  DOD's classification rationale is both "reasonably specific[]" and "logical[]."  Halpern, 181 F.3d at 290, 294; see also Rubin, 2001 WL 1537706, at *4 (agency satisfied burden under Exemption 1 where it "offered reasonable explanations for why the disclosure of [the requested] information could interfere with Agency efforts to collect human intelligence").  AP would have this Court second-guess DOD's judgment as to the chilling effect of disclosure on its intelligence-gathering ability, but this is precisely the sort of expert determination that is entitled to judicial deference.  See Mem. at 7 (citing cases).  The Court accordingly should uphold DOD's decision to withhold identifying photographs of detainees under Exemption 1.

POINT II

EXEMPTION 6 PROTECTS IDENTIFYING DETAINEE PHOTOGRAPHS AND HEIGHT AND WEIGHT INFORMATION CONTAINED IN MEDICAL RECORDS

**A.    DOD Has Demonstrated That Identifying Detainee Photographs Are Protected by Exemption 6**

Identifying photographs of Guantanamo detainees are also exempt from disclosure under Exemption 6 because their release would result in a clearly unwarranted invasion of the detainees' personal privacy.  See Mem. at 11-25; 5 U.S.C. § 552(b)(6).

**1.    The Detainees' Privacy Interests**

As a threshold matter, AP invokes the wrong standard for determining whether the detainees have privacy interests in their identifying photographs that are protected by FOIA. Exemption 6 does not require DOD to establish either a specific desire by individual detainees that their images remain private or an actual expectation that photographs taken by DOD without

10

their consent would remain private. See Opp. at 8-9. DOD need only establish that disclosure of identifying photographs could subject the detainees to embarrassment or other unwanted attention. See United States Dep't of State v. Ray, 502 U.S. 164, 176, 177 n.12 (1991); Wood v. FBI, 432 F.3d 78, 88 (2d Cir. 2005).

Here, the Declaration of Richard B. Jackson -- which sets forth in detail DOD's longstanding and consistent policy and practice prohibiting the publication of photographs and other public displays of military detainees because such publication improperly exposes the detainees to public curiosity -- is more than sufficient to document substantial and well-established privacy interests worthy of protection under Exemption 6. AP's suggestion that the "policies embedded in the[] treaties and regulations [cited by DOD] in no way control the Court's determination whether a privacy interest of the detainees would be clearly invaded by the release of an identifying photograph," Opp. at 13, cannot be squared with the Supreme Court's expansive approach to the definition of "personal privacy" protected by FOIA. See Mem. at 12-16. The Supreme Court has looked to diverse social and cultural sources, as well as legal obligations, in defining the scope of these privacy interests. See id. at 15.[2] In determining the nature and significance of the privacy interests at issue, it is therefore entirely appropriate for the

---

[2]    AP's suggestion that DOD is required to invoke Exemption 3 in order to protect detainee privacy interests reflected in DOD regulations and policy, see Opp. at 12, is plainly incorrect. In analyzing FOIA's privacy exemptions, the Supreme Court has considered legal sources of privacy interests without requiring the Government to demonstrate that those sources independently bar disclosure of the information at issue. See, e.g., U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 764-67 (1989) (considering federal statutory and regulatory requirements and state policies limiting disclosure of rap-sheet information as "evidence that the law enforcement profession generally assumes -- as has the Department of Justice -- that individual subjects have a significant privacy interest in their criminal histories").

Court to consider how analogous photographs of military detainees are generally treated, as demonstrated by DOD's historical policy and practice and the interpretations of the ICRC. <u>See</u> Jackson Decl. ¶¶ 6-16.

