SECRET/NOFORN

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: SARAH S. NORMAND (SN-2834)
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2709
Facsimile: (212) 637-2702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x
ASSOCIATED PRESS,

           Plaintiff,

   - v. -

UNITED STATES DEPARTMENT
OF DEFENSE,

           Defendant.
------------------------------x

ECF CASE

SECOND SUPPLEMENTAL
DECLARATION OF
PAUL B. RESTER

06 Civ. 1939 (JSR)

Pursuant to 28 U.S.C. § 1746, I, Paul B. Rester, hereby declare that:

1. (U) I am the Director of the Joint Intelligence Group at Joint Task Force (JTF) Guantanamo, Guantanamo Bay, Cuba. I have served in that position since October 2005. As Director of the Joint Intelligence Group, I interact with detainees personally on a regular basis and routinely observe interrogation of detainees and review reports of such interrogations.

2. (U) I make this declaration to clarify and supplement my prior declarations dated May 10, 2006 and June 3, 2006, in the above-captioned matter.

3. (U) Unless otherwise indicated, the statements made in this declaration are based on my personal knowledge.

1

SECRET/NOFORN

**Detainees at JTF Guantanamo Continue to Provide Actionable Intelligence Information**

4. (U)  Detainees at JTF Guantanamo continue to provide information that directly aids the Global War on Terrorism, including information that is essential in conducting combat operations in Iraq and Afghanistan.

5. (U)  Approximately 25 percent of the detainees at JTF Guantanamo are interrogated on a regular basis. The remaining detainees are interrogated when events or circumstances indicate that the detainees may have useful information. For example,

a. (S/NF)

b. (S/NF)

c. (S/NF)



SECRET/NOFORN

SECRET/NOFORN



d. (S/NF) In addition, detainees are often interrogated in response to particular events.



e. (S/NF)



f. (S/NF)



6. (S/NF) Detainees at JTF Guantanamo continue to provide useful information about, among other things, how al Qaida, the Taliban, and other terrorist organizations are organized and funded, their leadership structures, how such organizations recruit and train members, and how they plan, command and control their operations. Detainees at JTF Guantanamo also

3

SECRET/NOFORN

SECRET/NOFORN

continue to provide useful information about the physical areas of operation in which the Global War on Terrorism is conducted, the locations of training compounds and safe houses, travel patterns and routes used for smuggling people and equipment, and the identities of newly captured fighters.[1]

7. (U) The Joint Intelligence Group at JTF Guantanamo gains useful intelligence information from detainees on nearly a daily basis. Some of this information contributes pieces of the mosaic of how terrorist organizations operate. Other information supports real-time, ongoing operations in the Global War on Terrorism. Given the nature of the intelligence operation there, even individuals who have been detained for a period of years continue to possess and provide information that is useful to the U.S. Government and its allies in the Global War on Terrorism.

**Public Release of Official U.S. Government Photographs of Identifiable Detainees at JTF Guantanamo Would Facilitate Reprisals Against the Detainees and Their Families and Associates**

8. (U) In Paragraph 5 of my declaration dated May 10, 2005, I stated, "It is well documented in public sources, and consistent with my extensive experience, that persons who cooperate with capturing authorities are subject to reprisals by those about whom they might have information." This statement was intended to refer to human intelligence sources generally. It is common knowledge that individuals who cooperate with law enforcement organizations as part of

---

[1] *See also* JTF GTMO, *Information from Guantanamo Detainees* (Mar. 4, 2005), *available at* http://www.defenselink.mil/news/Mar2005/d20050304info.pdf.

4

SECRET/NOFORN

SECRET//NOFORN

organized crime or gang-related investigations have been targeted for reprisal by these organizations. This is also true in the military intelligence context. For example,

    a. (U) In 1994, Aldrich Ames was convicted in the United States for spying for the Soviet Union. Through his official duties at the Central Intelligence Agency, Mr. Ames had access to the identities of U.S. sources in the KGB and Soviet military. These individuals were secretly providing (or had provided) valuable intelligence to the United States. The information that Mr. Ames sold to the Soviet Union lead to the compromise of at least 100 U.S. intelligence sources and to the execution of at least 10 of those sources. *See* Report of Senate Select Committee on Intelligence at http://www.fas.org/irp/congress/1994_rpt/ssci_ames.htm.

    b. (U) A more current example closely linked to struggles in the Middle East involves Mohammed Nayil al-Jurayfi, who actively cooperated with United States and Coalition forces as the new mayor of Hadithah, Iraq. He was killed when attackers firing automatic weapons ambushed his car.

    c. (U) The repeated calls by a very senior Al Qaeda leader, Ayman al-Zawahri, for Al Qaeda members to fight against Muslims who cooperate with the United States substantiates this threat.

    d. (U) A recent press article, for example, reported that Islamic informant who was "feeding information to counter-terrorism agents" regarding alleged plot to bomb targets in Sydney and Melbourne was "now in hiding and in fear of his life". *See,* Greg Ansley, *Supergrass 'tipped off spies'*, The New Zealand Herald (Nov. 14, 2005).

