UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE AND VETERANS FOR PEACE,

*Plaintiffs,*

v.

DEPARTMENT OF DEFENSE, AND ITS COMPONENTS DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE AGENCY; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF JUSTICE, AND ITS COMPONENTS CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE OF INFORMATION AND PRIVACY, OFFICE OF INTELLIGENCE, POLICY AND REVIEW, FEDERAL BUREAU OF INVESTIGATION; DEPARTMENT OF STATE; AND CENTRAL INTELLIGENCE AGENCY,

*Defendants.*

DOCKET No. 04-CV-4151 (AKH)

DECLARATION OF SCOTT HORTON

*Document Electronically Filed*

---

Scott Horton, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am an attorney at law admitted to practice in the Courts of the State of New York and this Court since 1982. I submit this declaration at the request of plaintiffs for purposes of clarifying the application of the Geneva Conventions to certain issues arising in this litigation. I have neither sought nor received compensation for the preparation of this declaration. I am not a member, affiliate or employee of any party to this litigation.

2. My essential qualifications are as follows: I studied law at the Universities of Munich and Mainz in Germany and at the University of Texas at Austin, where I received a J.D. degree in 1981. I have practiced law in New York since 1982, first with Cleary, Gottlieb, Steen & Hamilton and, since 1985, with Patterson, Belknap, Webb & Tyler, where I have been a partner since 1990. Throughout my career I have been involved in international humanitarian law matters. In particular, I have been engaged in international relief projects, frequently working alongside the International Committee of the Red Cross ("ICRC") for twenty years in nations across Eurasia and in West Africa. In the course of this work I have regularly stud-

1

ied, spoken on and dispensed advice on questions of international humanitarian law,[1] including principally the application of the Geneva Conventions of 1949 and the Hague Convention of 1907. I have been an adjunct professor at Columbia Law School since 1997 teaching courses in international public and private law and supervising the work of advanced degree students in this area. I currently conduct Columbia Law School's seminar on international humanitarian law issues. I am also Chair of the Committee on International Law of the Association of the Bar of the City of New York, co-chair of the Committee on Human Rights and a director and member of the Executive Committee of the International Law Association.

3.     The purpose of this declaration is to provide an analysis of certain aspects of the Geneva Convention Relative to the Treatment of Prisoners of War ("Third Geneva Convention") and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention").

4.     While I have not read the record of this case, I have been given oral briefings as to the nature of the litigation. I have been informed that the litigation concerns plaintiffs' request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for, among other things, records concerning the abuse of detainees held by the United States in, Iraq, Afghanistan, and/or Guantánamo Bay. I have also been informed that some of the records responsive to plaintiffs' FOIA request are photographs and videotapes that depict detainees being abused (collectively, "Photographs").

5.     I understand the Defendants have taken the position that, were they to be compelled to produce the Photographs, they would breach their obligations under the Third and Fourth Geneva Conventions.

6.     For the reasons discussed below, I have formed the opinion that the release of the Photographs would be consistent with the Geneva Conventions if the Photographs were altered to ensure that the prisoners depicted would not be individually recognizable. In my view, neither Article 13 of the Third Geneva Convention nor Article 27 of the Fourth Geneva Convention requires a state party to withhold photographic evidence that has been altered in this manner. Conversely, the interests in enforcement of the fundamental purposes of the Third and Fourth Conventions speak strongly in favor of compelling the release of such photographic evi-

---

[1] "International humanitarian law" may be defined as that portion of the Law of Armed Conflict relating to the treatment of civilians and other individuals who have been taken *hors de combat*, and restricting generally the methods and means by which the conflict may be fought.

2

1176962v1

dence (provided it has been altered to obscure individual identities).

THE GENEVA CONVENTIONS

7. Common Article 2 of the Third and Fourth Geneva Conventions provides that the Conventions apply "to all cases of declared war or any other armed conflict which may arise between two or more of the High Contracting Parties" and "to all cases of partial or total occupation of the territory of a High Contracting Party."

8. The Third Geneva Convention addresses protections that must be accorded to "prisoners of war" as defined in Article 4 of that Convention. Article 13 of the Third Geneva Convention states that "[p]risoners of war must at all times be humanely treated" and "at all times be protected, particularly against acts of violence or intimidation and against insults and public curiosity."

9. The Fourth Geneva Convention addresses protections that must be accorded to "those who, at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals." Fourth Geneva Convention, Art. 4. Article 27 of the Fourth Geneva Convention states that such individuals "shall at all times be humanely treated, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity."

10. The United States, Afghanistan, and Iraq are states party to the Third and Fourth Geneva Conventions. Belligerents detained by the United States in connection with the conflicts in Afghanistan and Iraq are entitled to protection as prisoners of war under the Third Geneva Convention unless they are properly determined not to be prisoners of war pursuant to the status determination process envisaged in Article 5 of the Third Geneva Convention. Other individuals detained by the United States in connection with these conflicts are entitled to protection under the Fourth Geneva Convention.

