# Exhibit A

Gordon Risius and Michael A. Meyer

# The protection of prisoners of war against insults and public curiosity

Offprint from the *International Review of the Red Cross*
July-August 1993
(No. 295, pp. 288-299)

# The protection of prisoners of war against insults and public curiosity

by Gordon Risius and Michael A. Meyer*

> Mine honour is my life; both grow in one;
> Take honour from me, and my life is done.
> Shakespeare: *King Richard II*

## Introduction

International humanitarian law governing the treatment of prisoners of war is designed to protect almost every aspect of human welfare, in order to minimise as far as possible the adverse effects of captivity. As noted by the International Military Tribunal at Nuremberg,

"[W]ar captivity is neither revenge nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war ... and that it [is] contrary to military tradition to kill or injure helpless people".[1]

To the individual prisoner of war certain aspects will be of more concern than others. In some conflicts, for example, hunger and disease may be his major preoccupation; in others, where food and medical care are adequate, his main anxiety may be the well-being of his family at home, and his entitlement to correspond with them. One of the concerns of international humanitarian law which is often overlooked when arguably higher priority and more immediate issues are at stake, but is nevertheless of importance, is the protection of the prisoner's dignity and honour. With the advent of electronic newsgathering techniques enabling armed conflicts to be reported by the media with much greater immediacy than ever before, there is an increasing trend

for prisoner-of-war issues to be treated by the media in ways which diminish individual prisoner's honour and dignity, even if the motives of the media for such treatment may in themselves be honourable. The purpose of this short article is to consider the law protecting prisoners of war from "insult and public curiosity" and its origins, and to suggest how it might be interpreted in future in relation to filming and photography.

## Historical background

The Third Geneva Convention of 1949 (the Prisoners of War Convention) contains no provisions specifically regulating the circumstances in which prisoners of war can be photographed. The only article which touches on the subject is Article 13, paragraph 2, which states that:

"... *prisoners of war must at all times be protected, particularly against acts of violence or intimidation and against insults and public curiosity*."

This prohibition is not new. Article 2, paragraph 2 of the 1929 Geneva Prisoners of War Convention used almost identical language:

"*[Prisoners of war] shall at all times be humanely treated and protected, particularly against acts of violence, from insults and from public curiosity*."

According to Flory,[2] writing during World War II about the negotiations which resulted in the 1929 Convention, it was:

"*a general principle, frequently affirmed... that prisoners must be treated with humanity... The German delegate suggested that the conference of 1929 substitute for the Hague statement* a requirement that they be protected against death, wounds, bad treatment, robbery, injuries, and public curiosity, but the conference accepted a modification of the Hague rule in stating that they must be treated at all

---

* The opinions expressed in this article are the authors' own, and do not necessarily reflect the views of either the British government or the British Red Cross Society.

[1] Judgement (1947) 41 *AJIL* 172,229.

[2] William E. S. Flory, *Prisoners of War: A Study in the Development of International Law*, 1942, Washington D.C., American Council on Public Affairs, p. 39.

[3] Article 4 of the Hague Regulations of 1907 said no more than that "They must be humanely treated".

288

289

times *with humanity and must be protected especially against acts of violence, insults and public curiosity".*[4]

The 1929 Convention provision was the basis for the trial of Lieutenant General Kurt Maelzer before a United States Military Commission in Florence, Italy, in September 1946.[5] Maelzer, the commander of the German garrison in Rome in January 1944, had been ordered by Field Marshal Kesselring, commander of the German forces in Italy, to parade several hundred British and American prisoners of war through the streets of the Italian capital, in order to boost Italian morale. During the parade, onlookers threw sticks and stones at them. Numerous photographs were taken and published in the Italian press, under the caption "Anglo-Americans enter Rome after all ... flanked by German bayonettes". Maelzer was convicted of "exposing prisoners of war ... in his custody ... to acts of violence, insults and public curiosity", and was sentenced to ten years' imprisonment, later reduced to three years.[6]

