# CRS Report for Congress

Received through the CRS Web

# Lawfulness of Interrogation Techniques under the Geneva Conventions

**September 8, 2004**

Jennifer K. Elsea
Legislative Attorney
American Law Division

**Congressional Research Service ❖ The Library of Congress**

# Lawfulness of Interrogation Techniques under the Geneva Conventions

## Summary

Allegations of abuse of Iraqi prisoners by U.S. soldiers at the Abu Ghraib prison in Iraq have raised questions about the applicability of the law of war to interrogations for military intelligence purposes. Particular issues involve the level of protection to which the detainees are entitled under the Geneva Conventions of 1949, whether as prisoners of war or civilian "protected persons," or under some other status. After photos of prisoner abuse became public, the Defense Department (DOD) released a series of internal documents disclosing policy deliberations about the appropriate techniques for interrogating persons the Administration had deemed to be "unlawful combatants" and who resisted the standard methods of questioning detainees. Investigations related to the allegations at Abu Ghraib revealed that some of the techniques discussed for "unlawful combatants" had come into use in Iraq, although none of the prisoners there was deemed to be an unlawful combatant.

This report outlines the provisions of the Conventions as they apply to prisoners of war and to civilians, and the minimum level of protection offered by Common Article 3 of the Geneva Conventions. There follows an analysis of key terms that set the standards for the treatment of prisoners that are especially relevant to interrogation, including torture, coercion, and cruel, inhuman and degrading treatment, with reference to some historical war crimes cases and cases involving the treatment of persons suspected of engaging in terrorism. Finally, the report discusses and analyzes some of the various interrogation techniques approved or considered for use during interrogations of prisoners at Abu Ghraib.

# Contents

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Interrogation of Prisoners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Prisoners of War  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Civilians . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Common Article 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Interpreting the Geneva Conventions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Threshold Definitions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        Torture  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        Coercion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        Inhumane or Degrading Treatment  . . . . . . . . . . . . . . . . . . . . . . . . 17
    Status of Detainees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Department of Defense Methods of Interrogation  . . . . . . . . . . . . . . . . . . . . 23
    Approved Approaches for all Detainees  . . . . . . . . . . . . . . . . . . . . . . . . . 23
        Direct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        Incentive / Incentive Removal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        Emotional Love / Hate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        Fear Up Harsh / Mild . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        Reduced Fear  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        Pride & Ego Up / Down . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        Futility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        We Know All . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        Establish Your Identity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Repetition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        File & Dossier  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Rapid Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Silence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Require CG's Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        Change of Scenery Down . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        Dietary Manipulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        Environmental Manipulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        Sleep Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        Isolation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        Presence of Military Working Dogs  . . . . . . . . . . . . . . . . . . . . . . . . 34
        Sensory Deprivation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        Stress Positions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        Removal of Clothing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        Removal of All Comfort Items, Including Religious Items . . . . . . . . 35
        Forced Grooming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        Use of Scenarios Designed to Convince the Detainee that Death
            or Severely Painful Consequences are Imminent  . . . . . . . . . . . 36

# Lawfulness of Interrogation Techniques under the Geneva Conventions

## Introduction

Allegations of abuse of Iraqi prisoners by U.S. soldiers at the Abu Ghraib prison in Iraq raise questions about the applicability of the law of war to interrogations for military intelligence purposes. Particular issues involve the level of protection to which the detainees are entitled under the Geneva Conventions of 1949. After photos of prisoner abuse became public, the Defense Department (DOD) released a series of documents disclosing policy deliberations about appropriate techniques for interrogating persons the Administration had deemed to be unprotected by the Geneva Conventions with respect to the Global War on Terrorism (GWOT).[1] Investigations related to the allegations at Abu Ghraib revealed that some of the techniques discussed for "unlawful combatants" had come into use in Iraq, although none of the prisoners there was deemed to be an unlawful combatant.

This report outlines the provisions of the Conventions as they apply to prisoners of war and to civilians, and the minimum level of protection offered by Common Article 3 of the Geneva Conventions. The report analyzes key terms that govern the treatment of prisoners with respect to interrogation, which include torture, coercion, and cruel, inhuman and degrading treatment. Finally, the report discusses and analyzes the various interrogation techniques approved or considered for use during interrogations of prisoners at Abu Ghraib.

## Interrogation of Prisoners

Gathering of military intelligence has always been a top priority for belligerents, and captured enemy soldiers could be expected to have at least some knowledge pertinent to military operations.[2] As a consequence, prisoners of war (POWs) can expect to be questioned by their captors, who can be expected to employ whatever means are available to them for extracting such information. Possibly due in part to the inherent interest of belligerents both in procuring intelligence information and in protecting their own information and soldiers, ground rules developed for fair play in exploiting the intelligence value of captives. The emergence of "total war" in the twentieth century increased the military utility of economic data, industrial secrets,

---

[1] Press Release, Department of Defense, DoD Provides Details on Interrogation Process (June 22, 2004), *available at* [http://www.defenselink.mil/releases/2004/nr20040622-0930.html].

[2] *See* A. J. BARKER, PRISONERS OF WAR 59 (1975)(noting that during the Napoleonic wars, the U.S. Civil War, and in the Crimea, "all belligerents staged raids for the express purpose of capturing prisoners for interrogation").

and other information about the enemy that in centuries past might have been of little interest to warriors, increasing the intelligence value detainees might have, but not necessarily improving their treatment.[3]

## Prisoners of War

The ill-treatment of prisoners of war, even for the purpose of eliciting information deemed vital to self-defense, has long been considered a violation of the law of war, albeit one that is frequently honored in the breach.[4]  The practice was understood to be banned prior to the American Civil War.  The Lieber Code,[5] adopted by the Union Army to codify the law of war as it then existed, explained:

> "Honorable men, when captured, will abstain from giving to the enemy, information concerning their own army, and the modern law of war permits no longer the use of any violence against prisoners in order to extort the desired information or to punish them for having given false information" (Art. 80).

The Geneva Convention Relative to the Treatment of Prisoners of War (GPW)[6] Article 17, paragraph 4 provides the general rule for interrogation of prisoners of war:

> No physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever. Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to unpleasant or disadvantageous treatment of any kind.

This language replaced a provision in the 1929 Geneva Convention that stated "[n]o pressure shall be exerted on prisoners to obtain information regarding the situation in their armed forces or their country."[7]  According to the ICRC Commentary,[8] the many violations that occurred during World War II led drafters of the 1949 Convention to expand the provision to cover "information of any kind whatever," and by "prohibiting not only 'coercion' but also 'physical or mental

---

[3] Former Nuremberg prosecutor Telford Taylor commented that
> Today the value of prisoner interrogation for intelligence purposes and the fear of reprisals have ensured among the major powers (though by no means universally) observance of the obligation to accept surrender and grant humane treatment to prisoners of war.

Telford Taylor *in* WAR CRIMES, 49 (Henry Kim, ed. 2004).

[4] *See* Sanford Levinson, *"Precommitment" and "Postcommitment": The Ban on Torture in the Wake of September 11*, 81 TEX. L. REV. 2013, 2017-18 (2003).

[5] General Order No. 100, Instructions of the Government of Armies of the United States in the Field (1863) [hereinafter "Lieber Code"].

[6] August 12, 1949, 6 U.S.T. 3317 (hereinafter "GPW").

[7] Geneva Convention Relative to the Treatment of Prisoners of War art. 5 para 3, 47 Stat. 2021 (July 27, 1929)[hereinafter "1929 Geneva Convention"].

[8] INTERNATIONAL COMMITTEE OF THE RED CROSS, 3 COMMENTARY ON THE GENEVA CONVENTIONS OF 12 AUGUST 1949 (Jean Pictet, ed. 1960) [hereinafter "ICRC COMMENTARY III"].

CRS-3

torture.'"[9]  The provision does not prohibit the detaining power from seeking any particular kind of information, but prohibits only the methods mentioned.[10]  Coercion is also prohibited to elicit confessions from prisoners of war to be used against them at trial.[11]

Other articles that apply at all times during captivity are also relevant.  They suggest that prisoners of war may not be singled out for special treatment based on the suspicion that they may have valuable information.  Article 13 provides, in part, that "[p]risoners of war must at all times be humanely treated"[12] and they "must at all times be protected, particularly against acts of violence or intimidation..." Furthermore, it describes as a "serious breach" of the GPW "[a]ny unlawful act or omission by the Detaining Power causing death or seriously endangering the health of a prisoner of war in its custody." Article 14 states that "[p]risoners of war are entitled in all circumstances to respect for their persons and their honor."[13]

---

[9] *Id.* at 163 (citing in particular the "great hardship" inflicted on prisoners at "interrogation camps" to secure information ).  Interestingly, the ICRC Commentary seems to have viewed 'coercion' and 'pressure' to be the same thing, distinct from physical or mental torture.

[10] *Id.* The ICRC Commentary interprets the provision to prohibit the Detaining Power from "exert[ing] any pressure on prisoners," even with respect to the personal identification information the prisoner is required to give under the first paragraph.  *Id.* at 164. In other words, "It's not what you ask but how you ask it." *See* U.S. ARMY JUDGE ADVOCATE SCHOOL, LAW OF WAR WORKSHOP DESKBOOK 83 (CDR Brian J. Bill, ed. 2000) [hereinafter "L O W    D E S K B O O K"] , *a v a i l a b l e    a t* [https://www.jagcnet.army.mil/JAGCNETInternet/Homepages/AC/CLAMO-Public.nsf.].

[11] GPW art. 99 ("No moral or physical coercion may be exerted on a prisoner of war in order to induce him to admit himself guilty of the act of which he is accused.").

[12] GPW art. 13, para. 1.  The ICRC Commentary regarded this requirement as absolute, describing "humane" as follows:

> With regard to the concept of humanity, the purpose of the Convention is none other than to define the correct way to behave towards a human being; each individual is desirous of the treatment corresponding to his status and can therefore judge how he should, in turn, treat his fellow human beings.

ICRC COMMENTARY III at 140.  According to the ICRC Commentary, the elements of "humane" are set forth in the remainder of Article 13.  *Id.* (noting that it includes not only a prohibition against corporal punishment but also a positive duty to protect the detainee from harm and provide  assistance as necessary).

[13] GPW art. 14, para. 1; *see* ICRC COMMENTARY III at 143 (describing the article as encompassing both the "physical and the moral aspects of the individual"). Offenses against the physical person, according to the ICRC Commentary, include the killing, wounding or even endangering prisoners of war, or allowing these acts at the hands of others. *Id.* Protection of the "moral person" prohibits adverse propaganda and requires the detaining power to provide for the prisoners' intellectual, educational and recreational pursuits, according to their individual preferences. *Id.* at 145.  Respect for "honor" requires the protection of prisoners from "libel, slander, insult and any violation of secrets of a personal nature" (even if the source is another prisoner) and humiliating circumstances involving clothing and work.  *Id.*

Reprisal against prisoners of war is explicitly prohibited in Article 13. Article 16 requires that all prisoners of war must be treated equally:

> Taking into consideration the provisions of the present Convention relating to rank and sex, and subject to any privileged treatment which may be accorded to them by reason of their state of health, age or professional qualifications, all prisoners of war shall be treated alike by the Detaining Power, without any adverse distinction based on race, nationality, religious belief or political opinions, or any other distinction founded on similar criteria.

Article 16 does not prohibit more favorable treatment based on these criteria.[14]

Article 25 provides for a minimum level of living conditions, suggesting that the manipulation of environmental conditions below these standards is not permitted:

> Prisoners of war shall be quartered under conditions as favourable as those for the forces of the Detaining Power who are billeted in the same area. The said conditions shall make allowance for the habits and customs of the prisoners and shall in no case be prejudicial to their health. .... The premises provided for the use of prisoners of war individually or collectively, shall be entirely protected from dampness and adequately heated and lighted, in particular between dusk and lights out.

Articles 21 and 22 address physical conditions of confinement, and do not appear to allow the placement of prisoners in solitary confinement in order to prepare them for interrogation. Article 21 provides:

> Subject to the provisions of the present Convention relative to penal and disciplinary sanctions, prisoners of war may not be held in close confinement except where necessary to safeguard their health and then only during the continuation of the circumstances which make such confinement necessary.