AP's effort to distinguish photographs of Guantanamo detainees "held for years" in an "isolated location" from photographs of "prisoners held on the battlefield" or "enemy soldiers," Opp. at 12, 13, 17, is entirely without basis. DOD's policy regarding non-publication of identifying detainee photographs does not turn on the location of capture or detention, the length of detention, or the POW status of the detainee. <u>See</u> Jackson Decl. ¶¶ 6-16 & Exhs. A-C. AP's attempted distinction between photographs of detainees and other visual displays, such as videotape or "exploitive propaganda efforts," Opp. at 12, 17, also fails. DOD's non-disclosure policy applies equally to photographs and other public depictions and displays, all of which reflect the involuntary detention of individuals and therefore expose them to public curiosity, as the ICRC also recognizes. <u>See</u> Jackson Decl. ¶¶ 6-16 & nn.8-9. Moreover, AP ignores the fact that DOD issued specific guidance in January 2002 prohibiting the publication of photographs of persons detained <u>at Guantanamo</u>, "in conformity with long-standing U.S. procedures and practice." Jackson Decl. ¶ 8 & Exh. B ¶ 6.G. AP thus cannot show that Guantanamo detainees fall outside the scope of DOD's policy.

AP's arguments that the Geneva Conventions do not expressly prohibit publication of photographs, and "have no application to the Guantanamo detainees," Opp. at 12, also fail to defeat the detainees' FOIA-protected privacy interests. The President has determined that U.S. armed forces will treat the detainees at Guantanamo, to the extent appropriate and consistent with military necessary, "in a manner consistent with the principles of Geneva." <u>Id.</u> ¶ 11 & Exh. C.

12

Both DOD and the ICRC have historically interpreted the "public curiosity" provisions of GPW Article 13 and GC Article 27 as precluding the publication of identifying photographs of military detainees. Jackson Decl. ¶¶ 15-16 & nn.8-9. Disclosure of the photographs requested in this case would thus contravene the principles of Geneva and violate the President's directive regarding treatment of detainees, as no reason of military necessity dictates that the principles of Geneva should not be followed here. Id. ¶¶ 5, 12, 18. Further, DOD's policy regarding photographs of military detainees is derived from a variety of sources, including but not limited to the Geneva Conventions, and dates back long before the present conflicts in Afghanistan and Iraq. Id. ¶¶ 6-16.

AP's claim that DOD has "selective[ly] release[d] . . . photos in other contexts," Opp. at 13, does not withstand scrutiny. AP cites only three examples to support this claim. See id. (citing Declaration of Andrew Selsky ("Selsky Decl.") ¶ 13 & Exh. C). The first two are easily distinguishable from the present case. Saddam Hussein was the former head of state of Iraq, and DOD released photographs shortly after his capture to confirm his identity and to show that he was being treated properly. Supplemental Declaration of Richard B. Jackson ("Supp. Jackson Decl.") ¶ 5 ("This was an extraordinary case."). Similarly, the capture of Khalid Shaikh Mohammed, the alleged "mastermind" of the terrorist attacks of September 11, 2001, Selsky Decl., Exh. C, was uniquely high-profile. The publication of photographs of these two highly visible and symbolic public figures, who are plainly not similarly situated to the detainees at Guantanamo, does not cast doubt on the existence of DOD's general policy of non-disclosure of photographs of military detainees, nor does it establish that the policy has been selectively applied.

The third example cited by AP is a still image of "television footage" of John Walker Lindh.  See Opp. at 13 (citing Selsky Decl. ¶ 13 & Exh. C).  Contrary to AP's unsupported claim, this footage, which was shot by an independent news organization, was not released by DOD. Supp. Jackson Decl. ¶ 6.  Indeed, a U.S. soldier has been disciplined for taking and publishing photographs of Lindh.  Id.  Nine U.S. soldiers are also undergoing disciplinary proceedings for taking and distributing photographs of Saddam Hussein while in detention.  Id. ¶ 5.  AP's own examples therefore support, rather than undercut, DOD's contention that military detainees have firmly settled privacy interests in photographs depicting their captivity.