SECRET//NOFORN

SECRET/NOFORN

9. (U) Detainees at JTF Guantanamo (and their families and associates) are subject to reprisals by persons about whom the detainees have provided intelligence information to the U.S. Government, or by persons who believe that the detainees may have provided such information. For example, according to interrogation records maintained at JTF Guantanamo,

a. (S/NF) 

b. (S/NF) one detainee who had cooperated with us was severely beaten after providing information about another detainee, who was later questioned about that information.

c. (S/NF) Numerous other cooperating detainees have reported harassment by other detainees who suspect that they have cooperated with interrogators. In many cases, this harassment includes specific threats of harm against the cooperating detainee and/or his family.



6

SECRET/NOFORN

SECRET/NOFORN

  d. (S/NF) Another cooperating detainee stated ▆▆▆▆ that other detainees on his unit were threatening him, that they had read aloud a newspaper article that provided his full name and his statements to the Combatant Status Review Tribunal, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

  e. (U) In addition, various sources have publicly reported on potential reprisals against former JTF Guantanamo detainees. *See, e.g.*, BBC News, *Guantanamo Youngest Inmates Home* (Feb. 2, 2004) (reporting that the Red Cross, which had helped reunite minor detainees with their families in Afghanistan, avoided drawing publicity to the minors' return due to "fears of reprisals against them"); Ben Fox, *Guantanamo Detainees Seek Asylum*, NY Sun (March 8, 2006) (reporting one detainee's statement to Tribunal that "after being repeatedly interrogated at Guantanamo, he fears his fellow prisoners as well as others back in Saudi Arabia").

10. (U) Public release of official U.S. Government photographs identifying detainees at JTF Guantanamo would facilitate reprisals by allowing such detainees to be conclusively identified. As stated in my prior declarations, names and Internment Serial Numbers ("ISNs") alone do not conclusively identify detainees.

  a. (U) Many detainees have names common in Muslim countries. In addition, the Muslim naming tradition differs from that of the West, so that a detainee might be known by four or five names, none of which is an "alias" in the way we define that word. Instead, these alternative names are simply honorifics or indicators of lineage or occupation. For example, many Muslims have a given name (such as Mohammed or Suleiman, called an *ism* in Arabic), a *kunya*, which is an honorific title composed of "Abu" (meaning father) or "Umm" (meaning mother) and the name of the individual's eldest son. In addition, there is the *nasab*, which is a

7

SECRET/NOFORN

lineage marker, and the *nisba*, which can indicate occupation, descent, or birthplace. For example, the *nisba* "al Demashqi" indicates an individual is from Damascus, and "al Tikriti" means he is from Tikrit. Other detainees use *noms de guerre* or other aliases, which may be derived from many sources. Some *noms de guerre* are also *kunyas*. For example, Yassir Arafat used "Abu Ammar" as his *nom de guerre* although he never had a son named Ammar. When detainees reveal only their *kunya* or only some portion of their formal name, correctly identifying them in Guantanamo records becomes difficult. In many instances, our records reflect only one version of a detainee's name, which may be different from that used by his associates or family.

b. (U) In addition, there may be substantial variations in the spellings of certain names as a result of cultural variations, translation or Romanization. To cite a common example, there are varied spellings of Osama bin Laden, *e.g.*, Usama bin Laden and Usama Ibn Ladin.

c. (S/NF) Further, some detainees have used aliases in order to conceal their true identities from the U.S. Government. [REDACTED]

d. (U) For all of these reasons, photographs are essential to conclusively identify detainees. Photographs are routinely used to confirm the identities of detainees who are being transferred to the custody of foreign governments, by both the U.S. Government and the transferee government. Foreign governments have at times informed us of different names used by particular detainees from their own records, or have provided revised spellings of the names we have in our files.

8

SECRET/NOFORN

SECRET/NOFORN

11. (S/NF) If detainees associated with terrorist activity are identified as having been detained at JTF Guantanamo, the associates of such detainees are likely to seek them out upon release and attempt to determine whether or not the detainees provided information to the United States Government or its allies. Such individuals may inflict physical or mental harm or even torture in order to learn whether or not the former detainees cooperated with the U.S. Government. ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12. (U) In addition, in situations where intelligence information previously held by a limited number of people is obtained from detainees at JTF Guantanamo and subsequently used by the U.S. Government, it may be possible for terrorists to identify cooperators simply by identifying precisely who has been detained. For example, if information about a particular safe house was closely held by a small group of people, and the safe house is identified and raided or destroyed based on information provided by a detainee, the other individuals may easily be able to deduce that the detainee was the source of the information if the detainee is conclusively identified in an official U.S. Government photograph as having been detained at Guantanamo.