APPLICATION OF THE GENEVA CONVENTIONS TO THE PRESENT CASE

11. The Geneva Conventions contain no *per se* prohibition on the taking or dissemination of photographs of prisoners of war or protected persons. It is well established that a detaining power may photograph detainees for proper purposes including, for instance, identification, in connection with a criminal investigation, or

in connection with a detainee's medical examination and treatment.

12. Further, photography exposing inhumane conditions at detention centers played a powerful role in the historical development of the Geneva Conventions themselves. Much of the impetus for the restatement of the Geneva Conventions issued in 1949 came from powerful visual images of the survivors of concentration camps maintained by the Germans and Japanese during World War II. Since the Conventions were drafted, journalists and others have used photographs to raise public awareness about violations of the Conventions and to pressure states party to abide by their obligations under the Conventions. The Conventions do not prohibit such photographs. On the contrary, such photographs serve the Conventions' central aim of ensuring that prisoners are treated humanely.

13. I agree with the view expressed in declarations submitted for Defendants to the effect that photography of detainees may in some circumstances be forbidden by the Conventions and that the dissemination of such photography may be properly restricted. This is particularly true of photographs that depict identifiable prisoners. During the first Gulf War, for example, the Iraqi authorities were reported to have arrested family members of Iraqi soldiers who had been shown on television as prisoners of war; the family members were arrested because Iraqi authorities suspected that the soldiers had deserted their posts and surrendered. *See* Risius & Meyer, *The Protection of Prisoners of War Against Insults and Public Curiosity*, INT'L REV. RED CROSS (Jul.-Aug. 1993) (attached hereto as Exhibit A). The dissemination of photographs that depict individually identifiable prisoners can also cause embarrassment to prisoners who are depicted, particularly if the photographs show prisoners in humiliating or degrading circumstances. Beyond this, as Colonel Risius argues, and facts from the Gulf War bear out, dissemination of identifiable images can endanger the members of their families, who may be subject to reprisal.

14. The potential for adverse effects of this sort has led some to construe Article 13 of the Third Geneva Convention and Article 27 of the Fourth Geneva Convention to prohibit the dissemination of photographs in which prisoners of war or protected persons are individually identifiable. I consider this approach reasonable and prudent. However, this does not then dictate the outcome the Defendants suggest: withholding the Photographs against an FOIA request. It only suggests the need to modify the Photographs to render the subjects unidentifiable before they are produced.

15. This construction of the Conventions limits the risk that prisoners and their families will be exposed to retaliation, insult, or public curiosity. It also

1176962v1

limits the risk that prisoners who were maltreated in custody will be humiliated or traumatized by the dissemination of photographs that depict the maltreatment. Importantly, however, this construction does not afford states party a basis for suppressing photographic (or other) evidence that prisoners have been treated inhumanely. It preserves the ability of the media and others to uncover and publicize violations of the Conventions and to use photographic evidence to pressure states party to abide by their legal obligations.

### UNITED STATES PRACTICE UNDER THE GENEVA CONVENTIONS

16. I am troubled that the submissions of Defendants materially misstate established United States practice on the issue raised. United States practice is consistent with the interpretations set forth above and reflects a correct understanding and application of the language and animating principles of the Geneva Conventions.

17. I would note as an initial matter that the provisions cited above predate the 1949 restatement of the Geneva Conventions; they were in place under the 1929 Geneva Conventions that governed the Second World War. American armed forces were responsible for the liberation of a number of German and Japanese concentration and prison camps at the end of that war. They followed a consistent practice of carefully documenting the conditions at those camps through photographic means, using soldiers and "embedded" photojournalists to do so. The United States disseminated large volumes of photographs from the liberated camps to media; this included photographs of corpses and remains of prisoners as well as of emaciated and poorly clothed survivors. This photographic evidence was also used with great effect at the prosecutions convened by the United States and its allies or by the United States alone at Nuremberg and at Tokyo at the end of the war. These practices were consistent with the requirements of the Geneva Conventions and were done for proper purposes: exposing and documenting a consistent pattern of abuse by the detaining power, and building public understanding and support for the Geneva Conventions. *See, e.g.*, B. ZELIZER, REMEMBERING TO FORGET: HOLOCAUST MEMORY THROUGH THE CAMERA'S EYE (1998). It is accordingly significant that the United States has historically been a principal expositor of the view that photographic evidence can and should be used to bear witness to the abuse of detainees and for the purpose of seeking justice in their name.