But taking and publishing photographs of prisoners of war was hardly a new phenomenon in 1944. Most accounts of warfare since photography became popular and widespread in the early part of this century have contained such pictures.[7] Over the last seventy-five years or so these have ranged from prisoners depicted at the moment of surrender;[8] receiving medical treatment on the battlefield;[9] awaiting evacuation;[10] marching into captivity;[11] on board ship;[12] digging trenches;[13] undertaking agricultural work;[14] and occasionally even during detention in a prisoner-of-war camp.[15] More recently, with the advent of the video camera, television coverage has included footage of prisoners of war in the process of surrendering, in captivity and being repatriated. In general, neither the taking of such pictures, nor their publication or transmission, appears to have attracted much protest from any quarter, either on grounds of lack of taste or because they were thought to contravene the Third Geneva Convention. Such absence of protest may be partly the result of general ignorance of the provisions of the Convention, and partly because the majority of such pictures are not particularly shocking or offensive, at least by present-day standards.

But even if historically photographs and film of prisoners of war have aroused little concern about whether at least some pictures contravene the Third Geneva Convention, arguments can undoubtedly be put forward in support of the proposition that contraventions have

---

[4] Flory added that the German delegate was dissatisfied with the Hague rule on the ground that "the definition of 'humanity' is not uniform throughout the world".

[5] The case of *Kurt Maelzer*, War Crimes Report 11 (1949) 53.

[6] The International Military Tribunal in Tokyo similarly condemned the Japanese practice of "parading prisoners of war through cities and exposing them to ridicule and insults". See the UK Manual of *Military Law, Part III*, London, H.M.S.O., 1958, p. 51. Another instance from the Second World War where allied prisoners were exposed to the wrath of the local population, on this occasion with fatal results, was the Essen Lynching case (*Heyer and others*, War Crimes Reports 1 (1947) 88). Captain Heyer, a German officer, gave instructions that a party of three allied officers were to be escorted to a Luftwaffe unit for interrogation. He ordered their guards not to interfere if civilians should attempt to molest them. These instructions were given in a loud voice, and in the hearing of a crowd of civilians. When the prisoners reached one of the main streets in Essen, they were attacked by the crowd and eventually thrown over the parapet of a bridge to their deaths. However, the charge preferred against Captain Heyer and his six co-accused at their trial by a British Military Court in December 1945 appears to have made no reference to the prisoners' exposure to insult and public curiosity (understandably, in view of the fact that they suffered far worse consequences), but instead alleged that "in violation of the laws and usages of war, [they] were, with other persons, concerned in the killing of three unidentified British airmen, prisoners of war".

[7] See, e.g., *The Times History of the War*, two volumes of which are cited in Notes 13 and 14 below.

[8] E.g. *Korea — The First War We Lost*, Bevin Alexander, Hippocrene Books, New York, 1986, following p. 448, showing Americans emerging from a cave to surrender to Chinese soldiers. A further example, referred to by H. Levie in *The Falklands War* (Coll and Arends, eds.), Allen & Unwin, Boston, 1985, p. 72, is the widely-publicised photograph of the British Royal Marines surrendering at Port Stanley, showing a number of Marines lying face down on the ground.

[9] E.g. S. H. Best's *The Story of The British Red Cross*, Cassell & Co. Ltd., 1938, which opposite p. 144 shows a British medical officer tending a wounded Turk after the battle of Tikrit in November 1917.

[10] E.g. *The Longest War — The Iran-Iraq Military Conflict*, Dilip Hiro, Grafton Books, London, 1989, which includes (following p. 116) a picture of Iraqi prisoners of war taken in February 1984.

[11] E.g. *At the Going Down of the Sun*, Oliver Lindsay, Hamish Hamilton, London, 1981, opposite p. 152, which includes a picture of allied prisoners of war marching to Shamsuipo Camp, Hong Kong, on 30 December 1941, witnessed by Japanese soldiers, four days after Hong Kong surrendered.