Article 22 provides:

> Prisoners of war interned in unhealthy areas, or where the climate is injurious for them, shall be removed as soon as possible to a more favourable climate. The Detaining Power shall assemble prisoners of war in camps or camp compounds according to their nationality, language and customs, provided that such prisoners shall not be separated from prisoners of war belonging to the armed forces with which they were serving at the time of their capture, except with their consent.

## Civilians

The first important modern effort to protect civilians in occupied territory is reflected in Hague Convention IV of 1907 and its accompanying Regulations.[15]

---

[14]    ICRC COMMENTARY III, *supra* note 8, at 154 (explaining that differentiation is prohibited only when it is of an adverse nature).

[15] Hague Convention No. IV Respecting the Laws and Customs of War on Land, Oct. 18,
(continued...)

CRS-5

Article 44 forbids the occupying power "to force the inhabitants of territory occupied by it to furnish information about the army of the other belligerent, or about its means of defense." In 1949, the treatment of enemy civilians was addressed for the first time in a separate instrument, the Fourth Geneva Convention ("GC").[16]

The GC governs the treatment of civilians who fall into the hands of the enemy, including those residing in the territory of that power as enemy aliens and the civilian population of occupied territory. Civilians in occupied territory are "protected persons" under the fourth Geneva Convention ("GC"), and are entitled under article 27 "in all circumstances, to respect for their persons, their honor, their family rights, their religious convictions and practices, and their manners and customs."[17] While an occupying power is permitted to "take such measures of control and security in regard to protected persons as may be necessary as a result of the war," Article 27 provides further that "[t]hey shall at all times be humanely treated, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity." Article 32 forbids any "measure of such a character as to cause the physical suffering or extermination of protected persons in their hands. . . [including] not only . . . murder, torture, corporal punishment, mutilation and medical or scientific experiments not necessitated by the medical treatment of a protected person but also to any other measures of brutality whether applied by civilian or military agents." Reprisals against protected persons and their property are prohibited.

---

[15] (...continued)
1907, 36 Stat. 2277, 205 Consol. T.S. 277 [hereinafter Hague Regulations].

[16] Geneva Convention Relative to the Protection of Civilian Persons in Time of War, August 12, 1949, 6 U.S.T. 3516 [hereinafter GC].

[17] According to the ICRC Commentary,

> Article 27 is the basis on which the Convention rests, the central point in relation to which all its other provisions must be considered. It was in order to give greater prominence to this essential Article and to underline its fundamental importance that the Diplomatic Conference placed it at the beginning of Part III on the status and treatment of protected persons.

2 COMMENTARY ON THE GENEVA CONVENTIONS OF 1949 201 (Pictet, ed. 1960)[hereinafter ICRC COMMENTARY II]. The ICRC Commentary defined the rights as follows:

> The right of respect for the person . . . covers all the rights of the individual . . . which are inseparable from the human being by the very fact of his existence and his mental and physical powers; it includes . . . the right to physical, moral and intellectual integrity — an essential attribute of the human person.
> The right to physical integrity involves the prohibition of acts impairing individual life or health.
> Respect for intellectual integrity means respect for all the moral values which form part of man's heritage, and applies to the whole complex structure of convictions, conceptions and aspirations peculiar to each individual. Individual persons' names or photographs, or aspects of their private lives must not be given publicity.
> The right to personal liberty, and in particular, the right to move about freely, can naturally be made subject in war time to certain restrictions made necessary by circumstances.

*Id.* at 201-02.

Civilians may be detained or interned by an occupying power only if "security requirements make such a course absolutely necessary." (GC art. 42).[18] Article 5 provides for the detention of civilians who pose a definite threat to the security of the occupying power:

> Where in occupied territory an individual protected person is detained as a spy or saboteur, or as a person under definite suspicion of activity hostile to the security of the Occupying Power, such person shall, in those cases where absolute military security so requires, be regarded as having forfeited rights of communication under the present Convention.

> In each case, such persons shall nevertheless be treated with humanity and, in case of trial, shall not be deprived of the rights of fair and regular trial prescribed by the present Convention. They shall also be granted the full rights and privileges of a protected person under the present Convention at the earliest date consistent with the security of the State or Occupying Power, as the case may be.

Internment or assigned residence is the most severe measure allowed in the cases of protected civilians who pose a definite security threat (GC art. 41(1)), and these measures are to be reviewed by a court or administrative board at least twice annually. (GC art. 43).

Article 31 addresses interrogation explicitly. It provides that "[n]o physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties."[19] In addition, protected persons may not be held as hostages, which would appear to preclude an occupying power from detaining civilians as a method of persuading others to cooperate in providing information about possible threats to the security.

Protected civilians may be imprisoned as a punitive measure only after a regular trial, subject to the protections in articles 64 through 77. Additionally, article 33 provides that "[c]ivilians may not be punished for an offence he or she has not

---

[18] Most of the prisoners at Abu Ghraib in Iraq fall into this category. *See* AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade, LTG Anthony R. Jones and MG George R. Fay 11 (2004), *available at* [http://www.defenselink.mil/news/Aug2004/d20040825fay.pdf][hereinafter "Fay Report"]. The report explains further:

> [A] "Civilian Internee" is someone who is interned during armed conflict or occupation for security reasons or for protection or because he has committed an offense against the detaining power. Within the confinement facility, however, there were further sub-classifications that were used, to include criminal detainee, security internee, and MI Hold. Security Internee[s] are [c]ivilians interned during conflict or occupation for their own protection or because they pose a threat to the security of coalition forces, or its mission, or are of intelligence value. This includes persons detained for committing offenses (including attempts) against coalition forces (or previous coalition forces), members of the Provisional Government, Non-Government Organizations, state infrastructure, or any person accused of committing war crimes or crimes against humanity. (References omitted).

[19] *See* DEPARTMENT OF THE ARMY, AR 190-8 ENEMY PRISONERS OF WAR, RETAINED PERSONNEL, CIVILIAN INTERNEES AND OTHER DETAINEES Para. 1-5(a)(1) (1997)[hereinafter AR 190-8]].

personally committed," and prohibits all forms of collective penalties and intimidation. Article 100 addresses discipline in internment camps:

> The disciplinary regime in places of internment shall be consistent with humanitarian principles, and shall in no circumstances include regulation imposing on internees any physical exertion dangerous to their health or involving physical or moral victimization. Identification by tattooing or imprinting signs on the body is prohibited. In particular, prolonged standing and roll-calls, punishment drills, military drill and maneuver, or the reduction of food rations, are prohibited.

Like prisoners of war, protected civilians are entitled to equal treatment, "[w]ithout prejudice to the provisions relating to their state of health, age and sex, all protected persons shall be treated with the same consideration by the Party to the conflict in whose power they are, without any adverse distinction based, in particular, on race, religion or political opinion."

## Common Article 3

The 1949 Geneva Conventions share several types of common provisions. The first three articles of each Convention are identical. Common Article 3 provides minimal rules applicable to "armed conflicts not of an international character occurring in the territory of one of the High Contracting Parties." It provides that

> each Party to the conflict shall be bound to apply, as a minimum, the following provisions:
>
>> 1. Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.
>>
>> To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
>>
>>> (a) Violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
>>> (b) Taking of hostages;
>>> (c) Outrages upon personal dignity, in particular humiliating and degrading treatment; . . .
>>
>> 2. The wounded and sick shall be collected and cared for. . . .

Common Article 3 has been described as "a convention within a convention" to provide a general formula covering respect for intrinsic human values that would always be in force, without regard to the characterization the parties to a conflict

CRS-8

might give it.[20]  Originally a compromise between those who wanted to extend POW protection to all insurgents and rebels and those who wanted to limit it to soldiers fighting on behalf of a recognized State, Common Article 3 is now widely considered to have attained the status of customary international law.[21]  The prohibition against ill-treatment applies during interrogations.[22]

# Interpreting the Geneva Conventions

Despite the absolute-sounding provisions described above, whether certain techniques employed by interrogators are per se violations of the Geneva Convention remains subject to debate.  Presumably, all aspects of prisoner treatment fall into place along a continuum that ranges from pampering to abject torture.  The line between what is permissible and what is not remains elusive.[23]  To complicate matters, interrogators may employ more than one technique simultaneously, and the courts and tribunals that have evaluated claims of prisoner abuse have generally ruled on the totality of treatment without specifying whether certain conduct alone would also be impermissible.  Not surprisingly, governments may view conduct differently depending on whether their soldiers are the prisoners or the interrogators, and may be unwilling to characterize any conduct on the part of the adversary as lawful.  Human rights advocates may tend to interpret the treaty language in a strictly textual fashion, while governments who may have a need to seek information from prisoners appear to rely on more flexible interpretations that take into account military operational requirements.  Nonetheless, it may be possible to identify some threshold definitions.

## Threshold Definitions

The following sections explore relevant terms that provide boundaries for the conduct of a Detaining Power under the Geneva Convention with respect to prisoners of war, civilian internees, and other detainees.

---

[20] *See* JEAN PICTET, HUMANITARIAN LAW AND THE PROTECTION OF WAR VICTIMS 32 (1975).

[21] *See* KRIANGSAK KITTICHAISAREE, INTERNATIONAL CRIMINAL LAW 188 (2001)(citing Nicaragua v. United States, ICJ Rep. 1986, 14).

[22] *See* Prosecutor v. Krnojelac, No. IT-97-25-I, paras. 5.17- 5.26 (ICTY Indictment, June 17, 1997) (citing eight instances of physical beatings during interrogations charged as torture); Prosecutor v. Aleksovski, No. IT-95-14/1-A (ICTY Appeals Chamber May 7, 1999)(defendant not guilty of grave breaches of the 1949 Geneva Conventions because the conflict was not international, but was convicted of violating the laws or customs of war, namely outrages upon personal dignity, for conduct including excessive and cruel interrogation found to be inhumane treatment); Prosecutor v. Furundzija, No. IT-95-17/1-T (ICTY Trial Chamber Dec. 10, 1998) (defendant held criminally responsible as a co-perpetrator of torture and for aiding and abetting in outrages upon personal dignity, including rape, in connection with interrogation of unclothed civilians).

[23] *See* John T. Parry, *What Is Torture, Are We Doing It, and What If We Are?*, 64 U. PITT. L. REV. 237, 241 (2003).

**Torture.** Torture is proscribed by all four of the Geneva Conventions and their additional Protocols,[24] as well as customary international law.[25] Torture, which can be either mental or physical, is not explicitly defined in the Conventions. Modern tribunals may look to the United Nations Convention Against Torture ("CAT")[26] for a definition of torture:

> For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.[27]

The International Tribunal for the former Yugoslavia (ICTY) has identified the following elements of the crime of torture in a situation of armed conflict:

> (i) . . . the infliction, by act or omission, of severe pain or suffering, whether physical or mental; in addition
> (ii) this act or omission must be intentional;

---

[24] Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, *reprinted in* 16 I.L.M. 1391 [hereinafter Protocol I]. Protocol I art. 75 states:

> The following acts are and shall remain prohibited at any time and in any place whatsoever, whether committed by civilian or by military agents:
>     (a) violence to the life, health, or physical or mental well-being of persons, in particular:
>         (i) murder;
>         (ii) torture of all kinds, whether physical or mental;
>         (iii) corporal punishment; and
>         (iv) mutilation;
>     (b) outrages upon personal dignity, in particular humiliating and degrading treatment, enforced prostitution and any form of indecent assault;
>     (c) the taking of hostages;
>     (d) collective punishments; and
>     (e) threats to commit any of the foregoing acts.

The United States has not ratified Protocol I, but article 75 is widely considered to be universally binding as customary international law.

[25] *See* KITTICHAISAREE, *supra* note 21, at 143 (defining torture as "acts or omissions, by or at the instigation of , or with the consent or acquiescence of an official, which are committed for a particular prohibited purpose and cause a severe level of mental or physical pain or suffering")(citing International Criminal Tribunal for the former Yugoslavia (ICTY) decision in *Celebici* at para 442).

[26] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, U.N. Doc. A/39/51 (1984) [hereinafter CAT]. For an analysis of relevant case law, see U.N. Convention Against Torture (CAT): Overview and Application to Interrogation Techniques, CRS Report RL32438.

[27] CAT art. 1(1).