AP notes that a handful of detainees have allowed themselves to be filmed or photographed by reporters since their release from Guantanamo.  See Opp. at 10 (citing seven such detainees).  But that does not suggest that photographs taken of detainees by their captors, and reflecting their involuntary detention as enemy combatants, do not implicate strong privacy interests.  Voluntary photographs of persons who have been released from DOD custody, taken in their chosen physical environments, obviously do not subject the photographed individuals to "insult" or "curiosity" as do photographs showing individuals held by enemy forces against their will.  And, of course, DOD's policy prohibiting the disclosure of identifying photographs of military detainees would not apply to consensual photographs of individuals taken after their release from detention.  The private choices of a small number of detainees, furthermore, cannot be deemed a waiver of the privacy interests of the detainees generally.

The case law cited by AP is unpersuasive or inapposite.  In Detroit Free Press v. Department of Justice, 73 F.3d 93 (6th Cir. 1996), cited in Opp. at 11, 15-16, two of the three judges on the panel concluded that the release of a mug shot in an ongoing criminal proceeding

14

did not implicate any privacy interests, largely because the names of the defendants had already

been divulged and they had appeared in open court.  73 F.3d at 97.  As Judge Norris pointed out

in his dissent, however, the Supreme Court "rejected a very similar argument in Reporters

Committee," where "[a]lthough the information contained in the requested rap sheets was a

matter of public record, the Court found that reliance upon the fact that the information had been

previously disseminated reflected a 'cramped notion of personal privacy.'"  73 F.3d at 99

(citation omitted); see also Times Picayune Publ'g Corp. v. U.S. Dep't of Justice, 37 F. Supp. 2d

472, 476-79 (E.D. La. 1999) (explicitly rejecting majority's reasoning in Detroit Free Press as

"contrary to United States Supreme Court jurisprudence," and finding "a protectible privacy

interest under the FOIA" in a mug shot).  The other cases cited by AP, see Opp. at 10-11 & n.4,

15-16, involved the Fourth Amendment or state law, and not FOIA.  See Times Picayune, 37 F.

Supp. 2d 476; see Mem. at 13.[3]

        Nor does this Court's decision in AP v. DOD, 05 Civ. 3941, control the issues presented

here.  The Court previously ruled that a detainee who had testified at a Combatant Status Review

Tribunal ("CSRT"), which the Court found to be a "quasi-judicial" proceeding, could not have

had a reasonable expectation of privacy in his name and related identifying information in

connection with his testimony before the CSRT.  See AP v. DOD, 410 F. Supp. 2d 147, 156

(S.D.N.Y. 2006).[4]  That case had nothing to do with personally identifying photographs of

---

        [3]     Caldarola v. County of Westchester, 343 F.3d 570 (2d Cir. 2003), cited in Opp. at
15-16, is particularly irrelevant.  Caldarola involved the propriety under the Fourth Amendment
of the county's publication of a videotape depicting the plaintiff during a "perp walk"; this case
involves the propriety of DOD's withholding of photographic images under FOIA.

        [4]     AP mistakenly asserts that the "vast majority" of detainees appeared at CSRT or
ARB proceedings "open to the press."  Opp. at 10.  More than two hundred of the 759

military detainees, and the Court had no occasion to consider DOD's policy and practice, which show that detainees have significant and well-established privacy interests in their photographs.

### 2.    The Public Interests

On the other side of the scale, AP fails to show that disclosure of the photographs would contribute "significantly" to the public's understanding of DOD's operations or activities, the only public interest that FOIA protects.  Reporters Comm., 489 U.S. at 775; National Archives & Records Admin. v. Favish, 541 U.S. 157, 172 (2004); Mem. at 22.  The supposedly "enormous news value" of the photographs, Opp. at 15, does not establish a cognizable public interest under FOIA.  See Mem. at 22-23.  AP also asserts that the public has an interest in assessing claims of mistaken identity (AP cites only five such claims, Opp. at 16 n.6) or detecting detainees who may have provided an alias to DOD, but those interests are satisfied by the substantial other identifying information provided by DOD, including (without redaction) the names, ISNs, citizenship, dates and places of birth of every detainee held by DOD at Guantanamo since January 2002.  See Selsky Decl., Exh. B; Mem. at 23-24.  Indeed, AP has previously sought disclosure of detainee names and other biographical information for precisely these purposes. See AP v. DOD, 410 F. Supp. at 157 n.6.