**Public Release of Official U.S. Government Photographs of Identifiable Guantanamo Detainees Will Inhibit Cooperation by Detainees**

13. (U) Detainees at JTF Guantanamo have specifically voiced concerns to me, and to other interrogators under my supervision, that they and their families will be subject to reprisals if they

9

SECRET/NOFORN

provide information to the United States Government. Recent examples of this include the following, as found in interrogation records:

a. (S/NF) One cooperating detainee has repeatedly and consistently reported threats by other detainees dating back to December 2003. 

b. (S/NF) Another cooperating detainee in March 2006 requested a transfer to another unit because 

c. (S/NF) Another cooperating detainee in May 2006 requested a transfer away from other ▮▮▮ detainees because they referred to him as a "spy." 

10

SECRET/NOFORN

SECRET//NOFORN

14. (C) As noted in my prior declarations, alleviating detainees' perceived or genuine fears of reprisal is an essential part of developing human intelligence sources and gathering usable information. This is typically accomplished by assuring detainees that their identities and the fact that they've cooperated will be kept confidential. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ These assurances of confidentiality are very important to many of the detainees and other intelligence sources who cooperate with us. Absent assurances of confidentiality, detainees who fear for their safety or the safety of their families usually will not cooperate with intelligence personnel.

   a. (U) Providing credible assurances of confidentiality is absolutely critical to a successful intelligence-gathering operation. If official photographs of identifiable detainees at JTF Guantanamo are publicly released, it will be more difficult for interrogators to provide detainees with assurances of confidentiality, and detainees are less likely to believe and act upon any assurances provided.

   b. (U) As noted in my prior declaration dated June 3, 2006, the process of gaining actionable intelligence information from a human intelligence source is built around trust and confidentiality. When conducting intelligence-gathering operations, we spend a great deal of time cultivating relationships and a level of trust with the detainees and encouraging their confidence in us. If a detainee then learns that the U.S. Government has publicly released an official photograph confirming his detention, this calls into question the validity and good faith of the assurances we have been giving him.

   c. (U) Further, if official photographs of detainees are required to be released by the U.S. Government, I would be hampered in my ability to convince detainees that it is in their

11

SECRET/NOFORN

interest to cooperate. In fact, in my opinion, I would have an obligation to advise potential cooperators that their photographs may be released. Even if I told the detainees that the decision to release photographs was out of my hands, the detainees' level of trust in me, and thus my ability to collect intelligence, would be severely and materially compromised. (Even if we did not tell the detainees of the release of photographs, they would learn of it from other sources, and the release would grossly diminish their level of trust in the interrogators.)

      d. (U) Release of official U.S. Government photographs of detainees at JTF Guantanamo would also set a harmful precedent in terms of the U.S. Government's ability to gather intelligence from sources outside of JTF Guantanamo. If the U.S. Government is required to release the photographs of Guantanamo detainees, it will send a message that the U.S. Government cannot protect detainees who cooperate and provide information. Release of photographs would negatively impact our ability to provide assurances of confidentiality to future human intelligence sources, of various kinds, and reduce the likelihood that potential cooperators will place their trust in us.

15. (U) In Paragraph 7 of my declaration dated May 10, 2006, I stated, "In my experience with detainees generally, and with this population of detainees in particular, worldwide publication of a photograph identifying a detainee coupled with a name is likely to exacerbate the detainee's fears of reprisal and make it substantially less likely that the detainee will cooperate and provide information in the future." This statement was based on my personal observation of and interaction with detainees at JTF Guantanamo, and on my more than thirty years of experience in the field of human intelligence-gathering.

12

SECRET/NOFORN

SECRET/NOFORN

**Prior Classification of Photographs of Detainees**

16. (U) I have been advised that the Court has inquired about the pre-September 2005 classification of photographs of detainees at JTF Guantanamo, and whether such classification was accomplished on a categorical or photograph-by-photograph basis.

17. (U) According to the JTF Guantanamo Classification Guide in effect prior to September 2005, a close-up photograph clearly identifying the face of a detainee was classified at the level FOR OFFICIAL USE ONLY (FOUO) to CONFIDENTIAL for a period of 25 years.

18. (U) To my knowledge, no review was undertaken under the pre-September 2005 Classification Guide to determine the particular classification level (FOUO or CONFIDENTIAL) of such photographs, either individually or as a group. I have also made inquiries with the J-2, the staff officer within the military command structure responsible for the development and revision of the Classification Guide, and have been advised that no such review was undertaken.

19. (U) As stated in my prior declaration dated June 3, 2006, photographs that clearly identify the face of Guantanamo detainees (present and former) have not been publicly released in the past and have been classified or treated as classified material, utilized only for official purposes within the Department of Defense.

20. (U) Identifying photographs of detainees at JTF Guantanamo are properly classified on a categorical rather than a photograph-by-photograph basis. The public release of identifying photographs of even a small subset of the detainees would cause the harms identified in this declaration and in my prior declarations. Further, it is impossible to classify only the photographs of those detainees who have in fact cooperated with the U.S. Government, because

13

SECRET/NOFORN

to do so would single out those detainees and officially acknowledge and confirm their cooperation, causing even greater harm to intelligence sources and methods.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: 8 July 2006

Paul B. Rester

14

SECRET/NOFORN