18. As Defendants note, Department of the Army regulations preclude Army personnel from taking photographs of detainees in the absence of supervision: "Photographing, filming, and video taping of individual EPW [prisoner of war], CI [civilian detainees] and RP [retained personnel] for other than internal Internment

5

Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of EPW, CI and RP or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command." AR 190-8 1-5(d) (Oct. 1997). This measure is a correct implementation of the Geneva Conventions designed to shield detainees from the potential of abuses described above. It is noteworthy that the prohibition on photography is *not* absolute; it makes photography contingent upon the discretion of suitable command authority. Again, this is fully consistent with the text and policies of the Geneva Conventions.

19. Guidelines adopted by the Department of Defense to govern media access to Guantánamo Bay reflect this construction of the Conventions. The guidelines generally permit photographs of prisoners, with this caveat: "News media coverage, including photo/video coverage, will not identify individual detainees, by name(s) or by image (i.e., close-up images of individual face(s) that would allow individuals to be identified will not be permitted)." *See* Supplemental Public Affairs Guidance ("PAG") on Detainees (Exhibit B to Declaration of Edward R. Cummings), ¶ 2.A.1. The Guidelines state that "the policy on limiting photographs is in accord with treating detainees consistent with the protections provided under the Third Geneva Convention." *Id.* ¶ 6.G.

20. Similarly, the Defense Department Guidelines for "embedded" media in Iraq permit the taking and dissemination of photographs of enemy prisoners of war, with only this caveat: "[n]o photographs or other visual media showing an enemy prisoner of war or detainee's recognizable face, name tag, or other identifying feature or item may be taken." *See* Memo from Public Affairs Officer to Potential Media Embeds re: Media Embed Informational Package (Exhibit D to Declaration of Edward R. Cummings), ¶ 1(k)(18).

21. A recent Congressional Research Service report confirms my view that this has been the United States' established practice in implementing the Geneva Conventions. The Report states: "[t]he Department of Defense interprets the provision to protect POWs from being filmed or photographed in such a manner that viewers would be able to recognize the prisoner. Photos and videos depicting POWs with their faces covered or their identities otherwise disguised [do] not, in the view of the Department of Defense, violate GPW art. 13." *See* JENNIFER K. ELSEA, CONGRESSIONAL RESEARCH SERVICE REPORT FOR CONGRESS: LAWFULNESS OF INTERROGATION TECHNIQUES UNDER THE GENEVA CONVENTIONS (Sept. 8, 2004), p. CRS-19.

ICRC CONSTRUCTION AND PRACTICE

22. In questions of interpretation surrounding the Geneva Conventions, one international organization performs a special charge under the Conventions as their guardian, and as a matter of well-established practice its interpretation is considered to be extraordinarily authoritative. That organization is the ICRC.

23. I was disappointed to read in a declaration submitted on behalf of Defendants that "[t]he ICRC generally has taken the view that Article 13 of the Third Geneva Convention requires parties to a conflict to avoid publication of images that show prisoners of war in degrading or humiliating positions *or* allow the identification of individual POWs." Declaration of Edward R. Cummings, ¶ 17 (emphasis supplied). I have worked with ICRC for more than twenty years and have never heard a representative of ICRC express the view cited. To the contrary, the view I have consistently heard is that such photos *may be disseminated* provided the individuals are not identifiable. In this manner, a proper balance is struck between the interest in documenting mistreatment of detainees and preserving the dignity of the detainee.

24. The established United States practice on this issue is consistent with the view of the ICRC. The Congressional Research Service Report referenced above acknowledges that "[t]he ICRC considers the use of any image that makes a prisoner of war individually recognizable to be a violation" of the Conventions. *See* Elsea, *supra*, at CRS-19. With respect to photographs of abuse in particular, the ICRC recently stated, in keeping with its historical construction of the Conventions, that such photographs may be disseminated if faces and identifying features are obscured. *See Pics "not breaching convention*," South Africa News (May 21, 2004) (attached hereto as Exhibit B).

25. For these reasons, I have formed the opinion that the dissemination of the Photographs would be consistent with the Geneva Conventions if they were altered to ensure that the prisoners depicted would not be individually recognizable. In my view, neither Article 13 of the Third Geneva Convention nor Article 27 of the Fourth Geneva Convention categorically prohibits the United States from releasing photographic evidence that prisoners have been maltreated in violation of the Conventions. On the other hand, dissemination of such photographs may serve the fundamental policy of the Convention that its provisions be enforced by exposing breaches thereof.

7

      I declare under penalty of perjury that the foregoing is true and correct with respect to factual matters within my actual knowledge, and that otherwise it constitutes my opinion fairly formed following due and careful study of the questions presented.

Executed in New York, New York, this 27th day of April, 2005.

                                                                                 */s/ Scott Horton*

                                                                                     Scott Horton

SCOTT HORTON (RSH 0840)
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336 2820

1176962v1