[12] E.g. *British Forces in the Korean War*, ed. Cunningham-Boothe and Farrar, The British Korean Veteran Association, Leamington Spa, 1988, p. 132, showing North Korean and Chinese prisoners captured by Royal Marines and held aboard H.M.S. Belfast.

[13] See, e.g. Vol. VI of *The Times History of the War*, The Times, London, 1916, which on p. 262 shows "British prisoners at work — digging trenches in Germany and preparing wood for supports for the trenches".

[14] See, e.g. Vol. XII of *The Times History of the War*, The Times, London, 1917, which on p. 245 shows "British Prisoners of War engaged in farm work".

[15] E.g. *Monty — The Field-Marshal — 1944 — 1976*, Nigel Hamilton, Hamish Hamilton, London, 1986, opposite p. 420, showing Field-Marshal Busch, commander-in-chief of the surrendered German armies in the north, being reprimanded by Field-Marshal Montgomery for failing to obey orders promptly.

possible to identify him can redound either to his advantage or to his disadvantage. For example, by proving that he was alive and in captivity on the day the picture was taken, such a picture might help to ensure his proper treatment, on the basis that his captors could thereafter hardly deny all knowledge of him, and would then be bound to provide a full account of their dealings with him. On the other hand, pictures of identifiable prisoners can endanger their families. For example, during the 1991 Gulf War the Iraqi authorities were reported to have arrested the families of Iraqi soldiers who appeared on television as prisoners of war, on suspicion that the soldiers had deserted their posts in order to surrender.[19] Similar examples could be given from other conflicts.

c. *The photographer's intention.* Few would dispute that Article 13 is contravened where the photographer's intention is to humiliate the prisoner by taking and publishing a picture showing him in degrading circumstances. But what if the photographer is a journalist anxious to record and report degrading conditions in a prisoner-of-war camp, in the hope that international outrage will result in improvements?[20] Is he invariably to refrain from photographing or publishing such scenes for fear of contravening the said article? It has been pointed out that during the 1991 Gulf War the retransmission on British and American television of captured coalition aircrew being interviewed by the Iraqi authorities, and condemning the coalition action against Iraq was arguably a breach of Article 13 in its own right.[21] However, it might also be argued that by retransmitting the offending film, the western media were doing no more than reporting a contravention of the Third Convention.

d. *Routine and staged events.* A distinction may be drawn between pictures of "routine" events as they take place, such as prisoners of war in the act of surrendering, and events deliberately staged for the benefit of the cameras.[22]

---

[19] See *The Times*, 13 February 1991.

[20] This may have been the motive of the photographer who took the picture of Bosnian Muslims in a Bosnian Serb-run prison camp featured in the Amnesty International advertisement in *The Times* on 19 September 1992. It was undoubtedly Amnesty International's motive in publishing it.

[21] See Hampson's chapter on "Liability of War Crimes" in *The Gulf War 1990-91 in International and English Law* (ed. Rowe), Routledge, London, 1993.

[22] See Hampson, *op. cit.*

293

---

occurred in the past. Furthermore, given the increasingly intensive coverage of conflicts provided by the media and the expanding role of the major communications networks, there is every reason to expect in future an increased tension between the demands of the media and the requirements of the Convention.

## Problems of interpretation

Although few people would consider all photographs of prisoners of war to be objectionable as a matter of principle, most would surely oppose the publication or transmission of pictures of prisoners of war being interrogated under torture,[16] or cowering on the ground awaiting a further beating from their captors.[17] Since Article 13 of the Convention does not draw a clear dividing line between what is acceptable and what is a breach of its provisions, it may be helpful to reflect on the following considerations, which are by no means exhaustive:

a. *The prisoner's honour.* According to the ICRC's *Commentary*, the protection afforded by Article 13 "extends to moral values, such as ... the [prisoner's] honour".[18] Depending on the circumstances, the very act of taking pictures of a prisoner of war will in some cases humiliate him and wound his sense of honour, for example, if he is forced to put on his captors' uniform for the purpose of the photograph. But what if a picture is taken of a prisoner in non-humiliating circumstances (e.g. reading a book) without his knowledge? Can it be said that his honour is affected while he remains unaware of the photograph?

b. *Consequences for the prisoner or his family.* Depending on the circumstances, taking a photograph of a prisoner from which it is

---

[16] E.g. *The Illustrated History of the Vietnam War*, Brian Beckett, Blandford Press, Poole, Dorset, 1985, p. 41, showing South Vietnamese Marines subjecting "a Viet Cong prisoner to on-the-spot interrogation. The prisoner's head is held under water until he's about to drown".