CRS-10

(iii) it must aim at obtaining information or a confession, or at punishing, intimidating, humiliating or coercing the victim or a third person, or at discriminating, on any ground, against the victim or a third person;
(iv) it must be linked to an armed conflict. . . .[28]

**Physical Torture.** The U.S. Army Field Manual (FM) 34-52, Intelligence Interrogation[29] ("FM 34-52") lists the following as examples of physical torture: electric shock; infliction of pain through chemicals or bondage (other than legitimate use of restraints to prevent escape); forcing an individual to stand, sit, or kneel in abnormal positions for prolonged periods of time; food deprivation; and any form of beating.[30]

The International Military Tribunal for the Far East (IMTFE) found that Japanese soldiers had used the following forms of torture: water treatment, burning, electric shocks, the knee spread, suspension, kneeling on sharp instruments and flogging.[31]  The U.S. District Court for the District of Columbia found that U.S. POWs during the First Gulf War were tortured in Iraq:

> The torture inflicted included severe beatings, mock executions, threatened castration, and threatened dismemberment.  The POWs were systematically starved, denied sleep, and exposed to freezing cold.  They were denied medical care and their existing injuries were intentionally aggravated.  They were shocked with electrical devices and confined in dark, filthy conditions exposing them to contagion and infection.  The POWs suffered serious physical injuries, including broken bones, perforated eardrums, nerve damage, infections, nausea, severe weight loss, massive bruises, and other injuries.[32]

In the context of a non-international war, the conflict in the former Yugoslavia, frequent examples of torture were said to include "beating, sexual violence, prolonged denial of sleep, food, hygiene, and medical assistance, as well as threats to torture, rape, or kill relatives. . ."[33]

---

[28] Prosecutor v. Furundzija, No. IT-95-17/1-A, para. 111 (ICTY Appeals Chamber July 21, 1999).

[29] DEPARTMENT OF THE ARMY FIELD MANUAL 34-52, INTELLIGENCE INTERROGATION (1992), *available at* [http://www4.army.mil/ocpa/reports/ArmyIGDetaineeAbuse/FM34-52IntelInterrogation.pdf](Sep. 1, 2004)[hereinafter FM 34-52].

[30] FM 34-52 at 1-8 (1992).

[31] United States *et al.* v. Sadao Araki, IMTFE 1948, *excerpts reprinted in* HOWARD S. LEVIE, 60 INTERNATIONAL LAW STUDIES, DOCUMENTS ON PRISONERS OF WAR 450 (U.S. Naval War College 1979) (hereinafter "POW DOCUMENTS").

[32] Acree v. Republic of Iraq, 271 F.Supp.2d 179, 185 (D.D.C. 2003), *vacated by* 370 F.3d 41(D.C.Cir. 2004)(failure to assert a valid cause of action cognizable under the terrorism exception to the Foreign Sovereign Immunities Act).

[33] Prosecutor v. Kvocka *et al.*, No. IT-98-30-PT, para. 144. (ICTY Trial Chamber Nov. 2, 2001). The trial chamber also noted that "Mutilation of body parts would be an example of acts per se constituting torture."

**Mental Torture.** According to FM 34-52, examples of mental torture include mock executions, abnormal sleep deprivation, and chemically induced psychosis.[34] The International Military Tribunal for the Far East noted in its judgement of the major Japanese war criminals after World War II that mental torture had been commonly employed,[35] and cited the case of the Doolittle fliers to illustrate what mental torture entailed:

> After having been subjected to the various other forms of torture, they were taken one at a time and marched blindfolded a considerable distance. The victim could hear voices and marching feet, then the noise of a squad halting and lowering their rifles as if being formed to act as a firing squad. A Japanese officer then came up to the victim and said: "We are Knights of the Bushido of the Order of the Rising Sun; We do not execute at sundown; we execute at sunrise." The victim was then taken back to his cell and informed that unless he talked before sunrise, he would be executed.[36]

A more recent example of mental torture, as found by a U.S. court, involved the treatment of American POWs by Iraqi agents during the 1991 Gulf War:

> Iraqi agents caused the POWs to experience severe mental anguish by falsely reporting that they had killed Americans, including a pilot's wingman, other American POWs, and the President of the United States. The POWs suffered from knowing the agony that their families were enduring because the Iraqi authorities refused to inform the families that the POWs were alive.[37]

According to the ICTY, the following treatment may amount to mental torture:

> For instance, the mental suffering caused to an individual who is forced to watch severe mistreatment inflicted on a relative would rise to the level of gravity required under the crime of torture.  [B]eing forced to watch serious sexual attacks inflicted on a female acquaintance was torture for the forced observer. The presence of onlookers, particularly family members, also inflicts severe mental harm amounting to torture on the person being raped.[38]

**Physical / Mental Suffering.** Not all physical or mental suffering amounts to torture. While most people would likely accept that severe physical beatings or conduct such as electrocution and intentional cigarette burns amount to torture, relatively less physically brutal conduct, what might be described as psychological pressure (threats, verbal intimidation) and non-impact physical abuse (forcing detainee to remain in an uncomfortable position for a prolonged period) invite greater debate. Most forms of physical or psychological pressure are susceptible of being applied with varying degrees of intensity or duration.  Relatively humane-sounding techniques applied at great length or in combination could cause physical and mental

---

[34] FM 34-52 at 1-8.

[35] POW DOCUMENTS, *supra* note 31, at 437, 452.

[36] *Id.*

[37] *Acree* at 185.

[38] *Kvocka* at para. 149.

CRS-12

suffering that might be characterized as torture.[39]  Distinguishing between physical and mental forms of pressure may not be particularly helpful in determining whether torture has occurred.[40]  Physical abuse may cause mental suffering that outlasts the physical suffering.  Non-violent physical methods (playing loud music), especially over an extended period of time may cause physical as well as psychological suffering.  Some victims may be more susceptible to certain types of pressure and therefore experience suffering that might not affect another.  Permanent injury is not required.[41]

> According to the ICTY

> [T]he severity of the pain or suffering is a distinguishing characteristic of torture that sets it apart from similar offences.  A precise threshold for determining what degree of suffering is sufficient to meet the definition of torture has not been delineated.  In assessing the seriousness of any mistreatment, the Trial Chamber must first consider the objective severity of the harm inflicted.  Subjective criteria, such as the physical or mental effect of the treatment upon the particular victim and, in some cases, factors such as the victim's age, sex, or state of health will also be relevant in assessing the gravity of the harm.[42]

**_For Interrogation Purposes._**  Some experts take the position that the purpose of eliciting information from the victim is a necessary element of torture, and that behavior that is cruel and causes suffering, but does not entail coercion to elicit a confession or information, is not torture.[43]  Others take the view that cruel treatment

---

[39] _See_ Barak Cohen, _Democracy and the Mis-rule of Law: The Israeli Legal System's Failure to Prevent Torture in the Occupied Territories_, 12 IND. INT'L & COMP. L. REV. 75, 77-78 (2001):

> For example, few people would argue that a prisoner subjected to prolonged, intense questioning, perhaps after a sleepless night on a narrow prison bed, while seated in an uncomfortable chair, is suffering from torture. In fact, it is arguable whether that prisoner is even being treated inhumanely, given the fact that interrogations inherently tend to employ some measure of physical discomfort. However, extreme applications of a combination of these factors-prolonged lack of sleep, being forced to stand for unreasonable periods of time with arms held to the front at shoulder level, being denied food and use of a lavatory for extended periods, culminating with concentrated questioning and verbal threats of future abuse could be considered torture, although any one of these activities by itself might not be severe enough to constitute torture per se.

[40] _See id._ at 78 (arguing that physical and mental abuse both "employ physical means to achieve a psychological effect — fear and anxiety that ultimately brings about the rupture of the subject's ego, thereby allowing a torturer to impose his will on the subject").

[41] Prosecutor v. Kvocka et al., No. IT-98-30-PT, para. 148 (ICTY Trial Chamber Nov. 2, 2001).

[42] _Id_ at paras.142-143.

[43] _See_ HOWARD S. LEVIE, PRISONERS OF WAR IN INTERNATIONAL ARMED CONFLICT 357 & n. 60 (1979)(citing commentaries of Jean Pictet and Claude Pilloud, who would classify maltreatment for other purposes under the offense of "wilfully causing great suffering"). FM 34-52 states that torture is "the infliction of intense pain to extract a confession or information, or for sadistic pleasure." FM 34-52 at 1-8 (1992).

for other purposes, or even for no purpose, can constitute torture.[44]  Under the Geneva Conventions, it appears to matter little whether certain treatment is described as torture; the Conventions protect against treatment that is cruel, inhumane, and degrading even if such treatment does not amount to torture.

**Coercion.**  The Geneva Conventions do not define coercion.  Their prohibition against coercion may vary somewhat depending on the status of the person undergoing interrogation.  In the case of protected civilians, "[n]o physical or moral coercion shall be exercised against [them], in particular to obtain information from them or from third parties."[45]  Prisoners of war, on the other hand, may be subjected to no coercion *of any kind*, nor can they be "threatened, insulted, or exposed to unpleasant or disadvantageous treatment."  The conclusion might be drawn that some other kind of coercion, neither moral nor physical, may be permissible with respect to civilians but not for POWs.  Perhaps "moral" coercion is distinct from "mental" coercion.  However, we have found no references purporting to describe techniques in this category. Common Article 3 does not explicitly forbid coercion.

The essence of coercion is the compulsion of a person by a superior force, often a government, to do or refrain from doing something involuntarily. The intentional application of an unlawful force that robs a person of free will is coercive. However, circumstances that cause a person to reevaluate a course of action, even if deception is instrumental, may arguably be non-coercive pressure.  Under the interpretation set forth in FM 34-52, "physical or mental torture and coercion revolve around the elimination of the source's free will."[46]  These activities, along with "brainwashing," are not authorized, it explains, but are not to be confused with the psychological techniques and ruses presented in the manual.  FM 34-52 includes in the definition of mental coercion "drugs that may induce lasting and permanent mental alteration and damage."   This appears to reflect a change from earlier doctrine, which prohibited the use of *any* drugs on prisoners unless required for medical purposes.[47]

---

[44] *Id.*  The ICTY has found that required element of a "prohibited purpose," *see supra* note 28, does not require that the sole or even predominating motive or purpose behind the conduct is a prohibited purpose. *See* Prosecutor v. Kunarac, Kovac and Vukovic, Nos. IT-96-23 and IT-96-23/11, para. 486 (ITCY Trial Chamber Feb. 22, 2001).

[45] GC art. 31. According to the ICRC Commentary, the prohibition "covers all cases, whether the pressure is direct or indirect, obvious or hidden . . . [and] for any purpose or motive whatever."  *See* ICRC COMMENTARY II, *supra* note 17, at 219-20. The ICRC commented that the authors of the Convention were mainly concerned with "coercion aimed at obtaining information, work or support for an ideological or political idea," but notes the language is broader than that of the Hague Regulations on the same subject.  *Id.*

[46] FM 34-52 at 1-8.

[47] *See* Stanley J. Glod and Lawrence J. Smith, *Interrogation under the 1949 Prisoners of War Convention*, 21 MIL. L. REV. 145, 153-54 (1963)(citing JAGW 1961 / 1157, 21 June 21, 1961).

> In an opinion by The Judge Advocate General of the Army reviewing the employment of ["truth serum"] in the light of Article 17, it was noted that Article 17 justly and logically must be extended to protect the prisoner against any inquisitorial practice by his captors which would rob him of his free will. On this basis it was held that the use of truth serum was outlawed by Article 17. In addition, its use contravenes Article 18, which states in

(continued...)

CRS-14

In the context of U.S. criminal law, coercion is usually asserted as a defense to a crime[48] or as an element of a crime, or to render a confession inadmissible in court as involuntary. The standards differ depending on the purpose. To assert coercion as a defense to a criminal charge, a defendant generally has to show a well-grounded fear of imminent injury or death.[49] On the other hand, a confession is the product of coercion if a defendant's "'will was overborne' or if his confession was not 'the product of a rational intellect and a free will.'"[50] Prolonged questioning has been held to be inherently coercive,[51] as has incommunicado detention[52] and interrogation by a psychiatrist trained in hypnosis,[53] the use of violence,[54] threats,[55] and other mental "modes of persuasion."[56]

The standards that apply in criminal cases, however, probably do not apply to a determination of coercion under the Geneva Conventions.[57] The pertinent question appears to be whether the person subject to treatment designed to influence his conduct is able to exercise a choice and complies willingly or has no choice other than to comply.