AP's contention that disclosure of the photographs "will allow the public visually to assess the physical condition of the detainees while under DOD's control," Opp. at 15, is also unavailing.  The photographs requested by AP consist of "identification photographs."  Jackson

---

individuals detained by DOD at Guantanamo were transferred or released before the CSRTs began.  Supp. Hecker Decl. ¶ 4.  Of the remaining detainees, all of whom were subject to CSRT or Administrative Review Board ("ARB") proceedings, only approximately 360 detainees (65 percent) elected to participate in a CSRT and/or an ARB.  Id.  The press was present at only 38 of the CSRTs and 21 of the ARBS, at which no photographs were permitted to be taken.  Id.

Decl. ¶ 5.  Any claim that they would reveal some sort of mistreatment or other malfeasance by

DOD is speculative, as there is nothing in the record here to suggest that the photographs would

reveal mistreatment or abuse.  See Favish, 541 U.S. at 174; Ray, 502 U.S. at 179.

Here, moreover, DOD has demonstrated a compelling public interest weighing against

disclosure of the photographs, because disclosure would significantly undermine the ability of

the United States to reasonably object to similar treatment of U.S. service members in the future.

Jackson Decl. ¶¶ 5, 17-18; see Mem. at 24-25.  AP does not dispute that the public interest is

properly considered on both sides of the Exemption 6 balancing analysis, and concedes that "it is

obvious that some actions by the U.S. government could encourage a foreign government to

disregard the Geneva Conventions in its treatment of captured American soldiers."  Opp. at 16-

17.

AP attempts to avoid the import of this fact by arguing that the release of photographs

"for identification purposes" is not expressly prohibited by the Geneva Conventions, and that

"[a]ctions directly outlawed by the Conventions would be a far greater motivation to a foreign

power."  Opp. at 17.[5]  However, DOD's interpretation of the Geneva Conventions, and its

assessment of the impact of disclosure on the United States' ability to protect U.S. service

members thereunder, is entitled to deference.  See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,

525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive

---

[5]    AP argues that "some commentators point to the 'advantages' of foreign powers
photographing captured U.S. service members," Opp. at 17 n.7, but the article cited by AP itself
acknowledges that the ICRC holds a contrary view, and also concedes that "it is not the U.S.
practice to permit the photographing of enemy POWs."  See Maj. Scott R. Morris, America's
Most Recent Prisoner of War: The Warrant Officer Bobby Hall Incident, Army Law, Sept. 1996,
at 22 & n.191 (citing Gordon Risius & Michael A. Meyer, The Protection of Prisoners of War
Against Insults and Public Curiosity, 295 Int'l Rev. Red Cross 298 (July-Aug. 1993)).

Branch concerning the meaning of an international treaty."); <u>Ehrlich v. American Airlines, Inc.</u>, 360 F.3d 366, 398 (2d Cir. 2004) (same). Certainly, AP's conjecture that release of other kinds of photographs or video might inflict greater harm on U.S. forces does not rebut DOD's showing that release of <u>these</u> photographs would make it more difficult for DOD to protect U.S. service members detained by foreign governments or enemies. Jackson Decl. ¶¶ 5, 17-18. This factor weighs heavily against disclosure here.

**B.**   **DOD Has Shown That Height and Weight Information Contained in Detainee Medical Records Is Protected by Exemption 6**

It is well established in Exemption 6 itself, and in the case law applying it, that medical records implicate strong privacy interests and are routinely and properly withheld under FOIA. <u>See</u> Mem. at 25-26; <u>see also, e.g.</u>, <u>Bowen v. U.S. Food & Drug Admin.</u>, 925 F.2d 1225, 1228 (9th Cir. 1991); <u>Whitehouse v. U.S. Dep't of Labor</u>, 997 F. Supp. 172, 174-75 (D. Mass. 1998); <u>Hunt v. U.S. Marine Corps</u>, 935 F. Supp. 46, 54 (D.D.C. 1996). AP does not seriously dispute this, and indeed does not cite any cases in which courts have ordered disclosure of personally identifiable medical records under FOIA.[6]