[17] E.g. Beckett, *op. cit.*, at p. 76, with the caption "The Interrogation of a NVA [North Vietnamese Army] prisoner. In a brutal, dirty war like Vietnam, there were excesses on both sides".

[18] J. Pictet, ed., *Commentary on Geneva Convention III of 1949*, Geneva, ICRC, 1960, p. 141, which emphasises that the concept of humane treatment implies more than an absence of corporal punishment, and involves a positive obligation "to stand up for [the prisoner], to give him assistance and support and also to defend or guard him from injury or danger".

292

The fact that it is not possible to say with any degree of certainty which, if any, of these considerations is relevant or decisive when considering a possible breach of Article 13 demonstrates the unsatisfactory state of international humanitarian law on this subject. Laws whose true meaning is unclear are generally not good laws. Ideally they should be rewritten. It is unfortunate that the 1977 Geneva Protocols,[23] which update the 1949 Conventions, leave Article 13 untouched. No doubt the whole question of photographing prisoners of war[24] will be reconsidered when in due course the 1949 Conventions are next reviewed, but in the meantime it would be desirable to encourage a common interpretation of Article 13 as it relates to photography.

### Proposed interpretation

Although contraventions of Article 13 have occurred in previous conflicts, such as the Korean, Vietnam and Iran-Iraq Wars, it was the Gulf War of 1991 (in which breaches were alleged to have occurred on both sides) which prompted moves towards such a common interpretation. ICRC suggestions during the conflict that publishing photographs of prisoners of war inevitably exposed them to public curiosity gave rise to protests from the United States over such an interpretation of Article 13.[25] For a time care was taken to avoid publishing photographs showing prisoners' faces, but subsequently such caution was abandoned.[26] Another suggestion was that a photograph would contravene Article 13 if, but only if, it showed individuals being held captive in a humiliating way.[27] The idea has its attrac-

---

[23] Protocol I additional to the 1949 Geneva Conventions deals with international armed conflicts including wars of national liberation (Article 1.4), while Protocol II is concerned with non-international armed conflicts — see also Note 27 relating to Article 3 common to the 1949 Conventions.

[24] Under Article 27 of the Fourth Geneva Convention of 1949, civilians in the territories of parties to the conflict and in occupied territories enjoy protection similar to that contained in Article 13 of the Third Convention.

[25] *The Times*, 25 January 1991.

[26] See Rowe's chapter "Prisoners of War in the Gulf" in *The Gulf War 1990-91 in International and English Law* (ed. Rowe), Routledge, London, 1993.

[27] It is of interest that in relation to armed conflicts not of an international character, Article 3 common to all four Geneva Conventions of 1949 requires humane treatment in all circumstances and prohibits "outrages upon personal dignity, in particular, humiliating and degrading treatment" against "Persons taking no active part in the hostilities, including members of armed forces ... placed *hors de combat* by ... detention...". Thus the "humiliation" test already pertains to conflicts to which common Article 3 applies.

---

tions, being so closely related to the concept of the prisoners' honour, but the "humiliation" test is a subjective one, and thus unlikely to lead to consistent and uniform interpretation.

The British Red Cross Society (BRCS) took the view that the problem was sufficiently serious to justify proposing a draft resolution for consideration by the 26th International Conference of the Red Cross and Red Crescent, which was due to be held in Budapest at the end of 1991. As the conference was ultimately postponed *sine die*, the draft resolution was not discussed, but the interpretation it put forward remains valid, and the text, together with its accompanying Explanatory Note, is accordingly reproduced below.