---

[47] (...continued)

> part : ". . . no prisoner of war may be subject to . . . . medical or scientific experiments of any kind which are not justified by the medical, dental, or hospital treatment of the prisoner concerned and carried out in his interest." The opinion declared that ". . . the suggested use of a chemical "truth serum" during the questioning of prisoners of war would be in violation of the obligations of the United States under the Geneva Convention Relative to the Treatment of Prisoners of War." From this opinion it seems clear that any attempt to extract information from an unwilling prisoner of war by the use of chemicals, drugs, physiological or psychological devices, which impair or deprive the prisoner of his free will without being in his interest, such as a bonafide medical treatment, will be deemed a violation of Articles 13 and 17 of the Convention.

The 1987 version of FM 34-52 suggested that the use of any drugs for interrogation purposes amounted to mental coercion. FM 34-52 ch. 1 (1987).

[48] "Coercion," also known as "duress," is recognized in nearly every American jurisdiction as an excuse for otherwise criminal conduct. *See* PAUL H. ROBINSON, 2 CRIMINAL LAW DEFENSES §177(a) (1984) (". . .an actor is excused for his conduct . . .if [it results from ] (1) being in a state of coercion caused by a threat that a person of reasonable firmness in his situation would not have resisted and (2) the actor is not sufficiently able to control his conduct so as to be held accountable for it").

[49] D'Aquino v. United States, 192 F.2d 338, 359 (9th Cir. 1951).

[50] Townsend v. Sain, 372 U.S. 293, 307 (1963)(confession induced by truth serum would be inadmissible).

[51] *E.g*, Haynes v. Washington, 373 U.S. 503 (1963).

[52] *E.g,* Davis v. North Carolina, 384 U.S. 737 (1968).

[53] *E.g,* Leyra v. Denno, 347 U.S. 556 (1954) (confession was coerced where the subject was already emotionally drained from several days of interrogation).

[54] Brown v. Mississippi, 297 U.S. 278 (1936).

[55] *E.g,* Ward v. Texas, 316 U.S. 547 (1942).

[56] Blackburn v. Alabama, 361 U.S. 199, 206 (1960).

[57] LOW DESKBOOK, *supra* note 10, at 97 &n. 61.

Asserting coercion by the enemy as a defense to treason or aiding the enemy has not been fruitful; courts have tended to apply the same test that would govern in other criminal cases.[58]    In the post-WWII treason prosecution of Iva Ikuko Toguri D'Aquino (Tokyo Rose), the court stated its belief that despite the hostilities:

> there was no occasion for departing from the ordinary rules applicable to the defense of duress and coercion. We know of no rule that would permit one who is under the protection of an enemy to claim immunity from prosecution for treason merely by setting up a claim of mental fear of possible future action on the part of the enemy. We think that the citizen owing allegiance to the United States must manifest a determination to resist commands and orders until such time as he is faced with the alternative of immediate injury or death. Were any other rule to be applied, traitors in the enemy country would by that fact alone be shielded from any requirement of resistance. The person claiming the defense of coercion and duress must be a person whose resistance has brought him to the last ditch.[59]

However, the failure of an asserted coercion defense does not mean that the behavior giving rise to the claim is lawful.  Acts intended to coerce need not succeed to meet the definition of coercion as an element of a crime.[60]  In the case of prisoners held by the Chinese during the Korean War, courts referred to conditions in the prisoner of war camps as brutal and inhumane, in violation or international law.

> The conditions under which American prisoners of war in Korea were required to live were at best abominable and at worst intolerable. During the early stages, lack of adequate food, clothing, housing, and medical service resulted in a death rate which bespeaks man's inhumanity to man. Nevertheless, the accused was not subjected to any discomforts which were not shared by his comrades, and if his lot was harsh, so was theirs. . . . It goes without saying that all men cannot stand firm against torture, physical violence, starvation or psychological mistreatment. But in this instance, the record discloses that the accused weakened when others stood fast, and it does not reveal that he was compelled to sacrifice his countrymen because of the use of those influences.[61]

Yet soldiers who succumbed to the ill-treatment and collaborated with the enemy were unsuccessful in asserting the defense of coercion.

---

[58] *See* United States v. Fleming, 19 C.M.R. 438 (1955); U.S. v. Dickenson, 20 C.M.R. 154, 181 (1955)(testimony of accused that he was subject to "'cruel and brutal treatment' and that someone told him that he 'would kill me if I did not agree with the Chinese and abide by the rules and regulations of the camp'" insufficient to show POW's misconduct was coerced); U.S. v. Batchelor, 22 C.M.R. 144 (1956); U.S. v. Bayes, 22 C.M.R. 487, 491 (1956).

[59] D'Aquino v. United States, 192 F.2d 338, 359 (9th Cir. 1951).

[60] *See* MODEL PENAL CODE § 212.5 (defining criminal coercion as a threat intended to restrict unlawfully another's freedom of action).

[61] United States v. Batchelor, 22 C.M.R. 144,162 (1956).  The court did, however, note that the defendant's participation with the Chinese propaganda program "was instrumental in coercing other prisoners to sign the petitions." *Id.* at 150.

CRS-16

The infliction of any type of physical or mental suffering that would amount to torture would almost certainly qualify as "coercion." However, States have sought to find methods of applying "pressure" to convince a detainee that cooperation would be in his best interest, thereby persuading him to disclose information voluntarily. It may be useful to consider theories about coercion from the field of counterintelligence.

**Non-coercive Interrogation.** According to a 1963 CIA manual[62] on interrogation:

> The term non-coercive is used . . . to denote methods of interrogation that are not based upon the coercion of an unwilling subject through the employment of superior force originating outside himself. However, the non-coercive interrogation is not conducted without pressure. On the contrary, the goal is to generate maximum pressure, or at least as much as is needed to induce compliance. The difference is that the pressure is generated inside the interrogatee. His resistance is sapped, his urge to yield is fortified, until in the end he defeats himself.[63]

The manual describes the following techniques for non-coercive counterintelligence interrogation: "Nobody Loves You" (pointing out that all of the information about an interrogation subject has come from persons other than himself, eliciting a desire to tell his side of the story); "The All-Seeing Eye (or Confession is Good for the Soul)" (by manipulating information already known about the subject, the interrogator can convince a subject that all his secrets are already out and that further lies would be futile or even counterproductive);[64] "The Informer" (planting an informant as the source's cellmate);[65] "News from Home" (allowing a detainee to receive carefully selected letters from home);[66] "The Witness" (bringing an alleged witness with knowledge of subject's misdeeds within the subject's view to create a desire to refute charges);[67] "Joint Suspects" (causing the subject to believe that

---

[62] Central Intelligence Agency, KUBARK Counterintelligence Interrogation, July 1963, [hereinafter "KUBARK Manual"]. This and another CIA manual, Human Resource Exploitation Training Manual (1983) were released pursuant to a Freedom of Information Act (FOIA) request by the Baltimore Sun in 1997. *See* National Security Archive Electronic Briefing Book No. 122, *at* [http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB122] (providing links to both documents) (Sep. 7, 2004). The 1983 manual, which had been used by the CIA to train Honduran military units between 1983 and 1987, became the subject of Senate Intelligence Committee hearings in 1988 because of human rights abuses committed in Honduras.

[63] KUBARK Manual, *supra* note 62, at 52.

[64] *Id*. at 67.

[65] *Id*. (noting that the technique is "so well-known, especially in Communist countries, that its usefulness is impaired if not destroyed").

[66] *Id*.

[67] *Id*. at 67-69.

another person involved in the crime is trying to throw all blame upon the subject);[68] "Ivan Is a Dope" (pointing out that the adversary is incompetent or ignores the welfare of its agents, but that the interrogator's entity will treat the subject better);[69] "Joint Interrogators" (good cop/bad cop routine: the brutal, angry, domineering interrogator contrasted with the friendly, quiet interrogator, with multiple variations).[70]

**Coercive Interrogation.**  Coercive methods, according to the same CIA manual, "are designed not only to exploit the resistant source's internal conflicts and induce him to wrestle with himself but also to bring a superior outside force to bear upon the subject's resistance."  Further, it noted, "[a]ll coercive techniques are designed to induce regression," which is described as "the loss of those defenses most recently acquired by civilized man:. . . the capacity to carry out the highest creative activities, to meet new, challenging, and complex situations, to deal with trying interpersonal relations, and to cope with repeated frustrations."  These functions, it posited, could be impaired through the use of "relatively small degrees of homeostatic derangement, fatigue, pain, sleep loss, or anxiety"[71] to bring about the typical response to coercion: "debility, dependency, and dread."[72]  The following were named as the "principal coercive techniques of interrogation: arrest, detention, deprivation of sensory stimuli through solitary confinement or similar methods, threats and fear, debility, pain, heightened suggestibility and hypnosis, narcosis [use of drugs], and induced regression."[73]

### Inhumane or Degrading Treatment.

The prohibition of inhumane treatment of prisoners of war was already understood to be part of the law of war during the 19th century.  Art. 56 of the Lieber Code provided:

> A prisoner of war is subject to no punishment for being a public enemy, nor is any revenge wreaked upon him by the intentional infliction of any suffering, or disgrace, by cruel imprisonment, want of food, by mutilation, death, or any other barbarity.

Both the Union and Confederate governments accused the other of inhumane treatment of prisoners of war.  The North was accused of exposing prisoners of war to cold weather as well as deprivation of adequate food, clothing, and fuel.[74]  The

---

[68] *Id.* at 70 -71.

[69] *Id.* at 71-72.

[70] *Id.* at 72.

[71] *Id.* at 83 (citation omitted).  The manual advised against the use of such techniques.

[72] *Id.*

[73] *Id.* at 85.

[74] *See, e.g.,* Letter from Jefferson Davis to the Confederate Congress, November 7, 1864, *reprinted in* 7 Journal of the Congress of the Confederate States of America 254 (November
(continued...)

CRS-18

South was accused of "subjecting [prisoners of war] to torture and great suffering, by confining in unhealthy and unwholesome quarters, by exposing to the inclemency of winter and to the dews and burning sun of summer, by compelling the use of impure water, and by furnishing insufficient and unwholesome food," as well as using bloodhounds to track escaped prisoners, thereby allowing recaptured prisoners to be "cruelly and inhumanly injured."[75]

The barbarities complained of during the Civil War were repeated or multiplied during subsequent wars, despite the inclusion of provisions in treaties to protect prisoners of war.[76]  The ICRC Commentary to the Geneva Conventions views humane treatment as the fundamental theme running throughout the Convention.[77] GPW art. 13 is viewed as embodying the principal elements of humane treatment.[78] Paragraph 1 of article 13 requires that POWs "at all times be humanely treated."[79] It goes on to identify as inhumane any "unlawful act or omission by the Detaining Power causing death or seriously endangering the health of a prisoner of war," "physical mutilation or to [unjustified] medical or scientific experiments" and exposure to "acts of violence or intimidation and against insults and public curiosity."  "Inhuman treatment" is defined in GPW art. 130 to constitute a grave breach of the Convention.[80]

---

[74] (...continued)
7, 1864); 6 Journal of the Confederate Conference, 142 (February 24, 1863) (quoting Chicago Times newspaper article report that twelve Confederate prisoners at Camp Douglas were frozen to death).

[75] These were the charges against Henry Wirz, who was convicted by military commission for crimes related to prisoner-of-war camp at Andersonville.  *See* POW DOCUMENTS, *supra* note 31, at 46.

[76] Hague Regulations, *supra* note 15, arts. 4-20; 1929 Geneva Convention, *supra* note 7; *see* G.I.A.D. DRAPER, THE RED CROSS CONVENTIONS 2-6 (1958)(recounting historical developments leading up to the 1949 Geneva Conventions).

[77] ICRC COMMENTARY III, *supra* note 8, at 140.

[78] *Id.*; HOWARD S. LEVIE, PRISONERS OF WAR IN INTERNATIONAL ARMED CONFLICT 352 (1979)(remarking that the first sentence of art. 13 is the fundamental principle throughout the GPW).  Others would include arts. 14 and 16 in the minimum definition of "humane treatment."  *See* THE HANDBOOK OF HUMANITARIAN LAW IN ARMED CONFLICTS 329-30 (Dieter Fleck, ed. 1995)(hereinafter "HANDBOOK").

[79] The language "at all times" was new to the 1949 Convention, added by drafters to prevent derogations from the principle of humanity by reference to the circumstances of the conflict. *See* HANDBOOK, *supra* note 78, at 329; *see also* ICRC Commentary III, *supra* note 8, at 140 (noting the principles are valid at all times, including "cases where repressive measures are legitimately imposed on a protected person, since the dictates of humanity must be respected even if measures of security or repression are being applied").