AP also fails to show that release of weight (and now height) information would contribute significantly to the public's understanding of DOD's operations or activities. <u>See</u> Mem. at 26-28. The only public interest advanced by AP is the interest in learning about hunger strikes, but AP does not dispute that (1) height and weight alone may not provide information

_____

[6]   <u>Lissner v. U.S. Customs Serv.</u>, 241 F.3d 1220 (9th Cir. 2001), cited in Opp. at 6, 11, did not involve medical records. Further, the <u>Lissner</u> court's conclusion that a general physical description implicates no privacy interest when a person's identity has been revealed, <u>id.</u> at 1224, is inconsistent with Supreme Court case law. <u>See</u> <u>Reporters Comm.</u>, 489 U.S. at 749, 771 (identified individual had substantial privacy interest in criminal history rap sheet describing his "physical characteristics").

about hunger strikes, as detainees may gain or lose weight for other reasons, or (2) AP's request for all detainee height and weight information would reveal substantial information having nothing to do with hunger strikes.  See id. at 26-27.  Even if AP were correct that 200 detainees had engaged in hunger strikes, Opp. at 7 (citing newspaper article and statements by habeas counsel); but see Nat'l Council of La Raza v. Dep't of Justice, 339 F. Supp. 2d 572, 582 (S.D.N.Y. 2004) (press reports offered to rebut agency affidavits were "rank hearsay"), aff'd, 411 F.3d 350 (2d Cir. 2005), AP has requested height and weight information for more than 750 detainees.  AP thus requests personal medical information for more than 550 detainees without asserting any public interest in this information, much less satisfying its burden of proof on this issue.  See Favish, 541 U.S. at 1580-81.

AP wrongly claims that release of detainee height and weight information "will allow the public to properly assess the propriety and effectiveness of steps taken by DOD to respond to the hunger strikes."  Opp. at 7.  AP submits documents relating to detainee Bawazir, Opp. at 7; Selsky Decl., Exhs. D-E, contending that this "data suggest that the involuntary feeding methods DOD used in late 2005 were not effective, but the techniques it started using on January 11, 2006 were."  Id.  Release of the height and weight information requested by AP, however, would not show anything about the methods that DOD had employed with regard to particular detainees engaged in hunger strikes, the effectiveness of those methods, or how the detainees responded to DOD's methods.  See id.  AP thus fails to show that the information would contribute significantly to the public's understanding of DOD's response to the hunger strikes.

**C.    Categorical Withholding of Detainee Photographs and Height and Weight Information Is Appropriate**

Lastly, AP incorrectly asserts that the Court should engage in a case-by-case analysis because "it is likely that some detainees would feel more embarrassed than others by disclosure." Opp. at 18. The same could be said of the subjects of the criminal rap sheets in <u>Reporters Committee</u> and the identifying information of Haitian returnees in <u>Ray</u>, but the Supreme Court nonetheless upheld the Government's categorical withholding of information in those cases. Because DOD has established with respect to both identifying photographs and height and weight information contained in detainee medical records that "the balance characteristically tips in one direction," <u>Reporters Comm.</u>, 489 U.S. at 776, those documents are categorically exempt from disclosure under FOIA.

**CONCLUSION**

For the foregoing reasons, and the reasons set forth in DOD's opening memorandum of law, the Court should grant DOD's motion for partial summary judgment.

Dated: New York, New York
            June 5, 2006

                                        Respectfully submitted,

                                        MICHAEL J. GARCIA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for Defendant

                            By:        s/ Sarah S. Normand
                                        SARAH S. NORMAND (SN-2834)
                                        Assistant United States Attorney
                                        86 Chambers Street
                                        New York, New York 10007
                                        Telephone: (212) 637-2709
                                        Facsimile: (212) 637-2702

20