The test proposed by the BRCS for deciding whether to publish a photograph or transmit film of prisoners of war would be: whether the prisoners can be individually identified. Only if the prisoners' features cannot be recognized would it be permissible to publish or transmit. This approach has a number of advantages:

a. It involves an objective test;
b. It is easy to understand and to implement;
c. Because it is concerned with prisoners of war as individuals, it reflects the understanding referred to above that Article 13 is designed to protect individual honour;
d. By referring only to the publication or transmission of pictures of prisoners of war, it primarily restricts the media without, for example, prohibiting the taking of photographs intended for legitimate official purposes, such as the registration and documentation of prisoners of war.

### Future action

Although the images of the 1991 Gulf War are fast fading from the memory as equally horrifying photographs from current conflicts catch the media's attention, the problem of defining the prohibition in Article 13, paragraph 2, of the Third Geneva Convention still remains, and action should be taken now to seek to reach a common interpretation suited to modern circumstances. There are various possible fora for starting this process: the proposed International Conference for the Protection of War Victims, which is scheduled to be held in August/September 1993, the Council of Delegates of the International Red Cross and Red Crescent Movement, which will meet in late

October 1993, and the autumn 1993 Session of the United Nations General Assembly, are just three examples.

In our rapidly changing world, it is increasingly important for States to seek ways, in addition to Diplomatic Conferences which can take years to convene, to adapt existing international humanitarian law to present needs. It is hoped that governments, perhaps encouraged by the Red Cross and Red Crescent Movement, will seize the opportunity to do so with respect to the protection of prisoners of war against insults and public curiosity, which may not only set a useful precedent, but also help to make the media more aware of their significant role and responsibilities in implementing international humanitarian law and of the need for them to gain a better understanding of that law.

**Gordon Risius**
**Michael A. Meyer**

---

Gordon Risius is a Colonel in the legal services branch of the British Army and sits part-time in the Crown Court as an Assistant Recorder. In addition to tours of duty at the Ministry of Defence in London, he has served in Germany, Hong Kong, Cyprus and Northern Ireland. Since 1989 he has been a member of the Directorate of Army Legal Services at the Ministry of Defence in London, and was responsible for much of the military legal advice provided within the Ministry of Defence during the 1991 Gulf War. He is the Secretary and Treasurer of the UK Group of the International Society for Military Law and the Law of War, and has been a class leader and instructor at the International Institute of Humanitarian Law, San Remo, Italy. He has also been a member of the Principles and Law Panel of the British Red Cross Society.

Michael Meyer is Head of International Law at the British Red Cross. He has edited one collection of essays on different aspects of international humanitarian law, and co-edited another, for the British Institute of International and Comparative Law, and has contributed articles and book reviews on humanitarian subjects to various publications. Mr. Meyer is a member of the Council of the International Institute of Humanitarian Law, San Remo, the UK Group of the International Society for Military Law and Law of War, and the Working Group on International Humanitarian Law of the EC National Societies.

---

ANNEX

DRAFT RESOLUTION

# PROTECTION OF PRISONERS OF WAR AGAINST INSULTS AND PUBLIC CURIOSITY

The 26th International Conference of the Red Cross and Red Crescent,

*having taken note* with interest of the report submitted by the ICRC on the treatment of prisoners of war during armed conflicts,

*stressing* the importance of respect for the rules of international humanitarian law, in particular those contained in the Third Geneva Convention of 12 August 1949, requiring that prisoners of war be treated humanely at all times,

*reaffirming* in particular the rule that prisoners of war must be protected against insults and public curiosity as set out in Article 13 of the Third Geneva Convention of 1949,

*noting* however that the prohibition against insults and public curiosity must be interpreted in the light of modern communications technology,

*aware of* the important role of the media in helping to ensure respect for international humanitarian law,

*recognizing* however that media images of prisoners of war, which it is claimed provide evidence that prisoners of war are alive and of their standard of treatment, can also humiliate prisoners of war, endanger their families and make return to their own States more difficult,