[80] *See* LEVIE, *supra* note 110, at 356 (noting that the question remains open as to when maltreatment, other than torture or biological experiments, becomes "inhuman").  The ICRC Commentary offered the following interpretation:

It could not mean, it seems, solely treatment constituting an attack on physical integrity or health; the aim of the Convention is certainly to grant prisoners of war in enemy hands

(continued...)

CRS-19

The prohibition on "acts of violence or intimidation and against insults and public curiosity" appears to have resulted from the World War II practice in Europe and the Far East of parading captive soldiers through the streets for propaganda purposes.[81]  The ICRC has interpreted GPW art. 13 to prohibit the public display of prisoners through the news media.  The ICRC considers the use of any image "that makes a prisoner of war individually recognizable" to be a violation, because the condition of being taken prisoner might be considered degrading or humiliating in itself, and that representations of captives could also have an impact on families.[82] The Department of Defense interprets the provision to protect POWs from being filmed or photographed in such a manner that viewers would be able to recognize the prisoner.  Photos and videos depicting POWs with their faces covered or their identities otherwise disguised does not, in the view of the Department of Defense, violate GPW art. 13.  Other experts would make an exception for reporting on prisoners and their conditions of captivity, in order to enforce international humanitarian law and to improve their conditions in captivity.[83] However, it appears to be well-accepted that broadcasting images of POWs for humiliation or propaganda purposes is inhumane.[84]

Other examples of treatment deemed degrading or humiliating in the context of the Geneva Conventions include urinating on POWs and forcing them to undergo

---

[80] (...continued)
> a protection which will preserve their human dignity and prevent their being brought down to the level of animals. Certain measures, which might cut prisoners of war off completely from the outside world and in particular from their families, or which would cause great injury to their human dignity, should be considered as inhuman treatment.

ICRC Commentary III, *supra* note 8, at 627.

[81] *See* Trial of Lt. Gen. Kurt Maelzer, 11 LRTWC 53 (U.S. Military Commission 1946), *excerpts reprinted in* POW DOCUMENTS, *supra* note 31, at 355-56; United States *et al.* v. Sadoa Araki (IMTFE 1948), *excerpts reprinted in* POW DOCUMENTS, *supra* note 31, at 437, 461-62 (describing how Allied POWs were "paraded through the streets" in an "emaciated condition" and "held up to contempt by a Japanese officer").

[82] *See* Anthony Dworkin, *The Geneva Conventions and Prisoners of War*, Crimes of War Project, March 23, 2003, *at* [http://www.crimesofwar.org/special/Iraq/brief-pow.html] (quoting ICRC spokesman Florian Westphal) (Sep. 1, 2004). *But see* HILAIRE MCCOUBREY, INTERNATIONAL HUMANITARIAN LAW 148-49 (2d ed. 1998)("On the other hand, photographs of masses of prisoners of war with no humiliation beyond the fact of capture may not so obviously violate [article 13]."); United States v. Sidao Araki, *in* POW DOCUMENTS, *supra* note 31, at 476 (charging that the Japanese government concealed ill-treatment of prisoners by censoring photographs depicting conditions at POW camps).

[83] *See* HANDBOOK, *supra* note 7, at 704 (citing "examples of reports on prisoner of war camps in the former Yugoslavia" as an illustration of the need to weigh "preserv[ation] of prisoners' lives against the rule prohibiting their exposure to public curiosity").

[84] During the invasion of Iraq in 2003, both Houses of Congress passed resolutions condemning as inhumane and humiliating the broadcast of interrogations of U.S. POWs. H.Con.Res. 118, 108th Cong. (2003); S.Con.Res. 31, 108th Cong. (2003).

inspections of their genitals to determine if they were Jewish (Gulf War I),[85] forcing captured Royal Marines to lie down on the ground for the benefit of television cameras (Falklands War),[86] and the Communist practices for indoctrinating POWs and pressuring them to sign confessions.[87]  Acts causing severe humiliation or degradation may rise to the level of "outrages upon human dignity."[88]

## Status of Detainees

Belligerents have sometimes argued that certain prisoners are not entitled to protection under the laws of war and relevant treaties, and that such prisoners might be subjected to harsher treatment than that accorded to prisoners of war.  For example, during the Civil War, the Union initially promised to treat Confederate soldiers and sailors as common criminals and brigands, but later relented, with respect to regular Confederate soldiers and partisans (but not "guerrilla marauders") in order to secure better treatment for captured Union soldiers.  The Confederate States denied prisoner-of-war status to Union soldiers who were black.  This policy was a point of contention between the two sides throughout the war, and afterward, when Johnson granted amnesty to participants in the rebellion, the amnesty did not extend to those who had refused to treat black soldiers as prisoners of war.[89]

During World War II, Germany and Japan adopted different standards for various types of prisoners.  The Germans regarded Bolshevists as undeserving of POW status under the Geneva Convention, and those prisoners were to be shot on the slightest provocation without any warning.[90]  The Security Police and Gestapo adopted a series of harsher techniques for interrogating certain (mainly civilian)

---

[85] Acree v. Republic of Iraq, 271 F.Supp.2d 179, 185 (D.D.C. 2003), *vacated by* 370 F.3d 41(D.C.Cir. 2004).

[86] *See* McCoubrey, *supra* note 82, at 148.

[87] *See* Sen. Comm. On the Judiciary, 92d Cong., Communist Treatment of Prisoners of War (Comm. Print 1972).

[88]  *See* Prosecutor v. Kunarac, Kovac and Vokovic, No. IT-96-23-PT (ICTY Appeals Chamber June 12, 2002). The ICTY has listed elements of "outrages upon personal dignity" to include
> (i) that the accused intentionally committed or participated in an act or an omission which would be generally considered to cause serious humiliation, degradation or otherwise be a serious attack on human dignity, and
> (ii) that he knew that the act or omission could have that effect.

*Id.* at para. 161.  Serious humiliation would have to be "so intense that any reasonable person would be outraged." *Id.* at para. 162.  Examples include "inappropriate conditions of confinement," "perform[ing] subservient acts," being "forced to relieve bodily functions in their clothing," and "endur[ing] the constant fear of being subjected to physical, mental, or sexual violence" in camps. *Kvocka et al.,* at para. 173.

[89] Proclamation No. 37, 13 Stat. 758, 759 (May 29, 1865)(excepting from amnesty "all who have engaged in any way in treating otherwise than lawfully as prisoners of war persons found in the United States service, as officers, soldiers, seamen, or in other capacities").

[90] United States *et al.* v. Goering, 22 TMWC 411 (IMT 1946), *excerpts reprinted in* POW Documents, *supra* note 31, at 357, 360.

CRS-21

prisoners who were thought to possess valuable information and who resisted questioning. Known as the "Third Degree," the methods included a "simple diet (bread and water), hard bunk, dark cell, deprivation of sleep, exhaustive drilling, [and] flogging for more than twenty strokes a doctor must be consulted."[91] Such methods were restricted to "Communists, Marxists, Jehova's Witnesses, saboteurs, terrorists, members of resistance movements, parachute agents, anti-social elements, Polish or Soviet Russian loafers or tramps," and for any other case where permission from the Gestapo Chief was first obtained.[92] At Nuremberg, defendants argued that the treatment of Soviet prisoners was not unlawful because the Soviet Union had not ratified the Geneva Convention. For the most part, the international and national military tribunals did not accept this defense.[93]

Countries fighting terrorism or insurgencies have sometimes adopted special methods of interrogating suspects. For example, Great Britain in the 1970's implemented sensory deprivation interrogation methods known as the "five techniques" against suspected members of the terrorist Irish Republican Army (IRA).[94] Some of the subjects of such interrogation brought suit in the European Court of Human Rights. The court described these techniques as follows:

> (a) wall-standing: forcing the detainees to remain for periods of some hours in a 'stress position,' described by those who underwent it as being 'spreadeagled against the wall, with their fingers put high above the head against the wall, the legs spread apart and the feet back, causing them to stand on their toes with the weight of the body mainly on the fingers'; (b) hooding: putting a black or navy colored bag over the detainees' heads and, at least initially, keeping it there all the time except during interrogation; (c) subjection to noise: pending their interrogations, holding the detainees in a room where there was a continuous loud and hissing noise; (d) deprivation of sleep: pending their interrogations, depriving the detainees of sleep; (e) deprivation of food and drink: subjecting the detainees to a reduced diet during their stay at the center and pending interrogations.

The ECHR held that "use of the five techniques did not constitute a practice of torture within the meaning of Article 3 [of the European Convention for the Protection of Human Rights and Fundamental Freedoms]," but did constitute "inhuman and degrading treatment."[95]

Israel's General Security Service ("GSS") has employed interrogation methods involving "psychological pressure" and "moderate physical pressure" to obtain

---

[91] 22 TMWC 50 (1946).

[92] *See* United States v. Wilhelm von Leeb, 12 LRTWC 1, 20 (U.S. military Tribunal, Nuremberg 1948)(German High Command Case), *available at* [http://www.ess.uwe.ac.uk/WCC/ghctrial1.htm](Sept. 8, 2004).

[93] *Id* at 87 (finding general principals of international law required humane treatment, irrespective of whether Geneva Conventions were binding on Parties).

[94] Ireland v. United Kingdom,25 Eur. Ct. H.R. (ser. A) para. 94 (1978).

[95] *Id* at para. 167.

information from suspected terrorists.[96] A judicial commission headed by the former Israeli Supreme Court President, Justice Moshe Landau, investigated the interrogation practices of the GSS. The Landau Commission justified the use of physical pressure as necessary in the face of hostile acts, and recommended that rather than covering up the use of such tactics, the government should "acknowledge that some measure of coercion is permissible, and then codify and carefully monitor the allowable techniques."[97] The Knesset endorsed the findings of the Commission and enacted statutory authority adopting the Commission's guidelines.  The Landau Commission recommended:

> The means of pressure should principally take the form of non-violent psychological pressure through a vigorous and extensive interrogation. However, when these do not attain their purpose, the exertion of a moderate measure of physical pressure cannot be avoided.[98]

The contours of methods were detailed in a classified annex to the report and have not been made public, but later reports by human rights groups and a 1999 decision by the Israeli High Court shed light on the types of pressure the GSS employed.[99] The methods reportedly included position abuse, imposing hoods on subjects to produce disorientation, sleep deprivation, "shaking," the use of excessively tight handcuffs, and exposure to uncomfortable temperatures and loud noises.[100]  The Israeli High Court ruled that while such techniques did not constitute torture, they were nonetheless barred because they treated the suspects in an 'inhuman and degrading' manner.[101]

---

[96] *See* Ralph Ruebner, *Democracy, Judicial Review and the Rule of Law in the Age of Terrorism: The Experience of Israel — a Comparative Perspective*, 21 B.U. INT'L L.J. 1 (2003).

[97] Report of the Commission of Inquiry into the Methods of Investigation of the General Security Service Regarding Hostile Terrorist Activity (1987) [hereinafter Landau Commission Report], *excerpted in* 23 ISRAEL L. REV. 146, 167-76 (1989), *see* Ardi Imseis, Note, *"Moderate" Torture on Trial: Critical Reflections on the Israeli Supreme Court Judgment Concerning the Legality of General Security Service Interrogation Methods,* 19 BERKELEY J. INT'L L. 328, 333-34 (2001)(citing Landau Commission findings that confessions procured from Palestinians using physical pressure were used to obtain convictions in military courts).

[98] *See* Landau Commission Report, *supra* note 97, at para. 4.7.

[99] *See* Cohen, *supra* note 39, at 81-82.

[100] *Id.* (citing GSS agents' testimony at military hearings).

[101] The Judgment Concerning the Interrogation Methods Implied by the GSS, the Supreme Court of Israel, sitting as the High Court of Justice, adjudicating H.C. 5100/94, H.C. 4054/95, H.C. 6536/95, H.C. 6536/95, H.C. 5188/96, H.C. 7563/97, H.C. 7628/97, H.C. 1043/99,  *available at* [http:www.court.gov.il].