*recalling* that prisoners of war, upon capture, are required only to give certain specified personal details for the purpose of identification as prescribed in Article 17 of the Third Geneva Convention of 1949,

*deeply concerned* that public declarations by prisoners of war are often made under duress and contravene Articles 13 and 17 of the Third Geneva Convention,

1. *calls upon* States and other competent authorities to interpret the prohibition against insults and public curiosity in Article 13 of the Third Geneva Convention of 1949 as prohibiting the public transmission of images of prisoners of war as individuals, but not forbidding the public transmission of images of prisoners of war who cannot be individually recognized,

2. *appeals to* States and other competent authorities in particular not to permit media images of prisoners of war making statements,

3. *urges* media organizations and individual journalists to act prudently and discreetly when reporting on prisoners of war, bearing in mind the effect

pictured making a declaration, since these are often made under duress and contravene the right of a prisoner of war only to provide personal information (Article 17, paragraph four).

The problems described above arose during the Gulf War, although they have also occurred in other armed conflicts.

Michael A. Meyer
British Red Cross
7 November 1991

of publication or transmission of their work on the prisoners of war or their families,[28]

4. *requests* States, with the support of the International Red Cross and Red Crescent Movement, to spread knowledge of the international rules for the protection of prisoners of war against insults and public curiosity to media organizations and to individual journalists,[29]

5. also *requests* States to take appropriate measures to ensure compliance with these rules.

EXPLANATORY NOTE

PRISONERS OF WAR: PUBLICITY AND PROPAGANDA

The Third Geneva Convention of 1949 requires prisoners of war to be treated with humanity at all times (Article 13). In particular, prisoners of war must be protected against insults and public curiosity. However, this provision was agreed before the advent of television and contemporary communication technology. It has been argued that the prohibition against insults and public curiosity must be interpreted in the light of modern capabilities.

On the one hand, a newspaper photograph or television picture of a prisoner of war can be claimed to prove that he/she is alive, and to show his/her standard of treatment. On the other hand, such publicity can humiliate the prisoner of war, endanger his/her family and make his/her return to his/her own State more difficult. Consequently the media must be prudent and consider the consequences of their actions.

A practical way forward is to interpret the prohibition against insults and public curiosity as prohibiting the transmission of images of prisoners of war as individuals, whilst permitting images of prisoners of war who cannot be individually recognized, e.g. a shot of the backs of prisoners of war, of prisoners of war marching at a distance, or of a prisoner-of-war camp in the distance would be acceptable. In addition, prisoners of war should not be

---

[28] By drawing attention to Article 13, compliance with the terms of this resolution and the "individual recognition" test might encourage the media to become more familiar with international humanitarian law generally.

[29] As an illustration, over the last few years the British Red Cross Society has organized a number of half-day courses of instruction in international humanitarian law for trainee television journalists.

298

299

# Exhibit B

| News24 | Finance24 | Food24 | Health24 | Property24 | Wheels24 |

**NEWS24.com**

**On this day**
1945 - Benito Mussolini, dictator of Italy until his downfall in 1943, is killed by partisans.

**Lotto Page**
Check your lu find out all th news, visit Ne

Search ● News24  ○ Web by Google [     ] GO   My home page

**News Sections**
- Homepage
- **World**
- Iraqi Dossier
- News
- South Africa
- Sport
- Africa
- Sci-Tech
- Entertainment
- Finance
- Health
- Backpage

**Other Sections**
- Galleries
- Travel
- Traffic
- Letters
- Columnists
- Horoscopes
- TV Guides
- Lottery
- Cartoon
- Weather
- Mobile

**Special Reports**
- Zimbabwe
- Aids Focus
- Shaik Trial
- Iraqi Dossier
- More...

**Stidy**

**Lottery Numbers**
Lotto:
5 8 17 27 37 38  47

Lotto Plus:
7 27 32 40 41 42  20

UK Lottery:
2 15 20 24 32 47  29

Lottery Page

World : Iraq

**IRAQ**
News24 - Special Report

## Pics 'not breaching convention'
21/05/2004 20:56  - (SA)

Geneva - Releasing further photographs of prisoners being abused by United States forces in Iraq probably wouldn't breach the Geneva Conventions as long as the inmates couldn't be identified, the international Red Cross said on Friday.