CRS-23

# Department of Defense Methods of Interrogation

In the aftermath of the disclosure of photographs and reports of abuses at the Abu Ghraib prison in Bagdad, the Defense Department released a series of documents related to policy with respect to the interrogation of prisoners there and at the U.S. Naval Station at Guantanamo Bay, Cuba, where detainees captured in Afghanistan or elsewhere are being held as (unlawful) "enemy combatants." The released documents reveal deliberations about appropriate techniques for interrogating persons the Administration had deemed to be unprotected by the Geneva Conventions. The following sections analyze the interrogation methods that were suggested or approved for use at the Abu Ghraib prison. The descriptions of the various methods in the DOD documents are somewhat sketchy, however, and the sensitive nature of intelligence methods and the lack of detailed information about how the methods have been put into practice make comparison between these methods and past practices difficult.

## Approved Approaches for all Detainees

The list of approved methods for interrogation of terror suspects consisted, for the most part, of methods described in FM 34-52.[102] According to FM 34-52, "the Geneva and Hague Conventions and the UCMJ set definite limits on the measures which can be used to gain the willing cooperation of prisoners of war." It does not, however, elaborate on what the "definite limits" are,[103] or the extent to which they apply to persons who are not prisoners of war.[104] Some of the techniques might be considered coercive for the purposes of a criminal prosecution, and would likely be inadmissible were they used to elicit statements from an accused soldier prior to a court-martial.[105] Some techniques would very likely be unpleasant, possibly contravening GPW art. 17 if used against POWs who refuse to answer, but it appears to be the Army's position that the approved techniques below do not breach the

---

[102] Fay Report, *supra* note 18, at 16.

[103] FM 34-52, ch. 1 (1987), noted that:

> The psychological techniques and principles outlined should neither be confused with, nor construed to be synonymous with, unauthorized techniques such as brainwashing, mental torture, or any other form of mental coercion to include drugs. These techniques and principles are intended to serve as guides in obtaining the willing cooperation of a source. The absence of threats in interrogation is intentional, as their enforcement and use normally constitute violations of international law and may result in prosecution under the UCMJ.

[104] *But see* AR 190-8para. 2(1)(d):

> The use of physical or mental torture or any coercion to compel prisoners to provide information is prohibited. . . . . Prisoners may not be threatened, insulted, or exposed to unpleasant or disparate treatment of any kind because of their refusal to answer questions. Interrogations will normally be performed by intelligence or counterintelligence personnel.

[105] *See* Law and Military Operations in Haiti, 1994-1995: Lessons Learned for Judge Advocates 60 (Dec. 11, 1995).

CRS-24

law.[106] Most of the techniques do not appear to violate any provisions of the Geneva Conventions on their face, but military experts do not always agree among themselves as to their propriety and boundaries.

The "approach phase" begins when the interrogator first comes in contact with the source[107] and continues until the prisoner begins answering questions pertinent to the objective of the interrogation."[108]   The effort generally consists of the establishment of control over the source and the interrogation, establishment of rapport between the interrogator and the source, and the manipulation of the source's emotions and weaknesses to gain his willing cooperation.[109] An interrogator may employ more than one technique simultaneously to elicit the desired information.

**Direct.** This approach involves the straightforward questioning of the detainee without the interrogator adopting any of the tactics described below.  The interrogator simply asks the prisoner for the information, without concealing the interrogator's purpose or using deception of any kind, and is most effective when the prisoner is cooperative. As long as there is no exploitation of circumstances to cause fear or suffering, the Geneva Conventions' prohibition on coercion would not seem to be implicated. While it may be acceptable to exploit a detainee's initial shock upon capture to obtain information,[110] exploiting a detainee's suffering by interrogating a wounded prisoner would be more problematic, and could constitute a breach of the obligation to provide medical treatment.[111] As noted above, it is generally agreed that

---

[106] *See* FM 34-52, ch. 1 (1987):

> The use of force, mental torture, threats, insults, or exposure to unpleasant and inhumane treatment of any kind is prohibited by law and is neither authorized nor condoned by the US Government. Experience indicates that the use of force is not necessary to gain the cooperation of sources for interrogation. Therefore, the use of force is a poor technique, as it yields unreliable results, may damage subsequent collection efforts, and can induce the source to say whatever he thinks the interrogator wants to hear. However, the use of force is not to be confused with psychological ploys, verbal trickery, or other nonviolent and noncoercive ruses used by the interrogator in questioning hesitant or uncooperative sources.

[107] FM 34-52 (1992) at 3-10.

[108] *Id.*

[109] *Id.* at 3-21.

[110] *See* HOWARD S LEVIE, PRISONERS OF WAR IN INTERNATIONAL ARMED CONFLICT 109 (1977):

> The front-line unit which captures a prisoner of war will frequently, and understandably, attempt to exploit that event by seeking to obtain information from him concerning tactical positions and plans and order of battle before evacuating him to the rear. Psychologically, this is probably the most fruitful time to interrogate a prisoner of war because of the state of shock from which he will be suffering, and his fear of the unknown, including how he will be treated by the enemy in whose complete power he now so suddenly finds himself. The capturing unit may seek such information without in any way violating the provisions of the 1949 Convention, provided that it does not use any form of coercion and provided that if evacuates the prisoner of from the combat zone as soon as practicable.

(References omitted).

[111] GPW art. 15.

the Geneva Conventions allows *any* question to be posed to a prisoner of war, so long as the prisoner is not unlawfully compelled to give an answer.[112]

**Incentive / Incentive Removal.**  The incentive approach rewards the source for his cooperation.   According to FM 34-52, the approach is based on "the application of inferred discomfort upon [a detainee] who lacks willpower."[113]  It states that interrogators are not to withhold anything the prisoner is entitled to receive by right under the Geneva Conventions, but may withhold privileges.[114]  Under this view, it would be improper to use as an incentive something that is required for the health or survival of the detainee, such as adequate nutrition and necessary medical care.  However, comfort items  might serve as lawful incentives.[115]  For example, it would be improper to withhold water or food until a prisoner begins to cooperate, but

---

[112] *See id.* at 106-109; LOW DESKBOOK, *supra* note 10, at 83 (citing 15 UNITED NATIONS WAR CRIMES COMMISSION, LAW REPORTS OF TRIALS OF WAR CRIMINALS 101 n. 4 (1949)); Glod and Smith, *supra* note 47, at 145; ICRC COMMENTARY, *supra*, at 163-64.

[113] FM 34-52 at 3-14.  The 1987 version of the manual stated that the approach is accomplished by "satisfying the source's needs."  The 1992 version stresses that "[a]ny pressure applied in this manner must not amount to a denial of basic human needs under any circumstances," *id.* at 3-14, possibly indicating a change in military doctrine.  The interpretation that privileges may be used as an incentive may stem from GPW art. 17, which provides that POWs who refuse to provide the required information may be penalized with "a restriction of the privileges accorded to his rank or status." This has been interpreted to apply to "those contained in the provisions concerning special privileges to be accorded to officers, non-commissioned officers or persons with similar status."  *See* ICRC COMMENTARY III, *supra* note 8, at 159. The following provisions are said to qualify:
> Article 16: General clause referring to privileged treatment according to rank and age;
> Article 39, paragraph 3: Special provisions for saluting in the case of officers;
> Article 40: Wearing of badges of rank;
> Article 44: Special clause regarding treatment of officers;
> Article 45: Special clause regarding treatment of other prisoners of war according to rank and age;
> Article 49, paragraph 1: General conditions concerning labour: age reservation;
> Article 49, paragraph 2: Exemption from work for non-commissioned officers;
> Article 49, paragraph 3: Exemption from work for officers:
> Article 60: Advances of pay;
> Article 79, paragraph 2: Appointment of prisoners' representative in camps for officers and in mixed camps;
> Article 79, paragraph 3: Appointment of officers to administrative posts in labour camps;
> Article 87, paragraph 4: Requirement that the Detaining Power may not deprive a prisoner of war of his rank or prevent him from wearing his badges;
> Article 97, paragraph 3: Provision of quarters separate from those of non-commissioned officers and men for officers undergoing punishment;
> Article 104, paragraph 2: Notification of proceedings against a prisoner of war;
> Article 122, paragraph 4: Information transmitted by the Information Bureau.

*Id.* at 160-61. These restrictions, which apply only to the intentional refusal to give correct data *required* of POWs under art. 17, are said to be the "outer limit of the pressure which may be applied upon a prisoner of war incident to his interrogation."  *See* LEVIE, *supra* note 110, at 108.

[114] FM 34-52 at 3-14.

[115] *Id.* (suggesting that "luxury items" might include candy, fruit, or cigarettes).

it would not be improper to reward a cooperative prisoner with food he may regard as a "treat."

What qualifies as a "comfort item" or a "privilege" may be subject to debate, but the language of the Geneva Conventions suggests that in addition to items necessary for basic subsistence, items necessary for human dignity, such as clothing, would make inappropriate incentives.[116]  However, it might not be considered inhumane or degrading to compel prisoners to wear prison uniforms or clothing not to their particular liking, so long as the clothing is adequate for conditions (GPW art. 27) and the result is not degrading or dehumanizing.[117]  Such a practice might nonetheless breach other provisions, for example, GPW art. 18 (POWs are entitled to retain their personal articles other than weapons and military equipment not for personal protection or identification); GPW art. 40 (POWs are allowed to wear their badges of rank and nationality, as well as decorations); GPW art. 34 and GC 38 (right to practice religion); GC art. 27 (protected persons are entitled to respect for their religious convictions and practices, and their manners and customs).

FM 34-52 suggests that "realistic incentives" be used to establish rapport, such as "a meal, shower, [opportunity to] send a letter home" for the short term, or for the long term, repatriation or political asylum.[118]  Whether the use of "privileges" or "entitlements" is appropriate under the Geneva Conventions may depend on the circumstances.  Prisoners of war and interned civilians are entitled to adequate nutrition and hygiene, and, except for civilian internees who are definitely suspected of posing a security threat, to communicate with family members.  Making these privileges available (or varying their quantity and quality) based on the cooperation of each detainee during interrogations could run afoul of the GPW prohibition on disadvantageous treatment of any kind,[119] as well as other provisions outlining

---

[116] See Fay Report, *supra* note 18, at 10 ("The use of clothing as an incentive (nudity) is significant in that it likely contributed to an escalating "de-humanization" of the detainees and set the stage for additional and more severe abuses to occur.").

[117] The International Committee of the Red Cross (ICRC) reported as "ill-treatment" of prisoners at Abu Ghraib a method of securing cooperation whereby prisoners
> were "drip-fed" with new items (clothing, bedding, hygiene articles, lit cells, etc.) In exchange for their "cooperation". . . . Several had been given women's underwear to wear under their jumpsuit (men's underwear was not distributed), which they felt to be humiliating.

Report of the International Committee of the Red Cross (ICRC) on the Treatment by the Coalition Forces of Prisoners of War and Other Protected Persons by the Geneva Conventions in Iraq During Arrest, Internment and Interrogation § 3.2 (Feb. 2004) [hereinafter "ICRC Report"], *available at* [http://msnbcmedia.msn.com] (Sep. 1, 2004).

[118] FM 34-52 at 3-12.

[119] See Glod and Smith, *supra* note 47, at 152. By way of example, the authors posit that
> to interrogate subtly a hungry prisoner outside a mess hall would probably not contravene Article 17; however, if all other prisoners were fed and the one being interrogated was not, the action would be illegal because it would expose him to what Article 17 terms "unpleasant and disadvantageous treatment."

rights.[120]  For example, one U.S. court found that depriving POWs of any opportunity at all to communicate with the outside world amounted to "torture."[121]  However, allowing a cooperative detainee the opportunity to send three letters home per month, where other prisoners are only allowed to send the two required by GPW art. 71 and GC art. 107, may be permissible.

States whose prisoners of war have been subjected to the use of incentives to elicit information have criticized the technique as inhumane under the particular circumstances.  In describing the conditions to which the U.S. prisoners of war[122] held by North Korea were subjected, the Defense Department told Congress:

> Water was often scarce; bathing became difficult. Barracks were foul and unsanitary. In the best of the camps the men behind the barbed wire were sometimes given tobacco, a few morsels of candy, occasional mail. As will be noted, such items were usually offered as rewards for "cooperative conduct."[123]

A British report describing the lot of their POWs held by the Chinese noted that supplies of food, medicine, and standards of accommodation the POWs received depended "to a large extent on the degree of cooperation with their captors," and deplored the use of physical violence and solitary confinement as "incentives" for cooperation.[124]  The report also described how the Chinese manipulated mail as an inducement for cooperation, commenting that the refusal to allow POWs the chance to write home to let their families know they were alive was a breach of the Geneva Convention.[125]

---

[120] *See* 2003 Eritrea-Ethiopia Claims Commission (EECC): Partial Award on Prisoners of War (Ethiopia's Claim 4), *reprinted at* 42 ILM 1056, 1069 (2003) (Ethiopian POWs who were provided inadequate housing, sanitation, drinking water, bathing opportunities and food were entitled to compensation).