Florian Westphal, spokesperson for the International Committee of the Red Cross, said: "My interpretation would be that you are not exposing them to 'public curiosity' if their faces are obscured."

The Geneva Conventions on the conduct of war ban exposing prisoners of war to "public curiosity".

US defence secretary Donald Rumsfeld has said this regulation would forbid the government from distributing photographs that show Iraqi detainees being humiliated or abused at Baghdad's Abu Ghraib Prison.

print story on ROTATRIM
email story

**Related Articles**
- Inmates' tales of torture
- Hundreds leave Abu Ghraib
- US paper publishes more photos
- 'Cover-up' at Abu Ghraib
- New abuse pics, more charges
- Top brass accept abuse blame
- Guard pleads guilty to abuse

Westphal declined to comment directly on whether Rumsfeld could release all the pictures provided the faces of the detainees were obscured, but said that "blurring faces might be a good way" to ensure that detainees can't be recognised in pictures.

**Cornered inmate is cowering**

The Washington Post on Friday published new photographs of prisoner abuse in Abu Ghraib, but Westphal said the paper had not breached the Geneva Conventions even though the face of one detainee was clearly visible, because only governments were bound by the treaties.

It is up to governments to pass the sort of legislation that would prevent the media from publishing photos that breached the Geneva Conventions, he said.

In the Washington Post's front-page photo, a cornered inmate is cowering in the face of a US soldier restraining a large black dog. The inmate's face is clearly visible.

**Afrikaans**
Beeld
Die Burger
Volksblad
Rapport
Sake
Finansies & Tegniek
Landbou
Litnet
Jip
netAfrikaans
Streekkoerante

**Partners**
Natal Witness
City Press
Finance Week
Carte Blanche
SASI
SA Gateway
Keo
Community

**Subscribe**
Mens Health
FHM
SASI
Golf Digest
Shape
Fairlady
YOU
Heat

**Inteken**
Die Burger
Beeld
Volksblad
Weg
Huisgenoot

In other pictures, however, faces are obscured, blurred or hidden by hoods.

The photographs include images of a US soldier apparently preparing to strike a shackled detainee and a hooded inmate collapsed with his wrists handcuffed to the railing.

Another shows a baton-wielding soldier appearing to order a naked detainee covered in a brown substance to walk a straight line, although his ankles are shackled.

"What we say is that in order to protect the dignity of detainees, they should not be shown to public curiosity," said ICRC spokesperson Nada Doumani, speaking from Amman, Jordan.

"But we aren't going to make a big story of this. The problem now is not in publishing the picture as much as in what has happened in the prison."

**Never comments on conditions in prisons**

The neutral, Swiss-run ICRC is designated in the Geneva Conventions as their guardian, and ICRC delegates visit detainees across the globe.

The agency often speaks out on the legality of government actions under international humanitarian law, but never comments on the conditions it finds in prisons in order to ensure continued access.

Earlier this month, however, an ICRC report on conditions in Iraqi prisons was leaked, and the agency acknowledged that it had been demanding improvements for more than a year.

Coalition forces have met some of the demands, but others remain a concern, it said.

*Edited by Tisha Steyn*

Discussion Forums | Newsletters | Photo Galleries | Earlier stories

-- Top stories in this category --


Associated Press

PROMOTION

**Future lucky Lotto ticket for sale to the highest bidder on eBay**
In a bizarre encounter with a Turkish fortune-teller, a British Tourist was handed the supposed winning numbers for a July 2005 draw in the UK National Lotto.

**More strike it rich with Piggs Peak**
Piggs Peak Internet Casino has been at it again!

**Livestrong Bracelet $0.99**
Livestrong Bracelet, Wristbands Low Price & Fast Shipping

**Ribbon car magnets**
Magnet Mania Sale. Buy one get one free. Fast free Shipping.

Ads by Google