[121] *See* Acree v. Republic of Iraq, 271 F.Supp.2d 179, 185 (D.D.C. 2003), *vacated by* 370 F.3d 41(D.C.Cir. 2004) (failure to state a cause of action).
> No American POWs were permitted to notify their families of their capture and current state of health. As a calculated part of the torture of the POWs and their family members, Iraq refused all requests by both the POWs and the International Committee of the Red Cross ("ICRC") for notification of capture. For the POWs, this was a special dimension of the torture and mental anguish as they worried about their loved ones.

[122] The Geneva Conventions did not apply *de jure* to the war in Korea as not all parties had yet signed or ratified them.  North Korea and the United Nations Command declared their intention to apply the provisions in their treatment of prisoners of war.  The Chinese government took the position that United Nations troops were war criminals and thus not entitled to treatment as prisoners of war.

[123] Report by the Secretary of Defense's Advisory Committee on Prisoners of War (1955), *reprinted in* POW DOCUMENTS, *supra* note 31, at 643, 644.

[124] Ministry of Defence, United Kingdom, Treatment of Prisoners of War in Korea (1995), *reprinted in* POW DOCUMENTS, *supra* note 31, at 651, 652.  The aim of the treatment was not only to interrogate for intelligence information, but also to indoctrinate prisoners to the communist way of thinking and cause them to make confessions and statements for propaganda purposes.  *Id.* at 654.

[125] *Id.* at 660.

CRS-28

**Emotional Love / Hate.** Using the emotional approach, an interrogator seeks to exploit the source's emotions in order to override his rationale for resisting. According to FM 34-52, love or fear for one person may be exploited or turned into hate for someone else.[126] For the emotional love approach, the interrogator focuses on the source's anxiety brought on by his predicament. The interrogator then makes use of the love the source feels toward his family, homeland, comrades, etc., to devise an effective incentive, such as communication or promised reunification with the source's family, a quicker end to the war to save his comrades' lives, and so forth. FM 34-52 states that a "good interrogator will usually orchestrate some futility with an emotional love approach to hasten the source's reaching the breaking point. This places a burden on the source and may motivate him to seek relief through cooperation with the interrogator."

The emotional hate approach focuses on any genuine feelings of hatred, or possibly a desire for revenge, the source may feel toward his country's regime, his immediate superiors, officers in general, his fellow soldiers or the like. The interrogator might hint at an opportunity for revenge if the source cooperates and divulges certain information.

The manipulation of emotions as described does not seem to violate any prohibitions of the Geneva Conventions on its face. The success of the technique relies on the arts of perception and persuasion, which most commentators agree are not out of bounds. However, if the emotional love method, for example, were to involve threats against the lives of family members, for example, its use could contravene the Conventions' prohibitions of threats.

**Fear Up Harsh / Mild.** According to FM 34-52, the aim of the "increased fear up harsh" technique is to convince the source who appears to be hiding something that he does indeed have something to fear (not necessarily from the interrogator) and that he has no option but to cooperate. The interrogator will behave in a heavy, overpowering manner, using a loud and threatening voice, and perhaps throwing objects around the room to heighten the source's implanted feelings of fear.[127] Of the questioning methods approved by the manual, this approach is said to have greatest potential to violate the law of war,[128] presumably because it could lead to threats or violence against the subject.

The 'mild' version of the 'fear up' approach seeks to exploit circumstances that point to the interrogatee's involvement in some activity that could bring harsh punishment. The interrogator does not raise his voice or behave in an overbearing manner; instead, he uses a "credible distortion of the truth" as a subtle means to blackmail the subject into cooperating. The interrogator persuades the subject that he has good cause for fear under the circumstances, but the interrogator might intimate that he might be willing to conceal or alter the reported circumstances of the source's capture, as long as the source cooperates.

---

[126] FM 34-52 at 3-15.

[127] *Id*.

[128] *Id*. at 3-16.

**Reduced Fear.** The "decreased fear down" approach is to be used primarily on a source who is already in a state of fear. The technique involves calming the source and convincing him that he will be properly and humanely treated, or that he is safer in captivity than in combat, for example.[129] Using a soothing tone of voice, the interrogator attempts to create rapport with the source by engaging in small talk until the source is ready to answer more pressing questions. It is difficult to conceive of an implementation of this approach that would cause a violation of the Conventions.

**Pride & Ego Up / Down.** The "pride and ego" approach concentrates on tricking the source into revealing pertinent information through the use of flattery or abuse. The pride and ego up variation is used on sources who feel inferior, especially low ranking enlisted personnel or junior grade officers, who might respond to the opportunity to demonstrate their intellect or importance. The interrogator speaks as if he is very impressed with the accomplishments of the subject, engendering positive feelings on the source's part that he is finally getting the recognition he deserves. The source may reveal pertinent information in order to solicit more laudatory comments from the interrogator.

The "pride and ego down approach," in contrast, exploits a source's sense of inferiority by attacking the source's sense of personal worth, criticizing his loyalty, intelligence, abilities, technical competence, leadership qualities, slovenly appearance, or any other perceived weakness. The interrogator uses a sarcastic, caustic tone of voice to express distaste or disgust. If the tactic works, the source will become defensive and try to prove the interrogator wrong. In his attempt to vindicate his pride, according to FM 34-52, the source will usually involuntarily provide pertinent information.[130] The approach could contravene the Geneva Conventions' prohibition of insults and degrading treatment.

**Futility.** The "futility" approach is used to exploit the doubts and misgivings already in the source's mind to make him believe that it is useless to resist the interrogation efforts. FM 34-52 describes multiple techniques for accomplishing the desired effect.[131] By making the situation appear hopeless, the interrogator allows the source to rationalize his cooperation. This approach, as described, appears to be permissible as "guile," but extreme treatment designed to induce a feeling of overall futility could cause mental suffering severe enough to raise questions under the Geneva Conventions.

**We Know All.** The "we know all" approach involves making a source believe that the interrogator already knows everything about the source.[132] The interrogator compiles all available data on the source and his unit. The interrogator then asks questions to which he already has the answer. When the source refuses to answer or provides an incomplete or false response, the interrogator himself supplies the correct

---

[129] *Id.*

[130] FM 43-52 at 3-17.

[131] *Id.*

[132] *Id.* at 3-19.

CRS-30

answer. The interrogator tries to convince the source that all information is already known, so he may as well cooperate. When the source begins to give accurate and complete information, the interrogator begins interjecting questions for which he does not have the answers. This appears to be an unobjectionable tactic involving more wile than coercion, and seems to be widely accepted as legitimate.

**Establish Your Identity.** In the "establish your identity approach," the interrogator insists that the source has been identified as an infamous criminal who is merely posing as someone else to avoid punishment.[133] The source may be tricked into giving detailed information on his unit to establish or substantiate his true identity in order to refute the interrogator's allegations. The technique appears to involve trickery that might be acceptable under the Geneva Conventions, but could conceivably be applied in a threatening or coercive manner.

**Repetition.** The interrogator may repeat the same question many times in order to get a hostile source to cooperate.[134] The source becomes bored with the procedure and may give more complete and candid answers simply in order to gain relief from the monotony.[135] Taken to extremes, for example, during prolonged interrogations, it might be said to induce mental suffering

**File & Dossier.** The "file and dossier" approach is a variation of the "we know all approach," but uses a prop. Prior to the session, the interrogator prepares a dossier containing all available information obtained from records and documents concerning the source or his organization, possibly padding it with extra paper to create the illusion that it contains much more information than is really there. The interrogator confronts the source with the dossier, exploiting the known facts about the source to convince him that resistance would be futile.

**Rapid Fire.** FM 34-52 describes the "rapid fire" approach as a "psychological ploy based upon the principles that everyone likes to be heard when he speaks, and it is confusing to be interrupted in midsentence with an unrelated question."[136] One or two interrogators ask a series of questions without allowing the source time to answer them completely before the next question is asked. The source may become confused and contradict himself, which the interrogator can exploit by confronting the source with the inconsistencies. The source may reveal more than he intends in attempting to clarify his answers.

**Silence.** The silence approach involves an interrogator who says nothing to the source, but "looks him squarely in the eye, preferably with a slight smile on his face," in an effort to make the subject nervous and force him to break eye contact

---

[133] *Id.*

[134] *Id.* at 3-20.

[135] *Id.* at 3-20.

[136] *Id.*

first[137]. The source may begin to talk or ask questions to break the tension. When the interrogator eventually begins to ask questions, the subject may feel relieved and more willing to divulge information.

## Require CG's Approval

The methods listed below were authorized to be used under certain conditions but required the approval of the Commanding General. These methods are not described in FM 34-52, although some resemble techniques described as coercive by the CIA manual.[138] Some appear to involve the "environmental control" techniques of the sort that led to the revision of FM 34-52 in 1992,[139] to cause "debility,"[140] or fear. Some have argued that these techniques amount to torture, but Pentagon officials reportedly said that such methods can be applied within the framework of the Geneva Convention, as long as the prisoner's basic physical needs are met.[141]

**Change of Scenery Down.** For this technique, the interrogator removes the detainee from the standard interrogation setting to one that may be less comfortable, but would not constitute a "substantial change in environmental quality."[142] The purpose of a change of scenery is to throw the detainee off balance psychologically.

---

[137] *Id.*

[138] KUBARK Manual, *supra* note 62, at 85-86

> Little is gained if confinement merely replaces one routine with another. Prisoners who lead monotonously unvaried lives "... cease to care about their utterances, dress, and cleanliness. They become dulled, apathetic, and depressed." And apathy can be a very effective defense against interrogation. Control of the source's environment permits the interrogator to determine his diet, sleep pattern, and other fundamentals. Manipulating these into irregularities, so that the subject becomes disorientated, is very likely to create feelings of fear and helplessness.

[139] *See* Fay Report, *supra* note 18, at 16 (noting that detention policies in Iraq may have been based on the outdated 1987 version of FM 34-52). According to the report, the 1987 version could suggest to the untrained that the interrogator should control environmental factors, citing FM 34-52 (1987) Chapter 3:

> Establish and Maintain Control. The interrogator should appear to be the one who controls all aspects of the interrogation to include the lighting, heating, and configuration of the interrogation room, as well as the food, shelter, and clothing given to the source. The interrogator must always be in control, he must act quickly and firmly. However, everything that he says and does must be within the limits of the Geneva and Hague Conventions, as well as the standards of conduct outlined in the UCMJ.

[140] KUBARK Manual, *supra* note 62, at 92-93 (describing methods of inducing physical weakness, including "prolonged constraint; prolonged exertion; extremes of heat, cold, or moisture; and deprivation or drastic reduction of food or sleep").

[141] Department of Defense Background Briefing, May 14, 2004 (arguing that methods listed as requiring approval, if applied correctly and with appropriate oversight, and in conformity with the safeguards and as long as the baseline of the Geneva Conventions is maintained); *see Interrogation Guidelines*, Sydney Morning Herald, May 15, 2004.

[142] Department of Defense, Working Group Report on Detainee Operations 64, April 4, 2003, *available at* [http://www.pentagon.mil/news/Jun2004/d20040622doc8.pdf] (Sept. 1, 2004).

As long as it is not seen as punishment for failure to cooperate, and the environment does not fall below the standards for health and hygiene, a change of scenery would not seem to violate the Geneva Conventions.

**Dietary Manipulation.**  This technique involves changing the diet of a detainee, not in such a way as to deprive him of food or water, affect his health, or interfere with his religious practices.  This could involve a substitution of cold rations for hot, according to the DOD Working Group Report.  The object is probably to disorient the detainee by upsetting his regular routine.[143]

**Environmental Manipulation.**  This method involves alteration of the environment to create moderate discomfort, by means of adjusting the room temperature or introducing an unpleasant smell, without bringing about conditions that would injure the detainee.[144]

Subjecting prisoners of war to inhospitable climate conditions has long formed the basis for complaints about inhumane treatment in violation of the law of war.[145] Purposeful exposure of prisoners of war to temperature extremes for interrogation purposes has been found to be ill-treatment under the 1929 Geneva Conventions.[146]

**Sleep Adjustment.**  The detainee's ordinary sleep schedule is disturbed by, for example, reversing the sleep cycles from night to day, but without depriving the detainee of sleep.  The method likely induces a feeling of disorientation similar to "jet lag."  "Sleep management" for a maximum of 72 hours was approved for use at Abu Ghraib with the commander's approval.  The DOD Working Group distinguished "sleep management" from "sleep deprivation," which it defined as

---

[143] KUBARK Manual, *supra* note 62, at 86: "The point is that man's sense of identity depends upon a continuity in his surroundings, habits, appearance, actions, relations with others, etc. Detention permits the interrogator to cut through these links and throw the interrogatee back upon his own unaided internal resources."

[144] General Counsel of the Department of Defense, Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operational Considerations 64 (April 2003)[hereinafter "DODWG"], *available at* [http://www.defenselink.mil/news/Jun2004/d20040622doc8.pdf].

[145] 6 Journal of the Confederate Conference, 142 (February 24, 1863) (quoting Chicago Times newspaper article report that twelve Confederate prisoners at Camp Douglas were frozen to death).  The following resolution was proposed:
> Whereby it appears that twelve prisoners of the Confederate Army in the hands of the Abolition authorities of the United States have been murdered by forcibly confining them in a rigorous climate, in intensely cold weather, without any adequate means for their protection and the preservation of their lives, against the severity of the Northern climate into which they were forcibly taken: Therefore, it is
> Resolved, That the President be requested to cause inquiry to be made by one of our commissioners for the exchange of prisoners, or by such other means as he may deem expedient, whether the facts stated in said article are true, and if true, whether said fact, that he be requested to take proper steps to retaliate upon the enemy for their worse than brutal murder.

[146] *See* POW DOCUMENTS, *supra* note 31, at 291(discussing Trial of Erich Killinger and Four Others (British Military Court, Wuppertal at Germany, 1945)).

CRS-33

"[k]eeping the detainee awake for an extended period of time (allowing individual to rest briefly and then awakening him, repeatedly) NOT to exceed four days in succession."[147]  The DOD Working Group noted, "as a matter of policy," that other nations consider sleep deprivation to amount to torture or cruel, inhuman, or degrading treatment.[148]

Sleep deprivation is an age-old method for weakening the subject physically. However, the CIA manual recommended sleep disruption as a more effective method of coercion:

> Another objection to the deliberate inducing of debility is that prolonged exertion, loss of sleep, etc., themselves become patterns to which the subject adjusts through apathy. The interrogator should use his power over the resistant subject's physical environment to disrupt patterns of response, not to create them. Meals and sleep granted irregularly, in more than abundance or less than adequacy, the shifts occurring on no discernible time pattern, will normally disorient an interrogatee and sap his will to resist more effectively than a sustained deprivation leading to debility.[149]

**Isolation.** The detainee would be isolated from other detainees (for no longer than 30 days[150]), but otherwise complying with the basic standards of treatment. The DOD Working Group recommended isolation as an "exceptional"[151] technique, and

---

[147] DODWG, *supra* note 144, at 64.

[148] *Id.* at Annex *Summary of Analysis and Recommendations Detainee Interrogation Working Group Pertaining to Unlawful Combatants Outside of the U.S.*, n.24 (citing Concluding Observations of the Committee against Torture, U.N. Doc. A152/44, paragraphs 253-260; Judgment on the Interrogation Methods Applied by the GSS, Nos HC 5100/94, HC 4054/95, HG 5188/96, HG 7563197, HG 7628/97, HG 1043199 (Sup Ct of Israel, sitting as the High Court of Justice, Sep 6, 1999; Ireland v. United Kingdom, 25 Eur. Ct. H.R. (Ser. A) (1978)).

[149] KUBARK Manual, *supra* note 62, at 93.

[150] The DOD Working Group notes that isolation for interrogation purposes is "not known to have been generally used for . . . longer than 30 days." DODWG, *supra* note 144, Annex at 6.  According to the CIA manual, isolation becomes ineffective after a certain period of time, depending on the individual.  *See* KUBARK Manual, *supra* note 62, at 87 ("Little is known about the duration of confinement calculated to make a subject shift from anxiety, coupled with a desire for sensory stimuli and human companionship, to a passive, apathetic acceptance of isolation and an ultimate pleasure in this negative state.").

[151] The DOD Working Group recommended the following limitations for "exceptional" techniques to be used on persons deemed to be "unlawful combatants":
    (i) limited to use only at strategic interrogation facilities;
    (ii) there is a good basis to believe that the detainee possesses critical intelligence;
    (iii) the detainee is medically and operationally evaluated as suitable (considering all techniques to be used in combination):
    (iv) interrogators are specifically trained for the techniques;
    (v) a specific interrogation plan (including reasonable safeguards, limits on duration, intervals between applications, termination criteria and the presence or availability of qualified medical personnel) has been developed;
    (vi) there is appropriate supervision: and

(continued...)

CRS-34

noted that its use could implicate the definitions of torture or cruel, inhumane and degrading treatment under CAT,[152] and that, if applied to POWs, it would violate articles 13 (prohibiting intimidation), 14 (requiring respect for the person), 34 (prohibiting coercion) and 126 (entitlement to access and basic standards of treatment).[153]

**Presence of Military Working Dogs.** Introducing the presence of military dogs without directly threatening action or endangering the detainee was suggested as a method for creating anxiety but not terror or mental trauma.[154] The DOD Working Group framed the technique as an example of "increasing anxiety by use of aversions," which it flagged as inconsistent with policies followed by U.S. allies and possibly violating the CAT.

**Sensory Deprivation.** The DOD Working Group did not describe "sensory deprivation," but the CIA manual offered a discussion of it as a byproduct of solitary confinement and isolation:

> The chief effect of arrest and detention, and particularly of solitary confinement, is to deprive the subject of many or most of the sights, sounds, tastes, smells, and tactile sensations to which he has grown accustomed.[155]

Artificially limiting the extent to which a person is able to sense his environment has been found to induce stress and when taken to the extreme, can cause hallucinations and delusions.

> The apparent reason for these effects is that a person cut off from external stimuli turns his awareness inward, upon himself, and then projects the contents of his own unconscious outwards, so that he endows his faceless environment with his own attributes, fears, and forgotten memories. [One expert] notes, "It is obvious that inner factors in the mind tend to be projected outward, that some of the mind's activity which is usually reality-bound now becomes free to turn to phantasy and ultimately to hallucination and delusion."[156]

The CIA theorized that

> The more completely the place of confinement eliminates sensory stimuli, the more rapidly and deeply will the interrogatee be affected. Results produced only after weeks or months of imprisonment in an ordinary cell can be duplicated in

---

[151] (...continued)
(vii) there is appropriate specified senior approval for use with any specific detainee (after considering the foregoing and receiving legal advice).
DODWG, *supra* note 144, at 70.

[152] DODWG, *supra* note 144, Annex at 6 (noting isolation could transgress treaty obligations unless carried out with proper safeguards).

[153] *Id.* n. 15.

[154] DODWG, *supra* note 144, at 65.

[155] KUBARK Manual, *supra* note 62, at 87.

[156] *Id.* at 87.

hours or days in a cell which has no light (or weak artificial light which never varies), which is sound-proofed, in which odors are eliminated, etc. An environment still more subject to control, such as water-tank or iron lung, is even more effective.[157]

**Stress Positions.** The DOD Working Group did not define stress position, but suggested "prolonged standing" (not to exceed four hours in a 24-hour period), which it described as lengthy standing in a "normal" position (non-stress). . .not enforced by physical restraints.[158] Prolonged standing is explicitly prohibited against civilian internees as inhuman treatment.[159] The use of stress positions has been found to constitute torture or cruel, inhumane and degrading treatment in the past. The KUBARK manual included prolonged standing in its discussion of "coercive interrogation" methods, recommending that a subject's "resistance is likelier to be sapped by pain which he seems to inflict upon himself" rather than by direct torture, and suggests forcing the detainee to stand at attention for long periods of time.[160] It seems likely that the use of stress positions would violate the Geneva Conventions for all categories of persons under their protection if were to induce the requisite amount of suffering or humiliation, but the extent of suffering necessary to cross that line is not firmly established.

**Removal of Clothing.** Depriving detainees of clothing probably serves to divest them of their identity, but could endanger a detainees health depending on environmental conditions. The DOD Working Group stated its goal as creating a feeling of helplessness and dependence, but cautioned "it must be monitored to ensure the environmental conditions are such that this technique does not injure the detainee."[161] Forced nudity without threats or sexual assault may not rise to the level of an "outrage upon human dignity," but would probably be considered inhumane and degrading.

**Removal of All Comfort Items, Including Religious Items.** This technique is a harsher version of the "Removal of Incentives" approach described above. Whether it violates the Geneva Conventions depends on the nature of the items considered to fall under the "comfort" rubric. The removal of religious items could entail a violation of GC art. 27, providing that protected persons are entitled to respect for their religious convictions and practices, or GPW art. 14, respect for the person of the prisoner of war.

---

[157] *Id*. at 87-88 (citing research that found "... that isolation per se acts on most persons as a powerful stress . . . .  The symptoms most commonly produced by isolation are superstition, intense love of any other living thing, perceiving inanimate objects as alive, hallucinations, and delusions").

[158] DODWG, *supra* note 144, at 65.

[159] GC art. 100; *see* ICRC Commentary II, *supra* note 17, at (". . .anything which attacks the internees' personal dignity without being necessary for security reasons, is to be banned as inhuman.").

[160] KUBARK Manual, *supra* note 62, at 94.

[161] DODWG, *supra* note 144, at 65.

**Forced Grooming.**  The DOD Working Group described forced grooming as shaving of hair or beard (accomplished without risking injury to the detainee).  It may be viewed as a violation of the respect for the person under GPW art. 14, or as a violation of a prisoner's religious rights under GC art. 27.  By itself, it would not seem to constitute an outrage on human dignity,[162] but could be seen as inhumane or degrading.

**Use of Scenarios Designed to Convince the Detainee that Death or Severely Painful Consequences are Imminent.**  This technique was listed as a "Category III technique" that could only be used to interrogate the most uncooperative detainees at Guantanamo with the approval of the Commanding General.[163]  Category III techniques also included exposure to cold weather or water (with medical monitoring) and "the use of a wet towel and dripping water to induce a feeling of suffocation."[164]  There seems to be little doubt that such methods would violate the Geneva Conventions,[165] as constituting coercion, threats, and possibly mental torture.[166]  As such, these techniques are also likely to be considered inhumane by Geneva Convention standards.

---

[162] In one case against Japanese non-commissioned officers tried by an Australian military tribunal, a finding of maltreatment was aggravated by the fact that, after beating the prisoners unconscious, the defendants had cut off their hair and beards.  The court noted that the prisoners were "Indians, of the Sikh religion, which forbids them to have their hair or beards removed..." *See* Trial of Tanaka Chuichi, 11 LRTWC 62 (Australian Military Court, Rabaul, July 12, 1946), *excerpted in* POW Documents, *supra* note 31, at 344.

[163] *See* Memorandum, "Counter-Resistance Strategies," Department of Defense Joint Task Force 170, Oct. 11, 2002 [hereinafter "JTF-170 Memo"].

[164] *Id*. at 2.

[165] A legal brief attached to the JTF-170 Memo did not analyze the techniques with reference to the Geneva Convention because the Administration had determined they do not apply. *See id*. at encl.1.

[166] *See* KUBARK Manual, *supra* note 62, at 92.  While listing "threats and fear" among the coercive interrogation techniques, the CIA did not recommend threats of death:

> The threat of death has often been found to be worse than useless. It "has the highest position in law as a defense, but in many interrogation situations it is a highly ineffective threat. Many prisoners, in fact, have refused to yield in the face of such threats who have subsequently been 'broken' by other procedures." The principal reason is that the ultimate threat is likely to induce sheer hopelessness if the interrogatee does not believe that it is a trick; he feels that he is as likely to be condemned after compliance as before. The threat of death is also ineffective when used against hard-headed types who realize that silencing them forever would defeat the interrogator's purpose. If the threat is recognized as a bluff, it will not only fail but also pave the way to failure for later coercive ruses used by the interrogator. (Internal citations omitted).